### IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF INDIANA INDIANAPOLIS DIVISION

| | |
|---|---|
| **KATHY McCORD**, | No. <u>1:23-cv-866</u> |
| *Plaintiff,* | |
| v. | |
| **SOUTH MADISON COMMUNITY SCHOOL CORPORATION**, | **VERIFIED COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |
| *Defendant.* | |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................ 1

PARTIES ............................................................................................ 3

JURISDICTION AND VENUE ......................................................... 5

FACTUAL BACKGROUND .............................................................. 5

I.    Mrs. McCord serves students in the South Madison Community School Corporation with distinction for decades. ........................ 6

II.   South Madison adopts a new policy requiring employees to create and implement Gender Support Plans for students without their parents' involvement or consent. ........................ 8

      A.   The Gender Support Plan policy requires so-called "social transition" of students—even without parental knowledge or consent. .................................................... 9

      B.   South Madison forces Mrs. McCord to participate in Gender Support Plans despite her objections. .................................... 15

III.  Tipped off by a community member, a journalist investigates South Madison's Gender Support Plan policy. ........................ 17

      A.   Near the end of his investigation, the journalist asks Mrs. McCord for an interview. ........................................ 18

      B.   Mrs. McCord reluctantly agrees to meet with the journalist for an interview. ........................................ 21

      C.   Based on information from Mrs. McCord and other sources, the journalist publishes articles detailing South Madison's Gender Support Plan policy. ........................ 23

IV.   After the Pendleton community expresses outrage about the Gender Support Plan policy, South Madison begins proceedings to fire Mrs. McCord. ........................................ 28

      A.   Mrs. McCord's supervisors question her about her interview with the journalist. ........................................ 29

      B.   Mrs. McCord receives a letter from her school's principal alleging that her interview with the journalist and her statements about that interview justify firing her. ........................ 32

i

    C.    Mrs. McCord provides an initial response to South Madison's alleged reasons for firing her. ................................................. 36

    D.    The school board holds a hearing and then votes to fire Mrs. McCord. ..................................................................................... 44

V.    Participating in the Gender Support Plan policy violates Mrs. McCord's sincerely held religious beliefs and her understanding of how best to care for students ................................................................................................ 48

    A.    Mrs. McCord's faith prohibits affirming untrue ideas about sex and gender or hiding important information from parents. ................ 48

    B.    Mrs. McCord believes the Gender Support Plan policy hurts, rather than helps, at-risk young people. ............................... 51

STATEMENTS OF LAW ............................................................................ 52

FIRST CAUSE OF ACTION ...................................................................... 54

SECOND CAUSE OF ACTION .................................................................. 57

THIRD CAUSE OF ACTION ...................................................................... 60

FOURTH CAUSE OF ACTION ................................................................. 62

FIFTH CAUSE OF ACTION ....................................................................... 65

JURY DEMAND ........................................................................................ 66

PRAYER FOR RELIEF .............................................................................. 66

VERIFICATION OF COMPLAINT ........................................................... 69

**INTRODUCTION**

The South Madison Community School Corporation fired school counselor Kathy McCord, despite her decades of stellar service to Pendleton's students, because she spoke to a reporter about South Madison's controversial policy regarding students' gender identity. But Mrs. McCord, like any other public employee, did "not surrender all [her] First Amendment rights by reason of [her] employment" with South Madison. *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). Retaliating against Mrs. McCord for speaking as a private citizen about a matter of public concern, South Madison violated her constitutional rights.

In August 2021, South Madison adopted a new policy and practice regarding the use of names and pronouns for students that do not correspond with their sex. Prior to this new policy, South Madison employees would notify a student's parents and seek their consent before using cross-gender names or pronouns for the student. According to the new policy, South Madison required counselors like Mrs. McCord to use a form called a "Gender Support Plan" to document whenever the school decided to begin using cross-gender names or pronouns for a student and whether the school would notify a student's parents. The new policy did not require parental consent, or even parental notification, to change a student's name and pronouns, although such action is part of the psychotherapeutic intervention sometimes called "social transition."

Mrs. McCord explained to her supervisors that she objected to South Madison's Gender Support Plan policy. Above all, she objected to its requirement that she not seek parental consent before South Madison used cross-gender names and pronouns for a student. But Mrs. McCord's supervisors told her she had no choice: if she wished to keep her job, then she had to participate in the Gender Support Plan policy.

1

Mrs. McCord objected for good reason. This policy implicates core issues related to the developing identity of young people: What does it mean to be a boy or a girl? Can a person change sexes? How should parents shape their child's identity? A debate rages in Indiana and across the United States—indeed, around the world—about whether policies like South Madison's harm kids struggling with these questions. Even some who generally believe schools should use cross-gender names and pronouns for students nevertheless object to schools taking this action without parental involvement.

South Madison, however, tried to short circuit this debate. It instituted this new policy without consulting the community. It quietly began using cross-gender names and pronouns for students—in some cases without their parents' knowledge or consent. It did not present the Gender Support Plan policy for debate at a school board meeting. And the form at the heart of this policy, the Gender Support Plan itself, appeared nowhere on South Madison's website.

Notwithstanding South Madison's lack of disclosure, some in the community eventually heard about the Gender Support Plan policy and tipped off a journalist. Before this journalist ever communicated with Mrs. McCord, someone other than her gave him a blank copy of a Gender Support Plan and a redacted copy of an email from Mrs. McCord to a group of teachers. Mrs. McCord's email informed those teachers that South Madison had begun to use a new name and cross-gender pronouns for a particular student. But South Madison had not informed the parents of that student, the email went on to say. Based on what Mrs. McCord was ordered to do, she instructed the student's teachers not to inform the student's parents.

A few days before publishing his first article about the Gender Support Plan policy, the journalist approached Mrs. McCord for a comment. He told her he would run the article—featuring her email—with or without interviewing her. And she

2

realized that, taken out of context, her email would leave readers with the impression that she supported the policy. But Mrs. McCord has never supported the policy. In fact, participating in this policy violates her sincerely held religious beliefs. She did it during the 2021–2022 school year only because her supervisors told her she had no choice. So Mrs. McCord spoke with the reporter to explain her views as a member of the community about the Gender Support Plan policy. She never held herself out as speaking on behalf of South Madison, something beyond her authority as a high school counselor.

The reporter published his article exposing the Gender Support Plan policy to the community. A few days later, at the next school board meeting, members of the community expressed outrage that South Madison had implemented this policy without any public debate or even notice to all the families directly involved. A week after that meeting, South Madison began the process of terminating Mrs. McCord's employment, when the superintendent began questioning her about the interview. South Madison would ultimately tie its decision to fire Mrs. McCord directly to the journalist's article.

South Madison fired Mrs. McCord for exercising her constitutional rights. And even before its unconstitutional retaliation, it compelled her to speak a viewpoint that violates her religion. For decades, Mrs. McCord loved helping students—and excelled at it. Today, she just wants to get back to a school to help more kids. Therefore, she brings this Complaint for injunctive, declaratory, compensatory, and nominal relief.

## PARTIES

1.     Plaintiff Kathy McCord is a resident of Henry County, Indiana, and a citizen of the United States.

2.      Defendant South Madison Community School Corporation ("SMCSC" or "South Madison") is organized under the laws of the State of Indiana and located in Pendleton, Indiana.

3.      South Madison operates five schools, all located in Madison County, Indiana; three located in the town of Pendleton.

4.      South Madison is a political subdivision of the State of Indiana.

5.      The Board of School Trustees of the South Madison Community School Corporation ("the School Board") is South Madison's "governing body." SMCSC Policy Manual 0111 (July 21, 2011), https://bit.ly/3VUMyPv.

6.      South Madison is "a body corporate, and, as such, capable of suing and being sued," SMCSC Policy Manual 0122 (rev. Aug. 4, 2016), https://bit.ly/42s63RU, and the School Board, "acting on the school corporation's behalf" and "[i]n the name of the school corporation," has the power "to sue and be sued," Ind. Code § 20-26-5-4(a)(1); *see* SMCSC Policy Manual 0122 (vesting School Board with power to "exercise all powers" of School Corporation).

7.      The School Board, "acting on the school corporation's behalf," also has the power "[t]o take charge of, manage, and conduct the educational affairs of the school corporation." Ind. Code § 20-26-5-4(a)(2).

8.      The School Board, acting on South Madison's behalf, has exercised that power to establish policies that govern South Madison, including the policies and practices at issue in this lawsuit.

9.      The School Board, "acting on the school corporation's behalf," has the power to "[e]mploy, contract for, and discharge . . . teachers," among other employees of the School Corporation. *Id.* § 20-26-5-4(a)(8)(A); *see id.* § 20-18-2-22 (defining "teacher" to include school counselors and other educators).

10.     South Madison was Mrs. McCord's employer until March 9, 2023.

4

11.    The School Board, acting on South Madison's behalf, has exercised the power to terminate Mrs. McCord's employment contract.

## JURISDICTION AND VENUE

12.    This civil-rights action raises federal questions under the U.S. Constitution, namely its First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983; and, it also raises claims under Indiana's Religious Freedom Restoration Act, Ind. Code §§ 34-13-9-0.7 through -11.

13.    This Court thus has original subject-matter jurisdiction over this action, 28 U.S.C. §§ 1331, 1343, and personal jurisdiction over Defendant, Ind. R. Trial P. 4.4(A).

14.    This Court has supplemental jurisdiction over Plaintiff's state-law claim. 28 U.S.C. § 1367; *see* Ind. Code § 34-13-9-9 (creating a private cause of action for violations of Indiana's Religious Freedom Restoration Act).

15.    Venue is proper in this District and Division, because Defendant resides in this Division, 28 U.S.C. § 1391(b)(1), (c)(2); and because all the events giving rise to Plaintiff's claims occurred within this Division, *id.* § 1391(b)(2). *See id.* § 94(b)(1) (establishing this Division's boundaries).

16.    This Court has authority to award the requested damages, *id.* § 1343; the requested declaratory relief, *id.* §§ 2201–02; *see* Fed. R. Civ. P. 57; the requested equitable relief, 28 U.S.C. § 1343; *see* Fed. R. Civ. P. 65; and, costs and attorneys' fees, 42 U.S.C. § 1988; *see* Fed. R. Civ. P. 54. *See also* Ind. Code § 34-13-9-10 (providing relief for violations of Indiana's Religious Freedom Restoration Act).

## FACTUAL BACKGROUND

17.    South Madison adopted and maintained a Gender Support Plan policy requiring its employees to follow a "gender support plan" that calls for participation in the so-called "social transition" of students who express a "gender identity"

5

inconsistent with their sex by using names and pronouns inconsistent with the students' sex and legal name. *See* Ex. 1 (reproducing a blank copy of South Madison's Gender Support Plan).

18.    This same policy also requires South Madison employees who are assisting with socially transitioning a student to continue using correct pronouns and the student's legal name when communicating with the student's parents, unless a school counselor has determined that the parents will agree with and promote a social transition.

19.    When Mrs. McCord objected to these new requirements, which compelled her to speak in ways that violate her sincerely held religious beliefs, her supervisors and the teachers' union told her, if she wanted to remain a school counselor, then she had no choice but to comply.

20.    Despite refusing to accommodate Mrs. McCord's religious beliefs, South Madison excused other employees from the Gender Support Plan policy based on nonreligious objections.

21.    When Mrs. McCord spoke to a journalist about the policy and her objections to it, South Madison terminated her employment based on her speech.

**I.    Mrs. McCord serves students in the South Madison Community School Corporation with distinction for decades.**

22.    Mrs. McCord has served Indiana students and their families for over 37 years.

23.    She began her career as a middle school math teacher in the 1985–1986 school year, eventually adding science to her teaching repertoire before obtaining her M.A. in Counseling Psychology.

24.     After Mrs. McCord completed her graduate studies, the South Madison Community School Corporation hired her as a school counselor at Pendleton Heights High School starting in the 1998–1999 school year.

25.     As a school counselor, Mrs. McCord had a group of students assigned to her based on the first letter of their last names, and it was her role to help them with many issues, including preparation for college or a career, scheduling each year's classes, and supporting them as they managed the everyday crises of high school life.

26.     Mrs. McCord and the two other high school counselors, Mike Taylor and Ashley Zukowski, each covered one-third of the alphabet.

27.     At the time of the events described in this Complaint and also at the time of filing, Mr. Taylor was the director of counseling at Pendleton Heights High School, classified as an administrator by South Madison—unlike Mrs. McCord and Mrs. Zukowski—and the direct supervisor of Mrs. McCord and Mrs. Zukowski.

28.     During Mrs. McCord's 25 years with South Madison schools, Pendleton Heights High School has become like her second home, and its students and staff like her second family.

29.     Mrs. McCord has maintained consistently positive relationships with the administration, staff, students, and parents in South Madison.

30.     Before the proceedings to fire her based on her conversation with a reporter, Mrs. McCord had never faced any disciplinary proceedings—or even a single complaint.

31.     Mrs. McCord received consistently positive evaluations from her supervisors; as recently as June 2022, Mr. Taylor rated Mrs. McCord "Highly Effective"—the highest rating available.

32.     Students also consistently recognized Mrs. McCord's positive impact, naming her many times as a "Most Influential Educator" at the annual "Top 10% Banquet," which celebrated successful students and the educators who supported them.

33.     Mrs. McCord has always been involved in the lives of her students and colleagues, creating many student programs, and organizing retirement parties, wedding and baby showers, and Christmas luncheons for school staff.

34.     Last spring, Mrs. McCord and her grandson even drove back and forth across central Indiana—traveling over 900 miles—to deliver homemade cookies to school staff just to ensure they felt appreciated.

35.     Mrs. McCord has also devoted herself to serving the broader community in Madison and Henry Counties: as a certified emergency medical technician and member of nearby Middletown's all-volunteer emergency medical services unit (an experience that also led Mrs. McCord to join South Madison's emergency response team); as a mental health crisis volunteer certified by the American Red Cross; as a Court Appointed Special Advocate for children in Henry County; and as a volunteer—eventually a board member and an officer—for Outfitters, a local nonprofit that provides clothes for needy schoolchildren.

36.     Mrs. McCord planned to wait until at least 2026 to retire, when her grandson expects to graduate from Pendleton Heights High School.

37.     That changed when South Madison fired Mrs. McCord for giving an interview about its Gender Support Plan policy.

## II.     South Madison adopts a new policy requiring employees to create and implement Gender Support Plans for students without their parents' involvement or consent.

38.     The 2021–2022 school year began like any other, with Mrs. McCord and her colleagues returning to school to prepare for students' arrival.

8

39.     On September 3, 2021, the School Corporation required Mrs. McCord, the other high school counselors, and select administrators—including Mrs. McCord's direct supervisors—to attend an in-person training focused on issues regarding gender and sexuality.

40.     During that training, they watched a video that discussed South Madison's new policy for employees governing their behavior whenever a student wished to express a "gender identity" inconsistent with that student's sex.

41.     To comply with this new policy, which South Madison had begun to roll out in August 2021 and differed significantly from prior policies and practices as detailed below, Mrs. McCord would have to begin using a new document called a "Gender Support Plan" with students who wished to express at school a "gender identity" inconsistent with their sex.

**A.     The Gender Support Plan policy requires so-called "social transition" of students—even without parental knowledge or consent.**

42.     The September 2021 training instructed Mrs. McCord and her colleagues, as part of a new policy, to use a new document called a "Gender Support Plan" when a student expressed a gender identity inconsistent with that student's sex.

43.     This new Gender Support Plan policy required employees to socially transition students by using cross-gender names and pronouns for students upon request and, in some cases, to socially transition students without parental consent or notification.

44.     In the required September 2021 training, which Mrs. McCord attended in person with some of her direct supervisors, Mrs. McCord was shown a video that instructed her that "a person become[s] 'trans' . . . [w]hen they say so," as demonstrated by the slide reproduced on the following page:

9



45.    The training also instructed that it can be "discrimination" in violation of federal law to refuse to socially transition a student or to express "any religious objection or personal beliefs about transgender students," as illustrated below:



46.    Regarding parental consent or notification, this training instructed Mrs. McCord that South Madison employees needed to "[b]e cognizant of 'outing' [a] student" undergoing social transition to her parents, and that employees had "[n]o legal obligation to proactively inform parents" about a school's use of a cross-gender name or pronouns to socially transition a student, as shown on this slide:



47.    The information in this September 2021 training and the related instructions that Mrs. McCord received after that training from Mr. Taylor and other administrators was a significant departure from South Madison's old policies and practices.

48.    Prior to this new "Gender Support Plan policy," when a student requested that school employees refer to the student by a cross-gender name or pronouns the School Corporation required counselors like Mrs. McCord:

(a)    To call the student's parents and inform them of this request; and,

(b)    If the parents consented to the student's request, then inform the students' teachers of the student's request.

11

49.     The instruction Mrs. McCord received during the September 2021 training and in follow-up instructions from her supervisors was that South Madison's new Gender Support Plan policy established entirely different requirements for Mrs. McCord and her colleagues, including requirements that employees engage in the so-called "social transition" of students by using cross-gender names and pronouns for students—in reality, a controversial psychotherapeutic intervention—without the knowledge or consent of parents, and that employees avoid actions that would inform parents of the social transition.

50.     Under the Gender Support Plan policy, whenever an employee heard a student may be questioning their gender identity at school, that employee needed to notify the school counselor assigned to that student.

51.     South Madison then required counselors to facilitate the student's social transition by completing a Gender Support Plan for the student. *See* Ex. 1.

52.     The first page of the Gender Support Plan asks, among other things, for: the "Student's Preferred Name" and "Legal Name"; the "Student's Preferred Pronouns"; the "Student's Gender"; and, his or her "Assigned sex at birth." *Id.* at 1.

53.     The first page also asks two questions about the student's parents:

    (a)     "Are parent(s)/guardian(s) of this student aware"?; and,

    (b)     "Are parent(s)/guardian(s) supportive of their child's gender status?"

*Id.*

54.     Below is an excerpt from the first page of a Gender Support Plan:

**Gender Support Plan**

-CONFIDENTIAL-

The purpose of this document is to create shared understandings about the ways in which the student's gender-related accommodation requests will be accounted for and supported at school. School staff, caregivers, mental health support, and the student should work together to complete this document. This document may be updated any time when requested by student, caregiver, and/or staff.

School _____    Today's Date _____
Student's Preferred Name _____
Student's Legal Name _____
Student's Gender _____ Assigned sex at birth _____ DOB _____ Grade Level_____
Student's Preferred Pronouns _____
Parent(s)/Guardian(s)/Caregiver(s) - Relation to student
_____
_____

Meeting Participants
_____
_____

History of transition _____
    tudent under the care of a medical professional _____

Are parent(s)/guardian(s) of this student aware ____ Yes _____ No
Are parent(s)/guardians(s) supportive of their child's gender status? ____ Yes _____ No

*Id.*

55.     On this same page, the Gender Support Plan also asks: "How public or private will information about this student's gender be (check all that apply)?"; and then it lists options including, "District staff will be aware (Superintendent, etc. . . )," and, "May share Gender Support Plan when student is promoted to the next school" or "if the student transfers." *Id.* (ellipsis in original).

56.     The second page asks whether there are "[a]ny family dynamics to consider." *Id.* at 2.

13

57.     When a counselor completing a Gender Support Plan learned that a student's parents had either not received notice of or not given consent to the social transition, South Madison nonetheless required the counselor and other employees to proceed with socially transitioning the student at school.

58.     Not only that, in such situations, South Madison required employees to take steps to prevent such parents from discovering that South Madison was socially transitioning the student at school.

59.     The counselors were required to inform a student's teachers about South Madison's social transition of the student, including informing the teachers of what name and pronouns to use when referring to the student.

60.     And if the student's parents had either not received notice or not given consent to South Madison's social transition of the student, then Mrs. McCord and the other counselors were required to instruct the teachers not to inform the student's parents about the social transition.

61.     For example, in October 2021, Mrs. McCord emailed Andrew Kruer, the assistant superintendent overseeing the Gender Support Plan policy, about one of her students whom South Madison had socially transitioned against the wishes of the student's mother. *See* Ex. 2 (reproducing this email exchange).

62.     In that email, Mrs. McCord recounted a conversation with the student's mother: "She [the mother] said she thought we knew that he was to go by [name redacted], his given name, and not his name of choice." *Id.* at 1.

63.     Because of the Gender Support Plan policy, Mrs. McCord had explained to the mother that South Madison was going to ignore this mother's instruction not to socially transition her child: "At that point I explained the new policy and that legally we had to honor what he was asking of us." *Id.*

14

64.    "Needless to say," Mrs. McCord told Mr. Kruer, "she is not happy at all." *Id.*; *see id.* (noting mother's comment: "He is supposed to be getting an education, not be part of a social experiment[.]").

65.    This aspect of the Gender Support Plan policy—hiding information from parents, ignoring their instructions about their own children—struck Mrs. McCord as particularly wrong.

66.    Before adopting the Gender Support Plan policy, South Madison had never asked Mrs. McCord to keep any information from a student's parents, and it expected her and other employees to obtain parental permission before taking a variety of other actions, from giving a student an aspirin to taking a student on a field trip.

**B.    South Madison forces Mrs. McCord to participate in Gender Support Plans despite her objections.**

67.    Because the Gender Support Plan policy departed so significantly from prior policies and practices, Mrs. McCord had many conversations with her supervisors about how to implement the policy, especially during the first year South Madison required Gender Support Plans, the 2021–2022 school year.

68.    During these conversations, Mrs. McCord explained her objections—rooted in her sincerely held religious beliefs—to participating in the Gender Support Plan policy.

69.    Assistant Superintendent Andrew Kruer played a key role in initially implementing the Gender Support Plan policy.

70.    Mr. Kruer was and remains the Assistant Superintendent for Secondary Curriculum, Instruction and College and Career Readiness, and South Madison's Title IX coordinator.

71.    The first school year of the policy, Mr. Kruer often came to the high school and met with many of the students for whom Mrs. McCord and the other counselors had completed Gender Support Plans.

72.    Mr. Kruer and Mrs. McCord would often discuss how to implement the Gender Support Plan policy.

73.    On at least two occasions, Mrs. McCord explained to Mr. Kruer that she objected to participating in the Gender Support Plan policy, because she viewed it as wrong to socially transition students, especially without their parents' knowledge or consent.

74.    Mrs. McCord also had many conversations with other counseling staff about implementing the Gender Support Plan policy, particularly with Mr. Taylor, her direct supervisor.

75.    In conversations with Mr. Taylor, Mrs. McCord frequently discussed her objections to the Gender Support Plan policy.

76.    On at least one occasion, Mrs. McCord had a detailed conversation with Mr. Taylor focused specifically on her objections to the policy, in particular that she believed it was wrong not to notify parents when school employees began to socially transition their children.

77.    Mr. Taylor responded that Mrs. McCord had to comply with the Gender Support Plan policy and socially transition students, with or without parental consent.

78.    Mrs. McCord eventually asked her representative with the Indiana State Teachers Association, the state teachers' union, whether she could refuse to participate in the Gender Support Plan policy based on her objections to it.

79.     Mrs. McCord's union representative told her that South Madison would treat it as insubordination if she did not participate in the Gender Support Plan policy.

80.     Despite this refusal to accommodate Mrs. McCord's religious objections to the Gender Support Plan policy, South Madison accommodated different objections made by other employees.

81.     For example, after a meeting with Mr. Taylor about a student's Gender Support Plan, one teacher became angry at being told to participate in the policy and voiced his objection to the former principal of Pendleton Heights High School, who told that teacher he did not have to comply with the Gender Support Plan policy or attend future meetings with Mr. Taylor.

82.     Additional South Madison employees received accommodations that allowed them not to participate in the Gender Support Plan policy.

83.     Despite this, South Madison gave Mrs. McCord no choice: a counseling job that required her to violate her beliefs, or no job at all.

84.     Throughout the 2021–2022 school year and the start of the 2022–2023 school year, South Madison's coercion of Mrs. McCord worked, and she followed the Gender Support Plan policy.

### III.   Tipped off by a community member, a journalist investigates South Madison's Gender Support Plan policy.

85.     Despite requiring all school counselors to use Gender Support Plans, South Madison did not present a blank copy of the Gender Support Plan at a School Board meeting for discussion with parents and other community members.

86.     Nor did South Madison post a blank Gender Support Plan on its website to inform parents of what such a Plan entailed.

87.     To this day, the School Corporation has not posted a Gender Support Plan on its website, for example, on its page explaining available "Mental Health Resources" to parents. S. Madison Cmty. Sch. Corp., *Mental Health Resources*, https://bit.ly/3IiGDyg (last visited May 17, 2023).

88.     Although South Madison made no public disclosures before it began to implement the Gender Support Plan policy, a local community member happened to learn about the policy and informed an Indiana-based journalist named Tony Kinnett.

89.     Mr. Kinnett launched an investigation into the Gender Support Plan policy and published multiple articles on its implementation in South Madison's schools based on information from multiple sources.

90.     If Mr. Kinnett had not published these articles, it is unclear whether South Madison would have given the community any information whatsoever about the Plans.

### A.     Near the end of his investigation, the journalist asks Mrs. McCord for an interview.

91.     On Wednesday, November 30, 2022, Mr. Kinnett left Mrs. McCord a voicemail on her school phone, asking to speak with her.

92.     Having never spoken to Mr. Kinnett before, Mrs. McCord did not know him or why he would be calling, so she didn't initially return his call.

93.     The next day things changed.

94.     That day, December 1, Mrs. McCord heard that an email she had sent earlier in the fall was circulating in the community, and although she didn't know the subject of the email in question, she concluded that this email must relate to Mr. Kinnett's voicemail and request to speak with her.

95.     So that same day, Mrs. McCord called Mr. Kinnett back.

96.    On this first call, Mr. Kinnett explained to Mrs. McCord that he had obtained a copy of an email sent by her to certain teachers at Pendleton Heights High School regarding a student who had asked to go by a different name and cross-gender pronouns as part of a social transition under the Gender Support Plan policy, and that he had already conducted off-the-record interviews with other school employees about Mrs. McCord's email.

97.    Mr. Kinnett also informed her that he intended to publish an article about Mrs. McCord's email and the Gender Support Plans just three or four days later, but he gave Mrs. McCord the opportunity to speak with him for his article.

98.    Mrs. McCord sent this email, dated August 16, 2022 (soon after students had returned to school on August 4) pursuant to the Gender Support Plan policy.

99.    Mrs. McCord and other school counselors sent other emails like it, and it is representative of the sorts of emails Mrs. McCord and the other school counselors sent to comply with the policy.

100.    A copy of this email is attached as Exhibit 3.

101.    Mr. Kinnett showed Mrs. McCord a copy of this email with every employee's name redacted except for the names of Mrs. McCord and "Mrs. Zukowski," which referred to Ashley Zukowski, the other high school counselor directly supervised by counseling director Mr. Taylor.

102.    At that time, Mrs. Zukowski was on maternity leave, so Mrs. McCord and Mr. Taylor, who served as the third high school counselor in addition to being the counseling director, were helping with Mrs. Zukowski's students along with their own.

103.    Mrs. McCord's email referred to Mrs. Zukowski because the student was one of Mrs. Zukowski's students.

19

104.    On Mr. Kinnett's copy of the email, that student's name was also redacted: "[Redacted] would like to be called '[redacted].' He prefers the pronouns He/Him." Ex. 3.

105.    This email gave employees instructions about communicating with the student's family: "[Redacted] family is not supportive of this decision so any correspondence home or in reference to the student should remain as [redacted]." *Id.*

106.    During the first year South Madison implemented the Gender Support Plan policy, the 2021–2022 school year, Mr. Taylor told Mrs. McCord not to send emails to teachers with information about South Madison's social transition of a student via a Gender Support Plan.

107.    Mr. Taylor instructed Mrs. McCord to inform teachers about a social transition only orally, citing concerns about the security of email.

108.    Mrs. McCord thought Mr. Taylor's instruction was unusual; he had never before instructed her to avoid discussing confidential student information by email, and when such discussions were necessary, it was Mrs. McCord and the other counselors' normal practice to conduct them by email.

109.    At the start of the 2022–2023 school year, however, because Mrs. Zukowski's maternity leave had reduced the three-counselor department down to two and increased each counselor's caseload, Mr. Taylor relaxed the instruction not to email teachers about social transitions.

110.    After Mr. Kinnett published his first article, Mrs. Zukowski's husband asked Mr. Kinnett to redact Mrs. Zukowski's name from the email, which Mr. Kinnett and his publisher agreed to do.

111.    Mr. Kinnett never offered to redact Mrs. McCord's name from the email prior to publishing his article detailing the Gender Support Plan policy.

112.    As a result, Mrs. McCord felt she had no choice but to go on the record with Mr. Kinnett to explain that she in fact objected to South Madison's Gender Support Plan policy.

### B.    Mrs. McCord reluctantly agrees to meet with the journalist for an interview.

113.    During Mrs. McCord's initial phone call with Mr. Kinnett, he told her that he had talked with Pendleton parents who had become concerned upon seeing her email about a social transition at Pendleton Heights High School.

114.    These parents worried that South Madison was implementing a policy requiring employees to socially transition students—a policy that most of the community knew nothing about, because it did not even appear on South Madison's website.

115.    Mr. Kinnett explained further that the parents who had seen this email understood it as evidence that South Madison had, in some cases, begun socially transitioning students without notifying their parents or seeking parental consent.

116.    After Mrs. McCord's initial call with Mr. Kinnett on Thursday, December 1, she agreed to meet with him that evening at her home.

117.    Mrs. McCord was committed to helping that evening with her church's weekly "Community Night" dinner, so she could not meet with Mr. Kinnett until 7:30 P.M.

118.    At the outset, Mr. Kinnett asked Mrs. McCord whether she would agree to speak to him on the record, although he told her he already had enough information about South Madison's Gender Support Plan policy that he planned to publish an article a few days later, over the weekend, whether or not she chose to go on the record.

119.    Mrs. McCord decided to speak with Mr. Kinnett on the record, because she feared that otherwise, Mr. Kinnett's article would give readers the wrong impression, based on the email Mr. Kinnett had obtained, that she supported the Gender Support Plan policy.

120.    The short interview consisted of Mr. Kinnett asking Mrs. McCord about her experience with the Gender Support Plan policy.

121.    Before interviewing Mrs. McCord, Mr. Kinnett had already spoken with local parents and also at least one other South Madison employee who asked to remain anonymous.

122.    As a result, Mr. Kinnett already had much information about the Gender Support Plan policy.

123.    In fact, during Mr. Kinnett's interview with Mrs. McCord, he revealed that he already had a hard copy of a document he represented was a blank copy of a Gender Support Plan.

124.    On initial review, Mrs. McCord believed this document to be an accurate copy of South Madison's Gender Support Plan, but Mrs. McCord knew that several school corporations in the area used the same or a similar form as their own gender support plan.

125.    To confirm that Mr. Kinnett's document was an accurate copy of the South Madison Gender Support Plan, Mrs. McCord used her computer to open a blank Gender Support Plan while Mr. Kinnett was at her house.

126.    Comparing his hard copy document with her electronic document, she confirmed that they were the same.

127.    Mr. Kinnett left Mrs. McCord's house around 9:00 P.M.

128.    Afterwards, because she anticipated that South Madison might retaliate against her once Mr. Kinnett published his story, Mrs. McCord down-

loaded a copy of the Gender Support Plan and the few emails she could find discussing students who had requested one.

129.    None of Mrs. McCord's supervisors or anyone else employed by South Madison had ever instructed her not to share a blank Gender Support Plan with anyone, so Mrs. McCord decided at this point—after Mr. Kinnett had left her house around 9:00 P.M.—to email him a blank, electronic copy of South Madison's Gender Support Plan, and a screenshot showing that Mr. Kruer was the last person who had edited it.

130.    South Madison has never claimed that Mrs. McCord violated any policy by sharing any of this information with Mr. Kinnett.

**C.    Based on information from Mrs. McCord and other sources, the journalist publishes articles detailing South Madison's Gender Support Plan policy.**

131.    On December 5, 2022—the Monday after Mr. Kinnett's Thursday interview with Mrs. McCord—he published his first article about the Gender Support Plan policy, entitled *'What Else Are They Willing to Lie About?': Indiana School Compels Staff to Hide 'Gender Support Plans' From Parents*, which is reproduced as Exhibit 4, and available at https://dailysign.al/3I7IG8h.

132.    As Mrs. McCord anticipated, her August 2022 email regarding a Gender Support Plan featured prominently.

133.    But Mr. Kinnett made clear Mrs. McCord was not his only source.

134.    For example, his December 5 article notes: "Amanda Keegan, a geography and psychology teacher at Pendleton Heights High School, says she resigned in part to protest this policy." Ex. 4 at 1.

135.    Mrs. Keegan had given Mr. Kinnett "an exclusive interview," in which she confirmed "that she had received emails from counselors only when they were asking her to hide information from parents." *Id.*

136.   In this article, Mr. Kinnett reproduced a blank Gender Support Plan, which he made clear he had "obtained in blank form from a source who asked to remain anonymous"—not from Mrs. McCord, who simply "confirmed that the school district is using the same Gender Support Plan." *Id.* at 2.

137.   Citing Mrs. McCord, but not quoting her, Mr. Kinnett reported that South Madison's Gender Support Plan was "modeled on a document at Hamilton Southeastern Schools, a school district in Fishers, Indiana," and "has been the policy of the South Madison school district since fall of 2021." *Id.*

138.   Again citing but not quoting Mrs. McCord, this time along with "another counselor who wished to remain anonymous," Mr. Kinnett reported "that Andrew Kruer, the assistant superintendent in charge of the counseling department"—a misstatement of Mr. Kruer's title—"told counseling staff that this gender support policy was 'board-approved.'" *Id.*

139.   Mr. Kinnett also explained that based on "the document history" of "the online document obtained by [him] and authenticated by McCord," he could see "that Kruer was the last person to edit the form, titled 'SMCSC Student Gender Support Plan.'" *Id.*

140.   Mr. Kinnett paraphrased Mrs. McCord's position on the Gender Support Plans: "McCord insisted that she and a few other counselors despise this district policy, describing it as both dishonest and harmful," *id.*; and, that "she had assumed that since it was a policy approved by the school board, it must have been public knowledge as with any other policy," *id.*

141.   Finally, Mr. Kinnett reported that South Madison's "policy of keeping student information from Indiana parents isn't unique . . . . Several schools across Indiana have these types of policies: Hamilton Southeastern Schools, Carmel Clay Schools, Noblesville Schools, and Indianapolis Public Schools all have plans in place

24

that require staff to use student-chosen names and pronouns—none of which requires staff to inform parents." *Id.* at 3.

142.    In fact, "schools in Florida, Colorado, Michigan, and Iowa operate with similar gender support policies." *Id.*

143.    Mr. Kinnett contacted Mr. Kruer, Dr. Mark Hall, South Madison's superintendent, and Joel Sandefur, who was then the School Board president but has since left office, for a comment, but none provided one. *Id.* at 4–5.

144.    On December 19, 2022, Mr. Kinnett published a second article about the Gender Support Plan policy, *School Board Refuses to Explain Secret Transgender Policy to Parents*, reproduced as Exhibit 5, and available online under a slightly different title at https://dailysign.al/3o4ckEp.

145.    Mrs. McCord did not give Mr. Kinnett another interview or any additional information for this second article.

146.    Instead, this second article focused on events at a December 8 School Board meeting, which was the Pendleton community's first opportunity to address the School Board after Mr. Kinnett's first article detailing the Gender Support Plan policy.

147.    Mr. Kinnett recounted that "[d]ozens of parents and other area residents packed the meeting room to obtain information directly from the elected board and Hall, the appointed superintendent of the Pendleton-based school district." Ex. 5 at 1.

148.    "Hall read a prepared statement" at the December 8 meeting, in which he "claimed that because the South Madison school district accepts federal funding, the district is required to follow a nondiscrimination policy." *Id.*

149.    Mr. Kinnett further summarized Dr. Hall's statement: "To comply with that law and those rules, Hall said, the school system must treat all students

25

equally with regard to 'preferred names,' equating a student's asking to be called by a shortened name or nickname to a student's changing names and personal pronouns as a result of a gender transition." *Id.* at 2.

150.    According to Mr. Kinnett, Dr. Hall "didn't connect this explanation to parents' deep concern about the school district's withholding information from parents in any way," nor did he offer an "explanation as to why a blank form used by the district for transitioning students, called the Gender Support Plan, isn't accessible online." *Id.*

151.    Mr. Kinnett also reported that Mr. Sandefur, then-president of the School Board, echoed Dr. Hall's claim that South Madison's nondiscrimination policies required using Gender Support Plans. *Id.* at 3.

152.    The remainder of Mr. Kinnett's second, December 19 article largely summarized the content of his December 5 article. *See id.* at 2–5.

153.    The local paper, *The Herald Bulletin*, ran a much shorter article about the December 8 School Board meeting that confirmed Mr. Kinnett's character-ization of that meeting. *See* Andy Knight, *South Madison school board chided over gender support plan*, The Herald Bulletin (Dec. 12, 2022), https://bit.ly/3MmeIje.

154.    A community member livestreamed and recorded that meeting, and that recording remains publicly available on the internet. *See* @RingersIndiana, *South Madison Community School Corporation Board Meeting*, YouTube (Dec. 8, 2022), https://youtu.be/p7S2-UKSwAQ [hereinafter, "Dec. 8 Meeting Video"].

155.    In that video, members of the School Board repeatedly invoke South Madison's nondiscrimination policies as the basis for the Gender Support Plan policy.

156.    Specifically, at the December 8 School Board meeting and at subsequent meetings, Dr. Hall, Mr. Sandefur, and other South Madison School

Board members and employees disputed the characterization of South Madison's Gender Support Plan as a "policy" but also told the community that other policies require implementation of Gender Support Plans. *See, e.g.*, SMCSC Policy 2260 – Nondiscrimination and Access to Equal Educational Opportunity, https://bit.ly/3Mmipo6; SMCSC Policy 2266 – Nondiscrimination on the Basis of Sex in Education Programs or Activities, https://bit.ly/3Mds9kb; SMCSC Policy 1662 – Anti-Harassment, https://bit.ly/3ojpBJk; SMCSC Policy 3362 – Anti-Harassment, https://bit.ly/421NoM1; SMCSC Policy 4362 – Anti-Harassment, https://bit.ly/452C5Wm; and SMCSC Policy 5517 – Anti-Harassment, https://bit.ly/42QRVBZ. *See* Ex. 14 (reproducing each of these policies).

157.    The Gender Support Plan policy, therefore, has been implemented pursuant to a School Board policy.

158.    Additionally, in the video of the December 8 meeting, the School Board confirms that Mr. Kinnett's article contained an accurate copy of South Madison's Gender Support Plan. Dec. 8 Meeting Video, *supra*, at 54:34–38.

159.    When a parent asked the School Board where he could find a copy of that Plan on South Madison's website, the board confirmed that the Plan was not on the website. Dec. 8 Meeting Video, *supra*, at 54:39–43.

160.    That same parent also asked whether a school is "required to notify the parent" when "a student . . . is enrolled" in a Gender Support Plan. Dec. 8 Meeting Video, *supra*, at 57:30–45.

161.    Neither Dr. Hall nor any board member gave an answer audible on the recording.

**IV.   After the Pendleton community expresses outrage about the Gender Support Plan policy, South Madison begins proceedings to fire Mrs. McCord.**

162.   As the coverage of the December 8 School Board meeting makes clear, a "controversy erupted after [Mr. Kinnett's] story was published." Knight, *supra*.

163.   In fact, after publication of Mr. Kinnett's December 5 article, Mrs. McCord received many rude and threatening emails and voicemails from people who had read Mr. Kinnett's article.

164.   These messages asked whether South Madison had fired Mrs. McCord yet for the Gender Support Plan policy; they called her a predator, accused her of "grooming" students.

165.   Just as Mrs. McCord feared would happen, the senders of all these messages believed incorrectly that she had created the Gender Support Plan policy, rather than understanding the truth: Mrs. McCord was simply following the Plans as South Madison had instructed her—over her repeated protests.

166.   The video of the December 8 School Board meeting—not to mention the hateful messages that Mrs. McCord received—confirms that South Madison faced significant, negative criticism from the community because of Mr. Kinnett's December 5 article.

167.   On Thursday, December 15, 2022—one week after the December 8 School Board meeting, and just three days after *The Herald Bulletin*'s article covering that meeting—Dr. Hall asked Mrs. McCord to meet with him, which she did.

168.   As it turned out, Dr. Hall's December 15 meeting with Mrs. McCord was the first in a series of meetings that would culminate with South Madison's decision to fire her because of her interview with Mr. Kinnett.

A. **Mrs. McCord's supervisors question her about her interview with the journalist.**

169.    Mrs. McCord's December 15 meeting with Dr. Hall also included Mr. Shaun Rose, who was then an assistant principal at Pendleton Heights High School but would become the principal after New Year's Day.

170.    Lana Moore, a representative from the teachers' union, was also present.

171.    During this meeting, which lasted around an hour, Dr. Hall asked Mrs. McCord to tell him the story of how she came in contact with Mr. Kinnett.

172.    Mrs. McCord explained to Dr. Hall how Mr. Kinnett first contacted her on Thursday, December 1, to tell her that he would publish an article about her involvement with the Gender Support Plan policy just a few days later, with or without a comment from her.

173.    Mr. Kinnett's plans left Mrs. McCord feeling like she had no choice but to explain that South Madison had forced her to participate in the Gender Support Plan policy.

174.    Mrs. McCord explained to Dr. Hall how, since South Madison first rolled out the Gender Support Plan policy, she had gone multiple times to Mr. Kruer, the assistant superintendent over high schools, to explain her concerns.

175.    After discussing the substance of Mr. Kinnett's December 5 article, Dr. Hall asked Mrs. McCord about how Mr. Kinnett had obtained the documents referenced in that article.

176.    First, Mrs. McCord explained that she had not disclosed the August 2022 email from her about a student with a Gender Support Plan but that Mr. Kinnett had obtained a copy of that email from another local source before he interviewed Mrs. McCord and showed it to her during the interview.

177.    Then, Dr. Hall asked how Mr. Kinnett had obtained a blank copy of the Gender Support Plan.

178.    Mrs. McCord responded that Mr. Kinnett already had a blank copy of the Gender Support Plan before he came to her house to interview her, and that she showed him an electronic copy of the Gender Support Plan on her computer, which would have allowed him to see that Mr. Kruer had last edited the document.

179.    Mrs. McCord's response was consistent with the information in Mr. Kinnett's December 5 article, which clearly stated that he obtained the Gender Support Plan "in blank form from a source who asked to remain anonymous," and that Mrs. McCord "confirmed that the school district is using" that form. Ex. 4 at 2.

180.    Towards the end of the meeting, Mrs. McCord asked Dr. Hall whether, moving forward, South Madison could accommodate her desire to not participate in the Gender Support Plan policy.

181.    Dr. Hall responded that the administration was working on this but did not tell Mrs. McCord that she did not have to continue participating; she understood from this meeting that South Madison expected her to continue complying with the Gender Support Plan policy until further notice.

182.    Dr. Hall assured Mrs. McCord that he would speak with Mr. Kruer before the new semester began in January 2023 for clarification about South Madison's expectations surrounding the Gender Support Plan policy.

183.    The next day, December 16, which was the last day before the end of the fall semester and a two-week break, Mr. Taylor emailed Mrs. McCord to state that he wished to meet with her.

184.    On this email Mr. Taylor also included Mr. Rose, the assistant principal who was set to become principal on January 1, and Ms. Moore, who was

Mrs. McCord's union representative, both of whom Mr. Taylor asked to attend his meeting with Mrs. McCord.

185.    It was unusual for Mr. Taylor to ask Ms. Moore to attend a meeting on Mrs. McCord's behalf.

186.    Mr. Taylor used this meeting as an opportunity to voice his frustration with Mrs. McCord for giving Mr. Kinnett an interview.

187.    He told Mrs. McCord that, to be a school counselor, she needed to leave her values behind; if she could not do that, Mr. Taylor told her, then he questioned her ability to continue counseling.

188.    Both Mr. Rose and Ms. Moore were present throughout the meeting.

189.    Because of Mr. Taylor's tone, Mrs. McCord asked Mr. Rose to meet with her again after the New Year to discuss the December 16 meeting.

190.    When school began after the holidays, Mrs. McCord was still waiting to hear back from Dr. Hall regarding her multiple requests for an accommodation not to participate in the Gender Support Plan policy, so Mrs. McCord asked her union representative, Ms. Moore, to raise the issue with Mr. Rose and ask whether he had any new instructions regarding the Gender Support Plan policy and her accommodation request.

191.    Ms. Moore told Mrs. McCord that Mr. Rose had denied her accommodation request, and that he had said that the policy was a directive that Mrs. McCord needed to follow.

192.    Then, on January 3, 2023, South Madison's second day back in session after the Christmas and New Year's holidays, and just a few days after Mr. Rose's promotion on January 1 from assistant principal to principal, Mrs. McCord attended her meeting with Mr. Rose.

193.    Mrs. McCord had expected her January 3 meeting only to include Mr. Rose and Ms. Moore, but Dr. Hall also joined that meeting

194.    During the January 3 meeting, Mrs. McCord had expected to discuss her December 16 meeting with Mr. Taylor; instead, Dr. Hall used it as a chance to again question Mrs. McCord about the night of her interview with Mr. Kinnett.

195.    For the first time, Dr. Hall presented Mrs. McCord with information detailing who had accessed the digital version of the Gender Support Plan on December 1, 2022, the day of her interview with Mr. Kinnett.

196.    In particular, Dr. Hall pointed out that the timestamps showed that Mrs. McCord had downloaded a digital copy of the Gender Support Plan at 9:53 P.M. that night, which is consistent with Mrs. McCord's recollection that Mr. Kinnett left her house around 9:00 P.M. that night and only after he left did she then download a copy of the Gender Support Plan and send Mr. Kinnett an electronic copy.

197.    The January 3 meeting did not last very long, and afterwards, Ms. Moore came to Mrs. McCord with the news that Dr. Hall was beginning the process of firing Mrs. McCord.

198.    Mrs. McCord was devastated.

**B.     Mrs. McCord receives a letter from her school's principal alleging that her interview with the journalist and her statements about that interview justify firing her.**

199.    On Wednesday, January 18, Mr. Rose gave Mrs. McCord a draft of the letter recommending that the School Board cancel her contract and told her to expect the final version the morning of Friday, January 20, and to expect that at that point, she would be placed on administrative leave, required to leave the building, and instructed not to speak with any students or faculty.

32

200.    As a result, Mrs. McCord had just one school day to try to smoothly transition her assigned students to another counselor.

201.    Because she had over 500 students, this was an impossible task, made more difficult by the fact that she and the other counselors had just begun to help students with their schedules for the 2023–2024 school year, a detailed, time-intensive, four-week process.

202.    The abruptness of South Madison's actions sparked concern in Mrs. McCord for her students—many of whom were at-risk and regularly met with her.

203.    Mrs. McCord could not, in a single workday, even say goodbye to the hundreds of students with whom she worked—let alone help her colleagues understand the unique circumstances of all those students.

204.    South Madison put students' education at risk in its rush to fire her (with no time to properly transfer their files to new counselors) because she was unable to properly explain the needs of each student—some of whom she met with on a regular basis—to the counselors who would take over for her.

205.    As promised, on January 20, Mrs. McCord received the letter addressed to her from Mr. Rose, now the principal of Pendleton Heights High School. Ex. 6 (the "Termination Letter").

206.    And also as promised, Mrs. McCord was required to sign the letter to acknowledge receipt, and then South Madison immediately terminated her network access, leaving Mrs. McCord unable even to share notes with the other counselors about her students.

207.    At a high level, South Madison made two allegations against Mrs. McCord in the Termination Letter:

> (a)    "You have engaged in conduct that violated school board policy 3310 – Freedom of Speech in Noninstructional Settings by providing statements known to be false or made without truth or accuracy to Tony Kinnett who, with your knowledge and implied

33

consent, published those inaccurate statements online at DailySignal.com on 12/5/22. This resulted in severe, unwarranted reputational damage to the school corporation."

(b)     "You lied to the administration regarding Mr. Kinnett's access to the district Gender Support Plan that was published online at DailySignal.com on 12/5/22."

Ex. 6 at 1.

208.    Neither of these claims are accurate.

209.    Regarding the first allegation, the Termination Letter quoted five statements made by Mr. Kinnett in his December 5 article that mentioned Mr. Kinnett's reliance on Mrs. McCord as one source—none of which directly quote, or purport to directly quote, Mrs. McCord.

210.    In the Termination Letter, South Madison alleged that these five statements were "false or made without truth or accuracy." *Id.* at 1–3.

211.    In the Termination Letter, South Madison held Mrs. McCord responsible for these five statements, even though they were Mr. Kinnett's words, not Mrs. McCord's, and even though Mr. Kinnett has consistently made clear that his reporting for the December 5 article included at least three local sources other than Mrs. McCord: another, anonymous counselor employed by South Madison; Amanda Keegan, the teacher who resigned as a result of her objection to the Gender Support Plans; and a parent of students in South Madison schools.

212.    Mrs. McCord provided Mr. Kinnett with information that accurately reflected the information she had received from Mr. Taylor, Mr. Kruer, and other school administrators.

213.    In the Termination Letter, South Madison cited no district policy that allows cancellation of an employee's contract because of statements made by a third party based partially on accurate information received from the employee. *See generally* Ex. 6.

214.    As to the alleged falsity of these five statements by Mr. Kinnett, South Madison also did not allege that Mr. Kinnett's core claim is false.

215.    For example, in the Termination Letter, South Madison did not dispute that it was using Gender Support Plans to socially transition students at school. *Id.* at 1–2.

216.    Nor did South Madison dispute that it would inform the teachers of such students about their social transition and require those teachers to participate in it. *See generally id.*

217.    Finally, in the Termination Letter, South Madison did not dispute that at least some of these students were being socially transitioned at school without their parents' knowledge or consent. *Id.*

218.    Instead, South Madison alleged that Mr. Kinnett used imprecise language to describe certain details of South Madison policy, the Gender Support Plans, employees' job descriptions, and other similar matters. *Id.*

219.    Regarding the second allegation, from her December 15 meeting with Dr. Hall, Mrs. McCord has consistently maintained that Mr. Kinnett already had a blank copy of South Madison's Gender Support Plan when he came to her house on December 1.

220.    Mr. Kinnett has also stated in each of his articles that he initially obtained the Gender Support Plan from an anonymous source other than Mrs. McCord.

221.    And South Madison has never claimed that Mrs. McCord violated any policy by confirming the accuracy of the copy already in Mr. Kinnett's possession or sending him an electronic copy after he left her house.

222.    Neither of the reasons given in the Termination Letter, therefore, could justify firing Mrs. McCord, but instead these two allegations were pretext for

South Madison's retaliation against Mrs. McCord for her decision to speak with Mr. Kinnett.

223.    The School Board's investigation into the allegations in the Termination Letter was not reasonable in relation to the severity of the punishment meted out against Mrs. McCord.

224.    Based on that investigation, it was unreasonable to conclude that Mrs. McCord made any false statements that warranted her termination.

### C.    Mrs. McCord provides an initial response to South Madison's alleged reasons for firing her.

225.    As allowed by Indiana law and School Corporation policy, Mrs. McCord emailed Dr. Hall on January 25, 2023, to request a private conference with him to discuss the reasons given in the Termination Letter for Mr. Rose's recommendation that the board fire Mrs. McCord. *See* Ex. 7 (reproducing January 25 email).

226.    That email also summarized why the reasons stated in the Termination Letter did not justify firing Mrs. McCord, focusing in particular on the allegation that she had lied about Kinnett's access to the Gender Support Plan. *Id.* at 1–2.

227.    Mrs. McCord did not lie about Kinnett's access to the Gender Support Plan and none of the other reasons listed by South Madison in the Termination Letter justified her firing, as detailed below:

### *1.    Statement One*

228.    In the Termination Letter, South Madison first took issue with this statement by Mr. Kinnett:

> This is not a unique circumstance, either. Over the last two years, dozens of "Gender Support Plans" with guidelines not to contact parents have been sent to teachers across the South Madison school district headquartered in Pendleton, counselor Kathy McCord confirmed.

Ex. 6 at 1.

229.    According to South Madison, this statement by Mr. Kinnett is false, because "[n]o gender support plans have ever been sent to a teacher," and "[g]uidelines to not contact parents have never been sent to a teacher." *Id.*

230.    As an initial matter, neither of these is a statement by Mrs. McCord, who in fact told Mr. Kinnett that she and the other counselors did not send copies of the Gender Support Plans to teachers once they were completed.

231.    Additionally, South Madison did not dispute that it required Mrs. McCord and the other counselors to send emails like her August 2022 email that appeared in Mr. Kinnett's article, which did exactly what Mrs. McCord said it did— instruct teachers to socially transition a student and not to tell the student's parents. *See generally* Ex. 3.

232.    Nor did South Madison dispute what Mrs. McCord said about Mr. Taylor instructing her that school counselors must not contact a student's parents to discuss the specifics of a student's Gender Support Plan.

233.    South Madison only disputed Mr. Kinnett's failure to make clear that emails like the one Mrs. McCord sent did not actually attach the student's Gender Support Plan, which is not a false statement by Mrs. McCord.

234.    Separately, South Madison's Termination Letter said that because Mrs. McCord did "not have access to student information regarding gender-related accommodations from other schools," she could not "accurately state how many gender support plans exist across the district." Ex. 6 at 2.

235.    Mr. Kinnett never said Mrs. McCord claimed access to districtwide information about all students' Gender Support Plans; instead, he asked her how many Gender Support Plans she thought South Madison had in place.

236.    Based on Mrs. McCord's experience with her own students' Gender Support Plans, she estimated that, just at Pendleton Heights High School, each school counselor had 12–15 students with such Plans.

237.    Additionally, Mr. Taylor told Mrs. McCord and the other counselors that students in *every grade*, in *every building* were using Gender Support Plans.

238.    In fact, Dr. Hall himself sent an email on August 10, 2021, to various South Madison administrators, including Mr. Taylor, to inform them, "[W]e have had students in *almost all of our schools* who have requested accommodations related to their preferred gender." Ex. 8 (emphasis added).

239.    Contrary to the implication of the Termination Letter, Mrs. McCord had sufficient information to estimate the number of Gender Support Plans in use by South Madison.

240.    Based on this information, South Madison could not have reasonably determined that Statement One was false.

2.    *Statement Two*

241.    In the Termination Letter, South Madison next said that Mr. Kinnett made this allegedly false statement in his December 5 article:

> McCord said she and other counselors have access to such plans but teachers, parents and the public do not—which she strongly disagrees with. McCord insisted that she and a few other counselors despise this district policy, describing it as both dishonest and harmful.

Ex. 6 at 2.

242.    According to South Madison, "[i]n many cases, parents are present during meetings when gender support plans are completed." *Id.*

243.    But that statement simply proves the point that, in at least some cases, parents are *not* present, which is demonstrated by Mrs. McCord's August 2022 email that Mr. Kinnett included in his article.

244.    Additionally, while South Madison stated in the Termination Letter that "[p]arents can request their student's gender support plan at any time," *id.*, that does not address the fact that, until Mr. Kinnett published his December 5 article, the South Madison community was largely unaware of the existence of the Gender Support Plan policy, and thus unaware of the need to request their children's Plan.

245.    Finally, Mrs. McCord never told Mr. Kinnett that she thought any student's confidential information should be "shared with the general public." *Id.*

246.    When Mr. Kinnett said in Statement Two that "teachers, parents, and the public do not" have access to Gender Support Plans, he meant that South Madison had never publicized their existence or allowed the public to review a blank copy—a fact the School Board confirmed at the December 8 meeting.

247.    Based on this information, South Madison could not have reasonably determined that Statement Two was false.

### 3.    *Statement Three*

248.    Although South Madison called the Termination Letter's Statement Three "false or made without truth or accuracy," its discussion of this statement actually agrees with Mr. Kinnett.

249.    In Statement Three, Mr. Kinnett said:

> Before that, McCord said, if a student approached a teacher or counselor and asked to be called a different name, the school would call the student's parents to confirm this desire and decision. Now, the South Madison district requires only that the student says that his or her parents don't or wouldn't approve, and the district is obliged to hide the information from parents.

Ex. 6 at 2.

250. South Madison responded in the Termination Letter: "Beginning in fall 2021, . . . all students were given the option to request to be called a different name without requiring parental communication." *Id.*

251. Nothing in South Madison's response contradicted any part of Mr. Kinnett's statement, but rather it agreed with Statement Three that the School Corporation doesn't ask parents for permission to refer to a child by a new name at school.

252. Based on this information, South Madison could not have reasonably determined that Statement Three was false.

### 4. Statement Four

253. In Statement Four, Mr. Kinnett said this:

Finally, McCord and another counselor who wished to remain anonymous confirmed that Andrew Kruer, the assistant superintendent in charge of the counseling department, told counseling staff that this gender support policy was "board approved."

Ex. 6 at 2.

254. South Madison did not address the fact that Mr. Kinnett based this statement on information from Mrs. McCord and another, anonymous source.

255. South Madison rightly points out that Mr. Kinnett misstated Mr. Kruer's responsibilities as the Assistant Superintendent for Secondary Curriculum, Instruction and College and Career Readiness: "Mr. Kruer is not in charge of the counseling department. He is one of the two Title IX coordinators for the district." *Id.*

256. Regardless, Mr. Kruer has in fact overseen South Madison's Gender Support Plan policy, including by advising Mrs. McCord and the other school counselors about how South Madison expected them to apply it—a point consistent with the focus of Mr. Kinnett's article.

257.    In the Termination Letter, South Madison then stated that "[t]he district does not have a gender support policy," despite South Madison's repeated public statements that it implemented the Gender Support Plan policy pursuant to its various nondiscrimination policies. *Id.*

258.    Notwithstanding the statement that Mr. Kruer "did not tell the counseling staff that the gender support policy was board approved," *id.*, Mrs. McCord had several conversations with Mr. Kruer and Mr. Taylor during which each administrator instructed her that South Madison required her to participate in the Gender Support Plan policy.

259.    Mrs. McCord understood this instruction to mean that the School Board had approved the Gender Support Plan policy.

260.    In fact, since Mr. Kinnett's first article, Dr. Hall and members of the School Board have stated publicly that South Madison's nondiscrimination policies require the Gender Support Plan policy.

261.    Based on this information, South Madison could not have reasonably determined that Statement Four was false.

*5.    Statement Five*

262.    In Mr. Kinnett's last statement addressed by South Madison, he correctly identifies social transition as a psychotherapeutic intervention:

> Indiana Law (20-28-10-17) states school counselors are immune from "disclosing privileged or confidential communication", but doesn't give counselors the authority to diagnose or treat gender dysphoria. McCord and other counselors told the Daily Signal the current South Madison policy requires counselors to do so.

Ex. 6 at 2–3.

263.    As with Statement Four, Mrs. McCord is expressly not the sole source of the information in Statement Five.

41

264.   That said, South Madison is incorrect that "the district does not ask or require that our counselors diagnose or treat any mental conditions." *Id.* at 3.

265.   During the interview, Mr. Kinnett asked Mrs. McCord several variations on the question, "Are you qualified to diagnose gender dysphoria?" which she denied.

266.   Mr. Kinnett also discussed with Mrs. McCord the reality that changing a child's name or pronouns based on an asserted change in gender identity is part of a psychotherapeutic intervention—one which the child's parents should oversee.

267.   Mrs. McCord agreed with Mr. Kinnett on this point and told him she believed that South Madison's use of Gender Support Plans meant such mental health decisions were being made without parental knowledge or consent.

268.   By requiring counselors to use Gender Support Plans to socially transition students, South Madison does in fact "ask or require" them to "treat [a] mental [health] condition[]." Ex. 6 at 3.

269.   Based on this information, South Madison could not have reasonably determined that Statement Five was false.

*6.    Kinnett's Access to the Gender Support Plan*

270.   Separately from Mr. Kinnett's five allegedly false statements, South Madison also alleged in the Termination Letter that Mrs. McCord "lied to the administration regarding Mr. Kinnett's access to the district Gender Support Plan." Ex. 6 at 1.

271.   Mr. Kinnett has consistently and publicly maintained that he did not initially receive the Gender Support Plan from Mrs. McCord.

272.   Mr. Kinnett's first article, on December 5, stated that he obtained the Gender Support Plan "in blank form from a source who asked to remain

42

anonymous." Ex. 4 at 2; *see id.* (noting that Kinnett spoke with "another counselor who wished to remain anonymous").

273.    According to Mr. Kinnett, Mrs. McCord "confirmed that the school district is using the same Gender Support Plan" as the blank one he had already obtained. *Id.*

274.    Again, in an article published March 9, 2023, Mr. Kinnett reiterated that the blank Gender Support Plan "had been provided to [him] by both parents and staff members in the district," and that Mrs. McCord had "further confirmed the legitimacy" of that blank Plan. Tony Kinnett, *I Was Thrown Out of a School Board Meeting for Asking a Question*, Daily Signal (Mar. 9, 2023), https://dailysign.al/3pO4GP6 (reproduced here as Exhibit 9).

275.    Mr. Kinnett's account is consistent with Mrs. McCord's own account, which she explained in her January 25 email responding to the Termination Letter, *see* Ex. 7 (reproducing that email), and with the Termination Letter's own allegations.

276.    After Mr. Kinnett left her house, Mrs. McCord downloaded the Gender Support Plan, emailed a true and accurate copy of it to Mr. Kinnett, and gave him the true and accurate information that Mr. Kruer was the last person to edit it. *Id.* at 2.

277.    None of this conflicts with any information Mrs. McCord gave during her meetings with Dr. Hall and Mr. Rose on December 15, 2022, or January 3, 2023, nor with the details described by South Madison in the Termination Letter about the Google activity log for the Gender Support Plan. *Id.*

278.    And neither in the Termination Letter nor anywhere else has South Madison claimed that Mrs. McCord violated any policy by sharing a blank Gender Support Plan with Mr. Kinnett or information about who had edited it.

**D.      The school board holds a hearing and then votes to fire Mrs. McCord.**

279.    Per Mrs. McCord's request, she had a short, private conference with Dr. Hall on February 3, 2023, during which they discussed the Termination Letter.

280.    After that conference, on February 7, Dr. Hall wrote a short note to the School Board that contained no reasoning but recommended that the School Board cancel Mrs. McCord's contract. *See* Ex. 10 (reproducing that note).

281.    On February 8, Mrs. McCord exercised her right to request a meeting with the School Board about the recommendation to fire her. *See* Ex. 11 (reproducing that meeting request).

282.    That meeting took place on Tuesday, March 7.

283.    Amy Matthews, an attorney for the School Board, presided over that meeting, and Dr. Hall was the primary presenter.

284.    Dr. Hall offered a number of exhibits, including his communications with Mrs. McCord about the Termination Letter, copies of Mr. Kinnett's articles, copies of South Madison's nondiscrimination policies, and other documents regarding the Gender Support Plan policy.

285.    Dr. Hall also questioned South Madison employees about the Gender Support Plan policy and gave a narrative, evidentiary statement himself, without being questioned.

286.    Despite allowing Dr. Hall to give his own evidence in narrative form, Ms. Matthews refused to allow Mrs. McCord to do the same.

287.    Mrs. McCord had prepared a narrative, evidentiary statement, but when she stood up to give it, Ms. Mathews told her that she would not be permitted to read her statement but could be questioned before the School Board by her union representative.

288.   So without any advance notice, Mrs. McCord's union representatives were required to question her in lieu of her prepared statement.

289.   During Dr. Hall's questioning of Mr. Kruer, he admitted that Mrs. McCord did not violate any instruction of his by sharing a blank Gender Support Plan with Mr. Kinnett.

290.   Mr. Kruer also testified that, without notifying students' parents, South Madison will socially transition them by using cross-gender names and pronouns.

291.   Mr. Kruer also acknowledged that Mrs. McCord had explained her objections to participating in the Gender Support Plan policy to him.

292.   Dr. Hall also questioned Mr. Taylor.

293.   Mr. Taylor testified that South Madison's Gender Support Plan was based on the plan used by Hamilton Southeastern Schools, a nearby district; and that he and Mr. Kruer had adopted that district's plan with very few changes.

294.   Like Mr. Kruer, Mr. Taylor confirmed that South Madison does not notify parents before socially transitioning students through cross-gender names and pronouns.

295.   Also like Mr. Kruer, Mr. Taylor acknowledged that Mrs. McCord had come to him to object to the Gender Support Plan policy—in particular, the policy's requirement that she withhold information from parents, which seemed to her tantamount to lying.

296.   But Mr. Taylor had told her South Madison counselors had no choice but to comply.

297.   Both Mr. Kruer and Mr. Taylor testified that Mr. Kruer was primarily responsible for overseeing implementation of the Gender Support Plan policy.

298.    Dr. Hall also questioned Ryan Watts, South Madison's director of technology.

299.    Mr. Watts testified about the contents of the Google document log for the 2022 version of the Gender Support Plan.

300.    Mr. Watts did not testify about any other versions of the Gender Support Plan. *See, e.g.*, Ex. 12 (email from Mr. Kruer in September 2022 explaining to high school counselors that they should begin using 2022 version instead of other versions).

301.    Additionally, although Mr. Watts testified that electronic copies had been made of the 2022 version of the Gender Support Plan, he did not testify about whether any of those copies and prior versions had ever been downloaded or printed.

302.    In fact, Mr. Watts testified that he had only a little piece of the entire history of the Gender Support Plan and all its copies before him.

303.    In any case, Mr. Watts testified, consistent with Mrs. McCord's explanation of events, that she downloaded a copy of the Gender Support Plan to her home computer around 9:53 P.M. on December 1, 2022—after Mr. Kinnett had already left her house.

304.    Although Ms. Matthews refused to allow Mrs. McCord to present her evidence as a narrative despite having just allowed Dr. Hall to do the same, Mrs. McCord responded to questions from her union representative and School Board members.

305.    Her responses to those questions told the same story she has told all along:

(a)    On December 1, 2022, Mr. Kinnett already had a blank Gender Support Plan when he came to her house;

(b)  After the interview, she sent him an electronic copy of a blank Gender Support Plan and confirmation that Mr. Kruer had last edited it;

(c)  She did not initially mention this to Dr. Hall on December 15, because she understood him to be interested in how Mr. Kinnett had obtained a Gender Support Plan before interviewing Mrs. McCord; and,

(d)  Once she remembered having sent Mr. Kinnett an electronic copy of the Gender Support Plan, she told Dr. Hall about this.

306.  Two days after Mrs. McCord's meeting with the School Board, on Thursday, March 9, at a public meeting, the School Board voted to fire her.

307.  As in the Termination Letter, the School Board justified its vote based on the same allegedly false statements made by Mr. Kinnett in his December 5 article and a claim that Mrs. McCord had initially given Mr. Kinnett access to a Gender Support Plan, despite Mr. Kinnett's public statements that he had obtained a Plan from other sources in the community.

308.  After the March 9 meeting, the School Board released a document entitled "Findings of Fact, Conclusions of Law, and Order on Contract Cancellation," reproduced as Exhibit 13.

309.  This document largely mirrors South Madison's initial Termination Letter.

310.  Although it noted that Mrs. McCord had responded to South Madison's allegations in that Letter, the School Board did not offer any explanation for refusing to credit her response.

V.    **Participating in the Gender Support Plan policy violates Mrs. McCord's sincerely held religious beliefs and her understanding of how best to care for students.**

A.    **Mrs. McCord's faith prohibits affirming untrue ideas about sex and gender or hiding important information from parents.**

311.    Mrs. McCord is a practicing Christian and an active member of a local church, who bases her beliefs on the Bible and strives to live out her Christian faith, whether at work, out in the community, or in her home with her family.

312.    Mrs. McCord's sincerely held religious beliefs govern her views about all aspects of life, including human nature, parenting, sex and gender, and honesty.

313.    Mrs. McCord believes that God created the family and charged parents with the primary responsibility for raising, guiding, and caring for their children.

314.    Because of parents' God-given responsibilities for their children, Mrs. McCord believes that parents are essential to maintaining the physical and mental well-being of their children.

315.    As a corollary, Mrs. McCord also believes that it is generally harmful to make decisions about children's health without involving their parents.

316.    Regarding sex and gender, Mrs. McCord believes that God created two—and only two—sexes, male and female, and that God intended sex as a core aspect of his design for humans.

317.    Mrs. McCord also believes that each person's sex is fixed by biology from birth, rather than assigned by another person; that this sex is an immutable gift from God; and that it is not possible to change a person's sex.

318.    Mrs. McCord's faith does not command her to affirmatively communicate her religious beliefs at school, and she did not seek to do so; however, her faith requires her to refrain from speaking in a manner that her faith instructs is immoral, dishonest, or harmful.

48

319.    In particular, Mrs. McCord's sincerely held religious beliefs about honesty prevent her from affirming or communicating views about human nature or sex and gender contrary to her religious beliefs.

320.    Mrs. McCord believes that to affirm or communicate such views is tantamount to lying.

321.    These beliefs also prevent Mrs. McCord from referring to a child using pronouns that are inconsistent with the child's sex.

322.    Using such cross-gender pronouns to address or refer to that child communicates a message—namely, the message that what makes a child a boy or a girl is that child's personal sense of being a boy or girl rather than the child's sex— that is inconsistent with Mrs. McCord's religious beliefs.

323.    It harms Mrs. McCord to force her to communicate this message by using cross-gender pronouns or otherwise treating a student as a gender identity different than the student's sex because it forces her to express something she believes is untrue and harmful to her students.

324.    Mrs. McCord's beliefs about honesty also prevent her from lying to or intentionally deceiving the parents of South Madison students.

325.    It harms Mrs. McCord to force her to violate her beliefs about honesty by requiring her not to inform parents about South Madison's social transition of students through the use of cross-gender names and pronouns.

326.    Mrs. McCord's faith commands her to affirmatively communicate her religious beliefs *outside* of school, and she wishes to communicate freely on other matters of public concern, including human identity, sex, and gender consistent with those beliefs.

327.    Being forced to communicate South Madison's message by, for example, using cross-gender pronouns also harms Mrs. McCord by undermining her

49

ability to share her faith and express her views on matters of public concern outside of school.

328.    If Mrs. McCord claims outside school that using cross-gender pronouns communicates something false and harmful, but then she uses cross-gender pronouns while at school, Mrs. McCord would communicate either: (a) that she does not actually believe that social transition communicates something that is false and harmful; or, (b) that she is willing to harm children in order to keep her job—neither of which is true.

329.    Mrs. McCord wanted to continue counseling students as she always had while refraining from violating her conscience and harming her students by using Gender Support Plans to socially transition students, particularly without parental knowledge or consent.

330.    Mrs. McCord's sincerely held religious beliefs about human nature require her to treat every student with love, dignity, and respect, because she believes all people are created in the image of God, and God calls us to love all people.

331.    Because of these beliefs, Mrs. McCord provides the same, high-quality care for all her students regardless of their race, religion, sex, gender identity, sexual orientation, or any other similar characteristic.

332.    Mrs. McCord is thus committed to respectfully addressing all students in a way that does not violate her sincerely held religious beliefs, including a commitment to not lie to the students or parents, nor intentionally deceive parents about how a student is being addressed at school.

333.    If a student asked to be addressed by a different name and pronouns, for example, Mrs. McCord could refrain from using any gendered pronouns in the student's presence and could address the student, for example, by a nickname.

50

334.    South Madison never offered this or any other accommodation to Mrs. McCord when she objected to complying with the Gender Support Plan policy.

**B.    Mrs. McCord believes the Gender Support Plan policy hurts, rather than helps, at-risk young people.**

335.    In addition to Mrs. McCord's religious views, based on scientific evidence and her own experience as a school counselor—not to mention her experience as a mother—she believes that the Gender Support Plan policy hurts South Madison students.

336.    Mrs. McCord explained these beliefs to Mr. Taylor and others when they discussed the Gender Support Plan policy.

337.    Mrs. McCord understands that children do not have a fully developed capacity to understand the long-term consequences of their decisions.

338.    Mrs. McCord wants only to help her students and to refrain from doing anything that would hurt them or create an unreasonable risk of harm.

339.    In particular, Mrs. McCord is aware of an increase in students expressing a gender identity that is inconsistent with their sex and an accompanying request to be addressed with a different name consistent with the new identity and pronouns that are inconsistent with their sex, a process often called "social transition."

340.    "Social transition" is the use of a new name and pronouns to "validate" a gender identity that is not consistent with the person's sex.[1]

---

[1] *See* Leor Sapir, *The School-to-Clinic Pipeline*, City J. (Autumn 2022), https://bit.ly/3OgHlQo.

51

341.    As such, social transition "is not a neutral act"; instead, it is an "active intervention" that can have "significant effects on the child or young person in terms of their psychological functioning."[2]

342.    Mrs. McCord understands that most children who at some point express a gender identity inconsistent with their sex will eventually return to expressing an identity in harmony with their sex.

343.    For these children, all interventions—whether psychosocial, pharmaceutical, or surgical—that further entrench the gender identity inconsistent with the child's sex are harmful.

344.    Mrs. McCord wants to protect children from making potentially irreversible and life-changing decisions that they may later regret.

345.    Mrs. McCord believes that, because of the difficulty of assessing matters of gender identity and the long-term irreversible consequences of certain interventions, including puberty blockers, hormone replacement therapy, and sex-reassignment surgery, schools in particular should not engage in either socially or medically transitioning children.

346.    Mrs. McCord objects to personally participating in any child's social transition, because she believes that participating in this "active intervention" creates an unreasonable risk of harm to the child, in terms of the immediate impact, the potential irreversible impact of further treatment, and the likelihood that other mental health issues may be overlooked.

## STATEMENTS OF LAW

347.    At all times relevant to this Complaint, all of the acts, policies, and practices alleged in this Complaint and attributed to South Madison were

---

[2] Hilary Cass, *Independent review of gender identity services for children and young people: Interim report* 62–63 (Feb. 2022), https://bit.ly/42GuCed.

undertaken and maintained under color of a statute, regulation, or custom of the State of Indiana (*i.e.*, under color of state law and authority).

348. South Madison knew or should have known that it was violating Mrs. McCord's constitutional and statutory rights and did violate her constitutional and statutory rights by forcing her to participate in the implementation of the Gender Support Plan policy, and by terminating her employment in retaliation for her exercise of her constitutionally protected right to speak about matters of public concern.

349. Because South Madison's retaliation against Mrs. McCord was motivated at least in part by her exercise of constitutionally protected rights, its acts reflect a purpose of infringing on her federally protected rights.

350. South Madison also acted with reckless disregard for Mrs. McCord's constitutionally protected liberties.

351. The policies and practices that led to Mrs. McCord's termination remain in full force and effect, including the Gender Support Plan policy.

352. Mrs. McCord is suffering irreparable harm from South Madison's actions, because a retaliatory discharge is an ongoing deprivation of constitutional rights, and because the loss of constitutional rights caused by the Gender Support Plan policy is itself irreparable harm.

353. Mrs. McCord has no adequate or speedy remedy at law to correct the deprivation of her rights by South Madison.

354. South Madison has no interest in forcing Mrs. McCord to socially transition students by using Gender Support Plans that outweighs her interest, as a citizen, in refraining from doing so.

355.   Nor does South Madison have an interest in preventing Mrs. McCord from discussing the Gender Support Plan policy with the press that outweighs her interest, as a citizen, in discussing this matter of public concern.

356.   South Madison has no compelling interest in forcing Mrs. McCord to participate in students' social transition under the Gender Support Plan policy, nor in prohibiting her from speaking to the press about that policy.

357.   Any interest South Madison has could be achieved by significantly less restrictive means (such as by having a different school counselor work with that student) than by forcing Mrs. McCord to participate in students' social transition under the Gender Support Plan policy as a condition of keeping her public employment, or by terminating her for speaking to the press about that policy.

## FIRST CAUSE OF ACTION
### Free Speech Retaliation
### (U.S. Const., amends. I, XIV; 42 U.S.C. § 1983)

358.   Mrs. McCord repeats and realleges each of the allegations in paragraphs 1–357 of this Complaint.

359.   By punishing Mrs. McCord for expressing to a journalist her views about the Gender Support Plan policy, which requires her to socially transition students—and in some cases, requires her to hide social transitions from students' parents—South Madison retaliated against Mrs. McCord for exercising her First Amendment rights.

360.   In Mrs. McCord's interview with that journalist, she engaged in constitutionally protected speech as a private citizen about a matter of public concern.

361.   Mrs. McCord's speech to that journalist implicates her interests as a private citizen, because she was objecting to policies and practices adopted by South

Madison, which is a local governmental entity in Mrs. McCord's community, and its employees.

362.    Additionally, Mrs. McCord's speech implicates her interests as a private citizen, because she was expressing how South Madison's policies and practices violate her conscience and her sincerely held religious beliefs, which she maintains as a private citizen.

363.    Mrs. McCord had no official duty to speak with a journalist about South Madison's policies and practices, and her discussion with him did not occur as part of in-classroom instruction.

364.    South Madison's policies and practices relating to students' social transition and keeping information from parents are not valid curricular requirements.

365.    Mrs. McCord wishes to speak as a private citizen on these matters of public concern, because they implicate issues—human identity, sex, gender, and mental health, among others—that are hotly contested in education, society, law, politics, and academia, both in Pendleton and throughout Indiana; indeed, throughout the world.

366.    Mrs. McCord has a strong interest as a citizen in speaking on this issue consistent with her conscience, because it is among the sensitive political topics that occupy the highest rung of constitutional protection and require an even stronger showing by the government to outweigh her interest.

367.    By contrast, South Madison has no interest at all that justifies its actions against Mrs. McCord, since her action never disrupted or undermined any school function and did not place any legitimate interest in jeopardy.

368.    Because Mrs. McCord's strong interest in speaking on a matter of public concern outweighs any interests South Madison might assert in prohibiting

55

her from speaking to a journalist about its policies and practices—which require social transition and sometimes hiding it from parents—she engaged in constitutionally protected activity.

369.  In the days after publication of an article that criticized South Madison and its Gender Support Plan policy based, in part, on information from Mrs. McCord, Dr. Hall and Mr. Rose opened an employment investigation into Mrs. McCord.

370.  Less than a month after publication of that article, Dr. Hall and Mr. Rose informed Mrs. McCord's union representative that they intended to recommend that the School Board cancel her employment contract.

371.  A little more than one month after publication of that article, Mr. Rose delivered the Termination Letter to Mrs. McCord, informing her that he had recommended cancellation of her contract, and immediately placed her on administrative leave pending a final decision by the School Board.

372.  A short time later, Dr. Hall reviewed and agreed with Mr. Rose's recommendation, and Dr. Hall also recommended that the School Board cancel Mrs. McCord's employment contract.

373.  Each member of the School Board voted to adopt Mr. Rose and Dr. Hall's recommendation and to cancel Mrs. McCord's employment contract.

374.  As a result of that vote, South Madison canceled Mrs. McCord's employment contract.

375.  South Madison's adverse employment actions, including those just described, had a causal relationship to Mrs. McCord's exercise of her constitutional rights, in particular her interview with a journalist.

376.    In other words, but for Mrs. McCord's protected speech in an interview with that journalist, South Madison would not have taken its adverse employment actions against Mrs. McCord.

377.    South Madison was motivated at least in part by Mrs. McCord's exercise of her constitutional rights.

378.    South Madison's adverse employment actions against Mrs. McCord are the sort of actions that would likely deter a reasonable employee from speaking.

379.    Therefore, South Madison unconstitutionally retaliated against Mrs. McCord.

## SECOND CAUSE OF ACTION
### Compelled Speech
### (U.S. Const., amends. I, XIV; 42 U.S.C. § 1983)

380.    Mrs. McCord repeats and realleges each of the allegations in paragraphs 1–357 of this Complaint.

381.    By requiring Mrs. McCord to participate in the Gender Support Plan policy, including by socially transitioning students and hiding some students' social transition from their parents, South Madison has compelled Mrs. McCord to speak its viewpoint on a matter of public concern.

382.    South Madison has threatened to discipline Mrs. McCord and other employees, and did in fact discipline Mrs. McCord, for not speaking its message about socially transitioning students and informing parents.

383.    If South Madison had not terminated Mrs. McCord's employment in retaliation for exercising her constitutional rights, she could not comply and would not intend to comply with South Madison's Gender Support Plan policy; in particular, its requirements regarding socially transitioning students and parental notification.

384.    The Constitution protects Mrs. McCord's right to speak and to refrain from speaking.

385.    Compelled speech imposes additional harm, and so requires an even more urgent justification.

386.    The government must withstand "exacting scrutiny" in order to furnish this more urgent justification for compelled speech, which requires showing that compelling Mrs. McCord to speak furthers a compelling interest that could not be secured by significantly less restrictive means.

387.    Mrs. McCord wishes to speak as a private citizen consistently with her sincerely held beliefs about these matters of public concern, because they implicate issues—human identity, sex, gender, and mental health, among others—that are hotly contested in education, society, law, politics, and academia, both in Pendleton and throughout Indiana; indeed, throughout the world.

388.    Conversely, Mrs. McCord wishes to remain silent—to not speak South Madison's message—because using names and pronouns to participate in social transition and hiding their use from parents takes specific, identifiable positions on this matter: for instance, that a person's subjective identity (and not the person's sex) determines whether the person is male or female; or that school employees should make important decisions for students without parental involvement.

389.    Mrs. McCord's desire to remain silent by refraining from participating in the Gender Support Plan policy—in particular, to refrain from socially transitioning students and from hiding information from their parents—implicates her interest as a private citizen because she would never participate in a person's social transition on her own time or at work.

390.    Mrs. McCord's desire to remain silent by refraining from participating in the Gender Support Plan policy implicates her interest as a citizen because no

58

amount of private speech on her own time can counteract the harm that she would cause to her own conscience or to her students by socially transitioning them or by keeping it from their parents.

391.    Mrs. McCord had no valid official duty to participate in students' social transition or hide it from parents.

392.    South Madison's policies and practices relating to students' social transition was not a valid curricular requirement.

393.    Before South Madison's adverse employment actions against Mrs. McCord, her official duties did not include conducting in-classroom instruction of South Madison students.

394.    Mrs. McCord wishes to speak outside of school on the same issues of public concern without having her message undermined by participating in social transition at school in contradiction to her professed beliefs.

395.    Mrs. McCord has a strong interest in not being forced to speak as a private citizen about an issue of public concern in a manner that violates her beliefs.

396.    And South Madison has no compelling interest in forcing Mrs. McCord to participate in students' social transition nor in forcing her not to disclose some students' social transition to their parents.

397.    Additionally, South Madison's choice to force Mrs. McCord to participate in students' social transition and sometimes to not disclose it to their parents is not narrowly tailored to serve any compelling interest.

398.    Because Mrs. McCord's strong interest in speaking on a matter of public concern outweighs any interests South Madison might assert in forcing her to participate in students' social transition or hide it from parents, she engaged in constitutionally protected activity.

399.    Whatever interest South Madison might have, it could have used significantly less restrictive means to further such an interest, for example: by allowing Mrs. McCord to refrain from using pronouns to which she objects while simultaneously avoiding pronouns that a student has requested not be used; by using nicknames; or, by transferring Mrs. McCord's students with a Gender Support Plan to one of the other school counselors who doesn't share her objections.

400.    South Madison and its employees told Mrs. McCord that she had no choice but to comply with the Gender Support Plan policy's compelled-speech requirements and threatened her with adverse employment action if she chose not to comply, telling her that South Madison would treat noncompliance as insubordination.

401.    Backed by this threat of discipline, therefore, the Gender Support Plan policy has chilled and will chill Mrs. McCord's speech and would deter a person of ordinary firmness from engaging in protected speech.

402.    Therefore, South Madison's actions compelling speech through the Gender Support Plan policy fail exacting scrutiny or any other potentially applicable First Amendment standard; and South Madison has violated Mrs. McCord's right to be free from compelled speech and would be continuing to violate that right had South Madison not taken adverse employment action against her in retaliation for her constitutionally protect activities.

### THIRD CAUSE OF ACTION
### Viewpoint Discrimination
### (U.S. Const., amends. I, XIV; 42 U.S.C. § 1983)

403.    Mrs. McCord repeats and realleges each of the allegations contained in paragraphs 1–357 of this Complaint.

404.    South Madison's Gender Support Plan policy, by requiring employees to socially transition students, expresses the message that people can have a gender identity inconsistent with their sex.

405.    Additionally, the Gender Support Plan policy, by requiring employees to socially transition students at times without informing the student's parents, expresses the message that schools need not inform parents about important actions taken by schools in the lives of their children.

406.    South Madison has threatened to discipline Mrs. McCord and other employees who speak a message contrary to the School Board's message about socially transitioning students and informing parents, and has in fact so disciplined Mrs. McCord.

407.    What South Madison has done here—discriminating against speech because of its message—is presumptively unconstitutional.

408.    The discussion of gender identity, including whether it is appropriate to socially transition a student or hide a student's social transition from parents, is a matter of public concern and public debate.

409.    Mrs. McCord had no valid official duty to participate in students' social transition or hide it from parents, nor was it curricular speech.

410.    Before South Madison's adverse employment actions against Mrs. McCord, her official duties did not include conducting in-classroom instruction of South Madison students.

411.    By threatening to discipline employees like Mrs. McCord who hold viewpoints other than South Madison's, and in fact disciplining Mrs. McCord, it has thus singled out their viewpoints and forbidden them, on pain of discipline, from expressing their viewpoints—even by silently refusing to socially transition a student.

412.    Backed by the threat of discipline, therefore, the Gender Support Plan policy has chilled and will chill Mrs. McCord's speech and would deter a person of ordinary firmness from engaging in protected speech.

413.    Mrs. McCord's speech contrary to South Madison's preferred viewpoint would neither materially and substantially interfere with efficient operation of a school nor prevent South Madison from efficiently providing services to the public, nor would it threaten to do either.

414.    Therefore, South Madison has discriminated and continues to discriminate against Mrs. McCord's speech based on its viewpoint, contrary to the Constitution.

### FOURTH CAUSE OF ACTION
### Free Exercise of Religion
### (U.S. Const., amends. I, XIV; 42 U.S.C. § 1983)

415.    Mrs. McCord repeats and realleges each of the allegations in paragraphs 1–357 of this Complaint.

416.    The Constitution protects Mrs. McCord's right to freely exercise her religion.

417.    The Constitution requires South Madison to act in a neutral and generally applicable manner toward Mrs. McCord and her religious beliefs and bars even subtle departures from neutrality on matters of religion; even a slight suspicion that South Madison's actions stem from animosity towards Mrs. McCord's religious beliefs or practices violates the Constitution.

418.    South Madison has threatened to discipline, and has disciplined,  Mrs. McCord if she does not participate in the Gender Support Plan policy by socially transitioning students and by hiding some students' social transition from their parents.

419.    Specifically, South Madison and its employees told Mrs. McCord that she had no choice but to comply with the Gender Support Plan policy and threatened her with adverse employment action if she chose not to comply, telling her that South Madison would treat noncompliance as insubordination.

420.    But Mrs. McCord has sincerely held religious beliefs that require her not to participate in the Gender Support Plan policy; socially transitioning students and hiding social transitions from parents would violate those beliefs.

421.    If South Madison had not taken adverse employment action against Mrs. McCord in retaliation for exercising her constitutional rights, she could not comply and would not intend to comply with the Gender Support Plan policy's requirements regarding socially transitioning students and parental notification.

422.    South Madison has failed to act in a neutral manner toward Mrs. McCord's religious beliefs but has instead acted with hostility towards those beliefs.

423.    Among other things, its employee, Mr. Taylor, acting pursuant to South Madison's policies and practices, instructed Mrs. McCord to leave her religious beliefs out of her job as a school counselor.

424.    Additionally, South Madison has targeted Mrs. McCord for her religious beliefs by granting accommodations allowing other employees who have not asserted Mrs. McCord's religious beliefs not to comply with the Gender Support Plan policy, while refusing to grant one to Mrs. McCord.

425.    South Madison has also failed to act in a generally applicable way toward Mrs. McCord's religious beliefs, because its policies and practices allowed for individualized assessments by requiring consideration of a list of fact-intensive criteria when creating a Gender Support Plan.

426.    South Madison has also failed to act in a generally applicable way under the Gender Support Plan policy by granting categorical exemptions to other

employees from the policy based on their secular objections, while simultaneously refusing to grant Mrs. McCord's requests for an accommodation from the policy based on her religious beliefs.

427.   South Madison has created a system of individualized exemptions from the Gender Support Plan policy but has refused to grant Mrs. McCord an exemption based on her religious beliefs.

428.   South Madison's Gender Support Plan policy, which requires Mrs. McCord to socially transition students and to hide some students' social transition from their parents, substantially burdens her religious exercise because it forces her to choose between violating her beliefs and losing her job.

429.   The Gender Support Plan policy also substantially burdens Mrs. McCord's right to religious speech, which heightens the constitutional protection received by her right to freely exercise her religion.

430.   Because the Gender Support Plan policy is neither neutral toward religion nor generally applicable, and because it substantially burdens Mrs. McCord's right to religious speech, it must withstand strict scrutiny, which means it must be narrowly tailored to achieve a compelling governmental interest.

431.   South Madison has no legitimate—let alone compelling—interest in forcing Mrs. McCord to violate her sincerely held religious beliefs.

432.   Whatever interest South Madison might have, it could have used significantly less restrictive means to further such an interest, for example: by allowing Mrs. McCord to refrain from using pronouns to which she objects while simultaneously avoiding pronouns that a student has requested not be used; by using nicknames; or, by transferring Mrs. McCord's students with a Gender Support Plan to one of the other school counselors who doesn't share her objections.

64

433.   As a result, South Madison's Gender Support Plan policy is not narrowly tailored to achieve a compelling interest.

434.   Because South Madison enforced this policy against Mrs. McCord in a way that was not narrowly tailored to further any compelling interest, South Madison's policy fails strict scrutiny and violates Mrs. McCord's right to be free from substantial burdens on her religious exercise.

### FIFTH CAUSE OF ACTION
### Indiana Religious Freedom Restoration Act
### (Ind. Code §§ 34-13-9-0.7 through -11)

435.   Mrs. McCord repeats and realleges each of the allegations in paragraphs 1–357 of this Complaint.

436.   Under the Indiana Religious Freedom Restoration Act, South Madison "may not substantially burden" Mrs. McCord's "exercise of religion, even if the burden results from a rule of general applicability." Ind. Code § 34-13-9-8(a).

437.   South Madison has threatened to discipline Mrs. McCord if she does not participate in the Gender Support Plan policy by socially transitioning students and by hiding some students' social transition from their parents, and South Madison has in fact so disciplined her.

438.   Specifically, South Madison and its employees told Mrs. McCord that she had no choice but to comply with the Gender Support Plan policy and threatened her with adverse employment action if she chose not to comply, telling her that South Madison would treat noncompliance as insubordination.

439.   But Mrs. McCord has sincerely held religious beliefs that require her not to participate in the Gender Support Plan policy; socially transitioning students and hiding social transitions from parents would violate those beliefs.

440.   If South Madison had not taken adverse employment action against Mrs. McCord in retaliation for exercising her constitutional rights, she could not

comply and would not intend to comply with the Gender Support Plan policy's requirements regarding socially transitioning students and parental notification.

441.    South Madison's Gender Support Plan policy, which requires Mrs. McCord to socially transition students and to hide some students' social transition from their parents, substantially burdens her religious exercise because it forces her to choose between violating her beliefs and losing her job.

442.    South Madison cannot demonstrate that it has a compelling interest in forcing Mrs. McCord to violate her sincerely held religious beliefs.

443.    Additionally, South Madison cannot demonstrate that the Gender Support Plan policy is the least restrictive means of furthering any interest it might have; instead, South Madison could have, for example: allowed Mrs. McCord to refrain from using pronouns to which she objects while simultaneously avoiding pronouns that a student has requested not be used; allowed her to use nicknames; or, transferred Mrs. McCord's students with a Gender Support Plan to one of the other school counselors who doesn't share her objections.

444.    As a result, South Madison cannot demonstrate that the Gender Support Plan policy is "the least restrictive means of furthering [a] compelling governmental interest." Ind. Code § 34-13-9-8(b).

445.    Therefore, South Madison is violating Indiana's Religious Freedom Restoration Act by requiring Mrs. McCord to participate in the Gender Support Plan policy.

## JURY DEMAND

446.    A jury trial is demanded on all the issues so triable. Fed. R. Civ. P. 38.

## PRAYER FOR RELIEF

Mrs. McCord respectfully requests that this Court enter judgment against South Madison and provide her the following relief:

A.    A declaratory judgment that the Gender Support Plan policy, as described above, is unconstitutional as applied to Mrs. McCord under the First and Fourteenth Amendments to the U.S. Constitution and violates the Indiana Religious Freedom Restoration Act;

B.    A permanent injunction prohibiting South Madison from requiring Mrs. McCord to participate in the Gender Support Plan policy;

C.    A permanent injunction requiring Mrs. McCord's reinstatement and requiring South Madison, its agents, officials, employees, and any other person acting on its behalf to purge or correct, as law may require, Mrs. McCord's personnel file of any reference to South Madison's termination of her employment contract;

D.    Back pay, front pay, compensatory damages (including but not limited to damages for pain, suffering, emotional distress, humiliation, inconvenience, and reputational harm), nominal damages, and such other damages to which Mrs. McCord may be entitled;

E.    Mrs. McCord's reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988; and,

F.    All other relief to which Mrs. McCord may be entitled.

Dated: May 18, 2023                    Respectfully submitted,

                                       */s/ Joshua D. Hershberger*
DAVID A. CORTMAN*                      JOSHUA D. HERSHBERGER
Georgia Bar No. 188810                 Indiana Bar No. 29679-39
ALLIANCE DEFENDING FREEDOM             HERSHBERGER LAW OFFICE
1000 Hurricane Shoals Road N.E.,       P.O. Box 233
   Suite D1100                         Hanover, Indiana 47243
Lawrenceville, Georgia 30043           (812) 228-8783
(770) 339-0774                         josh@hlo.legal
dcortman@ADFlegal.org

KATHERINE L. ANDERSON*                 VINCENT M. WAGNER*
Arizona Bar No. 33104                  Virginia Bar No. 98663
ALLIANCE DEFENDING FREEDOM             ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street                   44180 Riverside Parkway
Scottsdale, Arizona 85260              Lansdowne, Virginia 20176
(480) 444-0020                         (571) 707-4655
kanderson@ADFlegal.org                 vwagner@ADFlegal.org

*Attorneys for Plaintiff*

*Applications for admission to the bar of this Court pending

## VERIFICATION OF COMPLAINT

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, and that the foregoing statements that pertain to me are based on my personal knowledge.

Executed on May 17, 2023.

Kathy McCord

69