# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

**KATHY McCORD**,

   *Plaintiff,*

  v.

  No. 1:23-cv-00866-RLY-CSW

**SOUTH MADISON COMMUNITY
SCHOOL CORPORATION**,

   *Defendant.*

## BRIEF IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

LOCAL RULE 7-1 STATEMENT OF ISSUES................................................................iii

TABLE OF AUTHORITIES ......................................................................iv

INTRODUCTION ......................................................................1

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE ........................................2

I.    McCord serves as a school counselor for decades without issue. .....................2

II.   South Madison changes students' names and pronouns without parental notification or consent........................................................................2

      A.    South Madison directs employees to stop contacting parents................2

      B.    South Madison's Gender Support Plans implement its directive. .........5

      C.    Some parents are excluded from Gender Support Plan meetings. ........6

      D.    South Madison trains employees on the new directive. ........................7

III.  A journalist reports about South Madison's new directive and Gender Support Plans based, in part, on an interview with McCord..........................8

IV.   Within days of the journalist's first report, South Madison begins the investigation that will lead to McCord's termination...................................10

      A.    South Madison investigates McCord because of her speech. ..............10

      B.    Administrators recommend firing McCord because of her speech.......12

      C.    Relying on rarely used policies, South Madison expressly bases McCord's termination on her protected speech...................................14

LEGAL STANDARD................................................................16

ARGUMENT ................................................................16

I.    The undisputed facts show, as a matter of law, that McCord engaged in constitutionally protected speech. ................................................16

      A.    Speaking to a journalist at home after business hours was not part of McCord's job duties, so she spoke as a private citizen..............17

      B.    McCord spoke to a journalist about an issue of public concern............17

i

C.     McCord's interest in speaking outweighed South Madison's interest in restricting her speech............................................................. 19

      1.     McCord's speech, in which she had a strong interest, did not disrupt South Madison's provision of public services. ......... 20

      2.     McCord neither knew her speech was false nor made it in reckless disregard of the truth. .................................................. 21

           i.     South Madison cites only statements by the journalist—not McCord. .................................................. 21

           ii.     The journalist's statements were true. ............................ 22

II.     Undisputed evidence shows South Madison would not have fired McCord but for her protected speech. ............................................................. 27

      A.     The direct evidence that South Madison fired McCord because of her speech makes a pretext analysis unnecessary. .............................. 27

      B.     Genuine disputes of material fact preclude summary judgment on whether South Madison fired McCord for pretextual reasons. ....... 29

           1.     South Madison's enforcement of rarely used, ambiguous policies provides an inference of pretext.................................... 30

           2.     South Madison's disproportionate discipline provides an inference of pretext. ...................................................................... 31

           3.     South Madison's investigation was suspicious in time and scope, further strengthening the inference of pretext............... 33

CONCLUSION............................................................................................. 35

CERTIFICATE OF SERVICE ..................................................................... 37

## LOCAL RULE 7-1 STATEMENT OF ISSUES

Plaintiff Kathy McCord gave truthful information to a journalist about a controversial school-district practice during an interview at her home after working hours. Her employer, Defendant South Madison Community School Corporation, immediately began an investigation of her speech to that journalist that ended in her termination. The issues presented are:

1.      Whether McCord's speech was protected by the First Amendment;

2.      Whether McCord's termination is a deprivation likely to deter protected speech; and,

3.      Whether the undisputed facts show that, as a matter of law, South Madison would not have fired McCord but for her protected speech.

# TABLE OF AUTHORITIES

## Cases

*City of San Diego v. Roe,*
  543 U.S. 77 (2004) .......................................................................................... 18

*Connick v. Myers,*
  461 U.S. 138 (1983) .................................................................................. 17, 19

*Davis v. City of Chicago,*
  889 F.3d 842 (7th Cir. 2018) ........................................................................ 16

*Dishnow v. School District of Rib Lake,*
  77 F.3d 194 (7th Cir. 1996) ..................................................................... 19, 20

*Donley v. Stryker Sales Corp.,*
  906 F.3d 635 (7th Cir. 2018) ........................................................................ 34

*Forgue v. City of Chicago,*
  873 F.3d 962 (7th Cir. 2017) ........................................................................ 17

*Garcetti v. Ceballos,*
  547 U.S. 410 (2006) ................................................................................. 16, 17

*Geraghty v. Jackson Local School District Board of Education,*
  No. 5:22-CV-02237, 2024 WL 3758499 (N.D. Ohio Aug. 12, 2024) ...................... 18

*Goelzer v. Sheboygan County,*
  604 F.3d 987 (7th Cir. 2010) ........................................................................ 16

*Gordon v. United Airlines, Inc.,*
  246 F.3d 878 (7th Cir. 2001) ........................................................................ 31

*Gross v. FBL Financial Services, Inc.,*
  557 U.S. 167 (2009) ....................................................................................... 30

*Gustafson v. Jones,*
  290 F.3d 895 (7th Cir. 2002) ..................................................................... 20, 21

*Haddad v. Wal-Mart Stores, Inc.,*
  914 N.E.2d 59 (Mass. 2009) ......................................................................... 30

*Harnishfeger v. United States,*
  943 F.3d 1105 (7th Cir. 2019) .............................................................. 16, 17, 19

*Hobgood v. Illinois Gaming Board*,
  731 F.3d 635 (7th Cir. 2013) ............................................................... 29, 34, 35

*Huff v. Buttigieg*,
  42 F.4th 638 (7th Cir. 2022) ....................................................................... 29, 31

*Janus v. American Federation of State, County, & Municipal Employees*,
  585 U.S. 878 (2018) ................................................................................ 18, 19, 22

*Johnson v. Chrysler Group, LLC*,
  No. 1:12- CV-1582-WTL-DML, 2014 WL 3509984 (S.D. Ind. July 15, 2014) ....... 35

*Josephson v. Ganzel*,
  115 F.4th 771 (6th Cir. 2024) .............................................................................. 18

*Karatzas v. Herricks Union Free School District*,
  No. 15-CV-2888, 2017 WL 3084409 (E.D.N.Y. July 18, 2017) .............................. 32

*Kodish v. Oakbrook Terrace Fire Protection District*,
  604 F.3d 490 (7th Cir. 2010) ...................................................................... passim

*Leonard v. McDonough*,
  No. 17-C-9259, 2024 WL 965192 (N.D. Ill. Mar. 6, 2024)..................................... 29

*Machinchick v. PB Power, Inc.*,
  398 F.3d 345 (5th Cir. 2005) ............................................................................... 30

*Meade v. Moraine Valley Community College*,
  770 F.3d 680 (7th Cir. 2014) ............................................................................... 18

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) ............................................................................... 18

*Nichol v. City of Springfield*,
  No. 6:14-CV-01983-AA, 2017 WL 6028465 (D. Or. Dec. 3, 2017).................... 32, 33

*Noeth v. Autozone Stores, Inc.*,
  No. 3:05- CV-149-RLY-WGH, 2007 WL 1396428 (S.D. Ind. May 3, 2007) ........... 35

*Ortiz v. Werner Enterprises, Inc.*,
  834 F.3d 760 (7th Cir. 2016) ............................................................................... 27

*Peele v. Burch*,
  722 F.3d 956 (7th Cir. 2013) ............................................................................... 29

*Pickering v. Board of Education of Township High School District 205*,
  391 U.S. 563 (1968) ............................................................................................. 19

*Rudin v. Lincoln Land Community College,*
   420 F.3d 712 (7th Cir. 2005) ............................................................ 27

*Stalter v. Wal-Mart Stores, Inc.,*
   195 F.3d 285 (7th Cir. 1999) .................................................... 29, 31, 32

*Swetlik v. Crawford,*
   738 F.3d 818 (7th Cir. 2013) ............................................................ 22

*Uvalle v. Dominick,*
   No. 09-C-3665, 2011 WL 589620 (N.D. Ill. Feb. 10, 2011) .............................. 27, 28

*Valentino v. Village of South Chicago Heights,*
   575 F.3d 664 (7th Cir. 2009) ............................................................ 29

*Vlaming v. West Point School Board,*
   895 S.E.2d 705 (Va. 2023) .............................................................. 18

*Wilcox v. Lyons,*
   970 F.3d 452 (4th Cir. 2020) ............................................................ 32

*Wood v. Cottey,*
   No. 1:02-CV-01450-RLY-TA, 2004 WL 3315376 (S.D. Ind. Sept. 21, 2004) .......... 18

*Yahnke v. Kane County,*
   823 F.3d 1066 (7th Cir. 2016) ...................................................... 16, 31

**Rules**

Fed. R. Civ. P. 56 ...................................................................... 16

**INTRODUCTION**

One evening in December 2022, Plaintiff Kathy McCord sat for a brief interview with a journalist at her home. He had questions about a new directive from her public employer, Defendant South Madison Community School Corporation. It had directed employees to stop notifying parents when their children asked, for gender-related reasons, to change names or pronouns at school. And it was using a document called a "Gender Support Plan" to implement that directive. McCord truthfully answered the journalist's questions based on her firsthand knowledge of that directive from implementing it as a high school counselor.

Because South Madison had never publicly disclosed this directive, many in the community only learned of it when the journalist wrote an article about it. And they voiced their displeasure with the directive at a School Board meeting three days after the article was published. Within a week, South Madison launched an investigation into McCord's involvement with the article. About a month later, after multiple meetings, McCord's supervisors recommended her termination.

At first, South Madison only sought to discipline McCord for statements the journalist made in his article. As the investigation progressed, its rationale shifted. It also claimed that McCord lied about how the journalist had obtained a blank, non-confidential copy of the Gender Support Plan. But McCord has maintained that he had a copy before her interview. Rather than investigate whether that was true, South Madison invoked policies it had never used against any other employee to fire McCord—despite her unblemished, 20-plus-year record.

Because South Madison cited McCord's protected speech as grounds for her termination, there is enough undisputed, direct evidence to warrant summary judgment in McCord's favor on her free-speech retaliation claim. As for the scope of her damages and her other claims, genuine issues of material fact preclude summary judgment. So McCord asks the Court to let them proceed to trial.

1

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### I.  McCord serves as a school counselor for decades without issue.

1.    South Madison hired McCord as a school counselor at Pendleton Heights High School starting in the 1998–1999 school year, and her job was to help the 450 or so students assigned to her with college or career preparation, class scheduling, and emotional or family issues. (Answer, Doc. 18, ¶¶ 24–25; App. 290, 305.)

2.    Working with parents was also an "important part" of her job. (App. 308.)

3.    As a school counselor, McCord was not typically in the classroom, and her job duties did not include speaking with the press or making public statements on behalf of South Madison. (App. 139, 295, 320, 324; *see* App. 295–99  (describing occasional in-classroom visits by counselors); *accord* App. 196.)

4.    McCord received consistently positive evaluations from her supervisors, including Mike Taylor, the director of counseling and McCord's supervisor, who rated her as "highly effective"—the highest rating. (Answer ¶¶ 27, 31; App. 302.)

5.    The assistant superintendent who oversaw Pendleton Heights, Andrew Kruer, also called McCord "a highly effective counselor" who "worked well with students." (App. 402.)

6.    Neither the current principal of Pendleton Heights, Shaun Rose, nor his immediate predecessor, Connie Rickert, had any issues with McCord's work. (App. 494–95; App. 674–75.)

### II.  South Madison changes students' names and pronouns without parental notification or consent.

#### A.  South Madison directs employees to stop contacting parents.

7.    At the start of the 2021–2022 school year, South Madison experienced a notable increase in students asking to change their names or pronouns for gender-related reasons, mainly at the high school, but also at the middle school and at least one elementary school. (App. 133, 136, 197–98, 208–09, 330–32, 404–05.)

8.   An email Superintendent Mark Hall sent South Madison administrators in August 2021 said: "[W]e have had students in almost all of our schools who have requested accommodations related to their preferred gender." (App. 787; *see* App. 225–26, 230 (authenticating exhibit).)

9.   At first, by Hall's directive, South Madison notified a student's parents and sought their consent before changing the student's name or pronouns for gender-related reasons. (App. 199, 201–02, 205–06, 207–08, 410–11, 517–18, 570–71; *see* App. 823 (describing practice); App. 498–99 (authenticating exhibit).)

10.  Under Hall's initial directive, South Madison tasked school counselors like McCord with obtaining parental consent before changing a child's name or pronouns for gender-related reasons. (App. 201–02, 205–08, 571.)

11.  In September 2021, Hall issued a new directive based on a decision made by him and the School Board "to not involve the parents in granting th[ose] request[s]" for "gender-related name or pronoun changes." (App. 207–08; *see* App. 226–27, 536, 540, 543–45; *see also* App. 3–7 (interrogatory response summarizing South Madison's directives).

12.  At this point, "no effort was made" by South Madison "to notify the parents" of a gender-related request to change names or pronouns. (App. 572–73.)

13.  South Madison employees would refer to students "by the name they requested" without "any communication home to inform the parents that the request had been made"—even when a student "informed the counselor that their parents were not supportive." (App. 210; *see* App. 155–56, 407.)

14.  Under this new directive, school counselors were to meet with a student making a gender-related request to change names or pronouns and ask whether the student's parents were aware. (App. 142.)

15.  If a student told a counselor the student's parents were aware and supportive of the student's request, the counselor did not usually verify the parents'

3

awareness or support. (*Id.*; *see* App. 316–18, 355–57, 448.)

16.  And when students "requested that South Madison employees not notify their parents" about their names or pronouns, South Madison would "honor the request." (App. 408.)

17.  South Madison employees were "expected not to notify parents" about requests to change names or pronouns if students "didn't want their parents to be aware of that." (App. 461–62; *see* App. 156–57, 167–68, 172, 335–36, 510, 511.)

18.  At times, South Madison used one set of names and pronouns for a student at school, while using a different set of names and pronouns in correspondence with the student's parents—even when parents were unaware their child had requested to go by a different name or pronouns at school. (App. 449–50.)

19.  Not all parents knew about their children's request to change names or pronouns. (App. 273–75.)

20.  South Madison knew it "had many parents who say they do not agree with their child's preferred name." (App. 779; *see* App. 190–91 (authenticating exhibit).)

21.  Yet South Madison granted gender-related requests, including name or pronoun changes, without parental consent or notice. (App. 179, 399–400.)

22.  South Madison would only tell parents about "the name and pronoun change" if they "were to call in and ask specifically about that." (App. 408; *see* App. 167–68, 217, 220, 323–24.)

23.  This new directive led to conflict between South Madison and some parents. (App. 214; *see* App. 457–58 (describing one particular conflict).)

24.  By changing students' names and pronouns for gender-related reasons, South Madison engages in a practice called "social transition," which "is a powerful intervention" that "strongly predisposes the child and family to desire and receive puberty blockers, cross-sex hormones and surgical interventions." (App. 22–23, 73–75, 110; *see* App. 749–50, 753–55, 761–63.)

4

**B. South Madison's Gender Support Plans implement its directive.**

25.  In September 2021, to keep track of students' gender-related requests, South Madison began using a form called a Gender Support Plan. (App. 347, 360, 420–21, 433.)

26.  The Gender Support Plan was "part of the school administration's day-to-day implementation of the board-approved nondiscrimination policy." (App. 561; *see* App. 556–58 (discussing nondiscrimination policy, reproduced at App. 832).)

27.  Taylor obtained a Gender Support Plan from a nearby school district and sent it to Kruer, who used it as a model for South Madison's own plan. (App. 150–51, 344, 376, 379, 432.)

28.  For the 2022–2023 school year, Kruer created a shortened version of the other district's form. (App. 811 (form); *see* App. 424–28 (authenticating exhibit).)

29.  Given Kruer's roles as the Assistant Superintendent for Secondary Curriculum, Instruction, and College and Career Readiness and also as a Title IX coordinator, he was primarily responsible for implementing the directive not to notify parents and the use of Gender Support Plans. (Answer ¶¶ 69–70, 297; App. 145–47, 152, 187, 505.)

30.  When it came to the Gender Support Plan form itself, Kruer made the ultimate decision about what it would contain. (App. 341, 389–90, 428–29.)

31.  More broadly, Kruer "oversees" "anything that occurs at the high school." (App. 391; *see* App. 487–88 (Kruer is direct supervisor of high school's principal).)

32.  At the assistant superintendent level, Kruer is in charge of the counseling department at Pendleton Heights. (App. 518–19; *see* App. 390.)

33.  So when Kruer and Taylor (the counseling director) agreed on a decision, the counselors had to comply. (App. 424.)

34.  Hall presented the Gender Support Plan to the School Board to let the Board know South Madison would be implementing it. (App. 538–39, 587.)

35.    The School Board had no objections and allowed Hall to proceed with its implementation. (App. 538–39, 587.)

36.    McCord understood that the School Board was "supportive of the development of" the Gender Support Plan and was "behind it." (App. 612.)

**C.  Some parents are excluded from Gender Support Plan meetings.**

37.    During the 2021–2022 school year, Kruer attended meetings with the counselors and most students who received Gender Support Plans. (Answer ¶ 71; App. 434–35.)

38.    As South Madison informed the Office for Civil Rights with the U.S. Department of Education: "At those meetings, counselors would ask if the student would like the parents involved; if the student did not want the parent involved in the meeting, the counselor would hold it without them. … Some of those meetings involved the parents and some did not, at the request of the student." (App. 807; *see* App. 480–81 (authenticating exhibit); *see also* App. 175.)

39.    Counselors "were instructed that [they] had no legal obligation to inform parents" about their child's Gender Support Plan. (App. 171; *accord* App. 178.)

40.    And even when parents were contacted, counselors were "not asking for permission" but "just letting them know this is what's going to be done." (App. 172.)

41.    South Madison has never posted a blank Gender Support Plan on its website. (Answer ¶¶ 86–87.)

42.    And it did not publicly discuss the existence of Gender Support Plans until after the events that led to this lawsuit. (App. 576, 578–79.)

43.    There was not "ever a notice sent out by South Madison" that it was "going to be using this document" nor "any plan to notify parents about" it. (App. 217, 222; *accord* App. 163–64.)

44.    In fact, Hall agreed that, before the events leading to this lawsuit, parents

6

would not "know whether or not to contact the school to" ask whether "'their student is requesting to be called by a different name,'" because there wasn't "anything that would notify them to do that." (App. 248 (discussing exhibit at App. 793).)

45.   Neither the existence of the Gender Support Plans nor the blank document itself was confidential, so sharing a blank copy would not violate any South Madison policy. (Answer ¶ 129; *see* App. 270, 352, 444–45, 507–08, 551–53.)

46.   Because of that, an employee would not expect to be punished for disclosing its existence. (App. 508.)

**D.  South Madison trains employees on the new directive.**

47.   In August and September 2021, Hall shared a training video about the new directive, first with the School Board, then with administrators, and finally with McCord and Zukowski. (App. 806–07.)

48.   Soon after these trainings, South Madison started using Gender Support Plans to implement its new directive, and counselors had to participate. (App. 382, 386, 454, 472–73.)

49.   After creating a Gender Support Plan for a student, the counselors would contact the student's teachers to inform them of the gender-related requests they needed to implement for that student, usually a request to change names and pronouns. (App. 159–62, 313.)

50.   Taylor "generally instructed counselors to inform teachers verbally regarding Gender Support Plans due to a concern regarding email that could be subject to public record requests." (Answer ¶ 107.)

51.   Unlike other plans for students, teachers would receive instructions about the new names and pronouns of students with Gender Support Plans but would not generally have access to copies of the Plans themselves. (App. 349–50, 363.)

52.   Once teachers heard from a counselor that a student had requested

different names or pronouns, they were expected to comply with that request and were not allowed to contact parents about their children's request. (App. 212–13, 363–64, 502, 514, 545, 582; *see* App. 412–13 (intentional noncompliance would likely violate nondiscrimination policy).)

53.  More than that, when teachers communicated with parents, they were supposed to refer to a student "[h]owever the student asked them to do"—"even if the student's parents were unaware of the student's request." (App. 585.)

54.  In the fall semester of the 2021–2022 school year, South Madison told the federal government that there were twenty requests by students for a "preferred name" or "preferred pronouns," and that it did not contact parents about six of those requests, or 30%. (App. 786; *see* App. 788 (government request for this information); *see also* App. 476–80 (authenticating and discussing exhibits).)

### III. A journalist reports about South Madison's new directive and Gender Support Plans based, in part, on an interview with McCord.

55.  On November 30, 2022, a journalist named Tony Kinnett left McCord a voicemail, asking to speak with her. (Answer ¶ 91.)

56.  At first, McCord did not plan to call him back. (App. 615.)

57.  But the next day, she heard that, circulating in the community, was one of her work emails in which she told teachers about a student whose parents did not support a name change and told "teachers to use discretion if they called home." (App. 615–16; *see* App. 777 (email); App. 182–84, 233–34 (authenticating email).)

58.  McCord does not know how Kinnett obtained this email. (App. 616–17.)

59.  And Hall never investigated how Kinnett obtained this email. (App. 234.)

60.  Presuming Kinnett wished to discuss that email and wanting "to get to the bottom of what was going on," McCord returned Kinnett's call. (App. 615–16.)

61.  Unlike the other South Madison employees on the email, McCord's name was not redacted. So she felt a need to defend herself from the appearance "that it

looked like [she] was deceiving parents by following the process [she] was told to do." (App. 634–35.)

62.  Kinnett interviewed McCord at her house around 7:30 P.M. on December 1, 2022. (Verified Compl., Doc. 1, ¶ 117; *see* App. 617.)

63.  Kinnett brought a blank hard copy of South Madison's Gender Support Plan with him to the interview. (Verified Compl. ¶¶ 123–26; *see* App. 617–18.)

64.  While Kinnett was at McCord's house, she used her computer to open a blank Gender Support Plan to confirm that the copy Kinnett brought with him was accurate. (Verified Compl. ¶ 125.)

65.  After Kinnett left McCord's house, she downloaded an electronic copy of the blank Gender Support Plan, emailed a copy to Kinnett, and sent him a screenshot that showed who last edited it. (*Id.* ¶ 276; *see* App. 621.)

66.  Kinnett sent McCord a draft of his article before he published it, and McCord responded with proposed corrections. (App. 624; *see* App. 640–49 (discussing inaccuracies McCord identified in the article).)

67.  Although Kinnett did not adopt all of McCord's proposed corrections, and there were portions that she "would have worded differently," in the end, she thought the gist of his article was correct. (App. 627, 630–31, 635–36.)

68.  On December 5, 2022, Kinnett published his first article about South Madison, which led to "a whole lot of questions about things that were in" it, but "[n]ot so much in the classroom disruption." (App. 237; *see* App. 781–85 (article); App. 250–51 (authenticating article).)

69.  Superintendent Hall remembered, in general, receiving "lots of e-mails" from community members upset about the practices reported on in the article. (App. 241–42 (referring to exhibit at App. 791).)

70.  But Hall could only remember one employee discussing the effects of the article on South Madison. Taylor, the counseling director, told Hall that people were

criticizing him. (App. 237–38.)

71.   And Taylor recalled only that the article caused "student concerns, parent concerns, and tension within the office." (App. 367–68, 373.)

72.   Kinnett's article created "a lot of buzz" in the community and increased attendance at the School Board's meetings. (App. 465–66.)

73.   Some of that attention came from angry community members questioning South Madison's practices, including at the December 8 School Board meeting, when many people attended and spoke about Kinnett's article. (App. 469; App. 522–23; *see* Answer ¶ 154 (admitting to authenticity of link to video of Dec. 8 meeting).)

74.   As this community response to that article shows—and multiple South Madison witnesses admitted—schools' practices related to transgender students were the subject of public debate. (App. 326–27, 338, 395–96, 678–80.)

75.   On December 19, 2022, Kinnett published another article about South Madison that again cited McCord as a source even though she did not give another interview or any additional information for this article. (Verified Compl. ¶ 145; *see* App. 798 (reference in this article to McCord); App. 280–81 (authenticating article).)

## IV. Within days of the journalist's first report, South Madison begins the investigation that will lead to McCord's termination.

### A. South Madison investigates McCord because of her speech.

76.   Before Hall or Taylor had seen the article or knew whom Kinnett had interviewed, McCord told Taylor that she had spoken with Kinnett. (App. 369–70.)

77.   Hall called Taylor, who told Hall of McCord's interview. (App. 262–63.)

78.   After Hall read the article, he started investigating where the information in it had come from. (App. 254–57.)

79.   From the outset, Hall and the School Board focused on the content of McCord's speech, treating it as a "leak of information to the media." (App. 551–53.)

80.   Hall quickly asked to meet with McCord, but she was not immediately

available due to counseling responsibilities. (App. 260–61.)

81.   So Hall met with McCord on December 15, 2022, one week after the School Board meeting during which many community members voiced concerns about South Madison's directive not to notify parents. (Answer ¶ 167; App. 265.)

82.   That December 15 meeting also included Rose, who was then still an assistant principal but would become the principal on January 1, and Lana Moore, the president of South Madison's teacher's union. (Answer ¶¶ 169–170; App. 685–86; *see* App. 795–96 (Hall's notes); App. 809–10 (Rose's notes); App. 278 (authenticating Hall's notes); App. 526–28 (authenticating Rose's notes).)

83.   Hall first discussed the substance of the December 5 article with McCord, who told him that the article "didn't accurately convey information from her in every instance." (App. 689; *see* Answer ¶ 175.)

84.   After that discussion, Hall asked McCord about how Kinnett had obtained the documents referenced in that article. (Answer ¶ 175.)

85.   McCord told Hall "the reporter already had a copy of the gender support plan at the beginning of her interview," and that "she accessed an electronic copy of the gender support plan while the reporter was at her house." (App. 689, 693–94.)

86.   But there is no evidence Hall asked McCord "whether she e-mailed an electronic copy of the gender support plan to the reporter." (App. 689–90, 694.)

87.   The next day, Taylor also convened a meeting about the article with McCord that Rose and Moore attended. (Answer ¶ 188.)

88.   The December 15 and 16 meetings took place the week before Christmas break. (Answer ¶ 167; App. 265.)

89.   Between then and the break, Kruer and Hall called Ryan Watts, the technology director, to investigate who had accessed the electronic Gender Support Plan saved in Kruer's Google Drive. (App. 708, 711–12, 718–19; *see* App. 597.)

90.   While on the phone with Kruer and Hall, Watts generated an "audit report"

11

for that document. (App. 713–15, 722–35.)

91.  That audit report showed McCord had downloaded that document at 9:53 P.M. the night of her interview with Kinnett. (App. 886–87; *see* App. 739–40, 742 (authenticating exhibit).)

92.  When employees returned in the new year, Rose and Hall again met with McCord on January 4, 2023. (Answer ¶¶ 192–94.)

93.  For the first time, Hall presented McCord with information showing that she had accessed the digital version of the Gender Support Plan on December 1, 2022, the day of her interview with Kinnett, from her house. (*Id.* ¶ 195.)

94.  McCord still understood Hall's and Rose's questions to relate to how Kinnett had first obtained a copy of the Gender Support Plan. (App. 655–56.)

95.  Again, McCord told Hall that "she didn't give the reporter a hard copy of the gender support plan," and that "she accessed the electronic gender support plan during the interview with the reporter." (App. 697.)

96.  In this meeting she maintained what she had consistently told them: When Kinnett arrived at her house on December 1, 2022, he already had a hard copy version of the Gender Support Plan, and while he was there, she accessed an electronic version to check the accuracy of his copy. (Verified Compl. ¶¶ 275–77.)

97.  After the January 2023 meeting, McCord reviewed her emails with Kinnett and realized she had forgotten that she emailed him an electronic copy of the Gender Support Plan after Kinnett left the interview—and after he had shown her the hard copy he had obtained elsewhere. (App. 659–62.)

**B.  Administrators recommend firing McCord because of her speech.**

98.  Soon after the January meeting—"[l]ess than a month after publication of [Kinnett's] article"—Hall and Rose informed Moore "they intended to recommend that the School Board cancel [McCord's] employment contract." (Answer ¶ 370.)

99.  On January 18, Rose gave McCord a draft of a letter recommending that the School Board cancel her contract. He told her to expect the final version the morning of January 20, and to expect that at that point, that she would be placed on administrative leave, required to leave the building, and instructed not to speak with any students or faculty. (*Id.* ¶ 199.)

100. Rose's letter came to McCord on January 20, "[a] little more than one month after publication of [Kinnett's] article," and it immediately placed McCord on administrative leave and recommended that the School Board fire her. (*Id.* ¶¶ 205, 371; *see* App. 826–30 (letter); App. 531 (authenticating letter).)

101. Rose expressly based his recommendation on McCord's interview with Kinnett and identified five statements from Kinnett's December 5 article that he claimed were "false or made without truth or accuracy." (App. 826–28.)

102. Rose also claimed that McCord lied about how Kinnett obtained a copy of South Madison's Gender Support Plan. (App. 828.)

103. South Madison required McCord to sign the letter to acknowledge receipt and immediately terminated her network access. (Answer ¶ 206.)

104. On January 25, 2023, McCord emailed Hall to request a private conference with him to discuss the reasons given in by Rose for his recommendation that the board fire her. (*Id.* ¶ 225 (admitting that Compl. Ex. 7 is a copy of McCord's email); *see* App. 802–04 (reproducing email).)

105. In that email, McCord summarized her responses to the allegations in Rose's letter, with a particular focus on refuting the allegation that she lied about sending Kinnett a blank copy of the Gender Support Plan. (App. 803–04.)

106. Although McCord copied the members of the School Board on her email to Hall, he instructed them not to read this email, and the School Board did not consider it when deciding whether to terminate her contract. (App. 602–03, 607.)

107. Per McCord's request, she had a short conference with Hall on February 3,

during which they discussed Rose's letter, and which South Madison viewed as her opportunity "to appeal [Rose's] recommendation." (App. 593–94; *see* Answer ¶ 279.)

108. But Moore (McCord's union representative) recalled that during this conference Hall seemed like he had already made a decision; her "termination seemed kind of like a done deal at that point." (App. 700.)

109. Although McCord told Hall about "specific corrections that [she] had given Mr. Kinnett that he did not incorporate," Hall asked no questions about her email responding to the allegations in Rose's letter. (App. 665; *see* App. 703.)

110. Less than a week later, Hall sent the School Board a short note in which he wrote that his "careful consideration of the teacher's statements" led him to recommend firing McCord. (App. 805; *see* App. 284–85 (authenticating exhibit).)

### C. Relying on rarely used policies, South Madison expressly bases McCord's termination on her protected speech.

111. McCord immediately requested a hearing, which took place on March 7. (Answer ¶¶ 281–82, 372.)

112. Watts, the technology director, testified at the hearing about the Google Docs audit report, which Hall used as evidence to the School Board. (*See* App. 770–74 (Watts's testimony during School Board hearing).)

113. Because that report begins on July 26, 2022, with an entry for McCord viewing the Gender Support Plan, the Plan must have existed before that date. (App. 887; *see* App. 735–36.)

114. Watts confirmed this at his deposition, admitting: "I remembered it differently." (App. 738–39.)

115. But he testified to the School Board that the audit report began on the date this Gender Support Plan "was created" and that he could thus confidently say no one other than McCord had downloaded the document. (App. 772–73.)

116. Despite the facial inconsistency between Watts's testimony and the

14

document on which he relied, neither Kruer, nor Hall, nor the School Board—nor anyone else at South Madison—asked him to explain it. (App. 737–39, 742–43.)

117. South Madison terminated McCord's contract on March 9. (Answer ¶ 306.)

118. To explain its purported justifications for firing McCord, the School Board issued a document it called "Findings of Fact, Conclusions of Law, and Order on Contract Cancellation." (App. 878–85; *see* App. 601–02 (authenticating exhibit).)

119. The Board's findings closely resembled Rose's January 20 letter recommending McCord's termination. Like that letter, the findings expressly relied on statements written by Kinnett which mentioned McCord as a source to justify firing her. And like that letter, the findings claimed that McCord had lied about how Kinnett obtained a copy of the Gender Support Plan. (*See* App. 879–83.)

120. In the School Board's conclusions of law, it cited three South Madison policies that it argued justified terminating McCord. It claimed McCord had violated both Policy 3310, "Freedom of Speech in Noninstructional Settings," and Policy 3210, "Staff Ethics"; and it relied on those alleged policy violations to argue that McCord committed "insubordination" under Policy 3139, "Staff Discipline." (App. 883–84; *see* App. 792 (Policy 3310); App. 877 (Policy 3210); App. 824–25 (Policy 3139); *see also* App. 243 (authenticating Policy 3310); App. 566, 600–01 (authenticating and discussing Policy 3210); App. 490–93 (authenticating and discussing Policy 3139).)

121. Superintendent Hall could not explain how employees would know what sorts of conduct would violate Policy 3310, in particular. (App. 243, 245.)

122. And no South Madison employee other than McCord has ever been investigated or disciplined under Policy 3310 or Policy 3210. (App. 566–67, 600–01; *see* App. 243; App. 489–90.)

123. Rose could name no one other than McCord whom South Madison had punished under the exceptions to progressive discipline. (App. 492–93.)

## LEGAL STANDARD

Summary judgment is "appropriate when the pleadings, discovery materials, disclosures, and affidavits demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Goelzer v. Sheboygan Cnty.*, 604 F.3d 987, 992 (7th Cir. 2010); Fed. R. Civ. P. 56(c).

## ARGUMENT

McCord seeks summary judgment on her first cause of action (*see* Verified Compl. ¶¶ 358–79), which claims she "was penalized by an employer"—South Madison—"because of speech." *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 500 & n.9 (7th Cir. 2010). To prevail on this claim, she must show: (1) "she engaged in constitutionally protected speech"; (2) "she suffered a deprivation likely to deter protected speech"; and (3) her protected speech caused that deprivation. *Harnishfeger v. United States*, 943 F.3d 1105, 1112–13 (7th Cir. 2019). Because South Madison can't dispute "termination is the sort of deprivation likely to deter the exercise of First Amendment rights," *Yahnke v. Kane Cnty.*, 823 F.3d 1066, 1070 (7th Cir. 2016), the Court can focus on the first and third elements.

As explained below, McCord seeks partial summary judgment on the merits of this claim and a jury trial on her other claims and the scope of damages.

## I. The undisputed facts show, as a matter of law, that McCord engaged in constitutionally protected speech.

McCord did "not surrender all [her] First Amendment rights by reason of [her] employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). When she spoke to a journalist after work at her home, her speech was protected. The undisputed facts prove: (1) she spoke as a private citizen, (2) addressed a matter of public concern, and (3) her interest in speaking was not outweighed by South Madison's interest "in promoting effective and efficient public service." *Davis v. City of Chicago*, 889 F.3d 842, 845 (7th Cir. 2018) (citation omitted).

16

## A. Speaking to a journalist at home after business hours was not part of McCord's job duties, so she spoke as a private citizen.

When a public employee like McCord engages in protected speech "*about*, [her] public employment," it remains protected unless "the speech is made *pursuant to*" her official duties. *Forgue v. City of Chicago*, 873 F.3d 962, 967 (7th Cir. 2017). Because the undisputed facts show McCord's "official responsibilities" did not include speaking to reporters, when Kinnett interviewed her—in her own home after work—she did not "speak[] pursuant to employment responsibilities." *Garcetti*, 547 U.S. at 424. (*See* Verified Compl. ¶¶ 117, 127.)

South Madison's documents and testimony confirm that McCord "spoke as a citizen rather than an employee." *Harnishfeger*, 943 F.3d at 1113. South Madison's Policy 2411, "Guidance and Counseling," describes the official responsibilities of a school counselor like McCord. (App. 775–76.) And it nowhere mentions giving public statements on behalf of South Madison or speaking to reporters. (*See id.*; *see also* Answer ¶ 25.) Witnesses testified that McCord had no duty as a counselor to speak with the press or make such public statements. (*See* App. 139, 196, 320, 324.)

Not only that, South Madison cited its Policy 3310, "Freedom of Speech in Noninstructional Settings," to support its decision to fire McCord. (App. 883–84.) Policy 3310 only applies to speech by an employee who "is not engaged in the performance of professional duties." (App. 792.) By relying on Policy 3310 to justify firing McCord, South Madison conceded that her interview with Kinnett was not given "pursuant to [her] duties as a" school counselor. *Garcetti*, 547 U.S. at 421. So there is no genuine dispute McCord spoke to Kinnett as a private citizen.

## B. McCord spoke to a journalist about an issue of public concern.

The next question is whether McCord "spoke on a matter of public concern rather than 'matters only of personal interest.'" *Harnishfeger*, 943 F.3d at 1113 (quoting *Connick v. Myers*, 461 U.S. 138, 147 (1983)). As long as speech has

17

"legitimate news interest" or relates to "a subject of general interest and of value and concern to the public at the time of publication," it is protected. *Meade v. Moraine Valley Cmty. Coll.*, 770 F.3d 680, 684 (7th Cir. 2014) (quoting *City of San Diego v. Roe*, 543 U.S. 77, 83–84 (2004) (per curiam)).

As a matter of law, McCord's speech "to the media[] involve[d] a matter of public concern." *Wood v. Cottey*, No. 1:02-CV-01450-RLY-TA, 2004 WL 3315376, at *7 (S.D. Ind. Sept. 21, 2004). She spoke about South Madison's use of Gender Support Plans to change students' names and pronouns according to their gender identity without parental notification to Kinnett, a journalist writing an article on this topic. (*See* Verified Compl. ¶¶ 113–27; App. 618; *see also* App. 781–85 (copy of article).)

The Supreme Court has held in another free-speech context that "sexual orientation and gender identity … are sensitive political topics" that "are undoubtedly matters of profound value and concern to the public." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 585 U.S. 878, 913–14 (2018) (cleaned up). And many courts have applied this principle to conclude that a public employee spoke on a matter of public concern. *See, e.g.*, *Josephson v. Ganzel*, 115 F.4th 771, 784 (6th Cir. 2024) (plaintiff "spoke on a matter of public concern" when speaking "about the treatment of children with gender dysphoria"); *Vlaming v. W. Point Sch. Bd.*, 895 S.E.2d 705, 741 (Va. 2023) (similar practice in school district touched on "an ideological topic that has engendered fierce public debate"); *Meriwether v. Hartop*, 992 F.3d 492, 506 (6th Cir. 2021) (calling gender identity "a hotly contested matter of public concern"); *Geraghty v. Jackson Loc. Sch. Dist. Bd. of Educ.*, No. 5:22-CV-02237, 2024 WL 3758499, at *14 (N.D. Ohio Aug. 12, 2024) (applying *Meriwether* in the K–12 context). These decisions show that, as a matter of law, McCord spoke on a matter of public concern.

Undisputed facts cement this conclusion. Assistant Superintendent Kruer agreed that "schools' treatment of transgender students is the subject of a public

18

debate," including "around Indiana." (App. 395–96.) Principal Rickert testified that "using preferred names and pronouns for students" was a "heightened issue[]"—a topic "that's in the media"—that "many people are talking about." (App. 678–80.) And Mike Taylor, the director of counseling, "agree[d] that the treatment of transgender students in particular is the subject of public debate." (App. 326–27.)

Unsurprisingly, when the School Board held its first meeting after Kinnett's first article broke, "more people than" were "usually" there attended and spoke about it. (App. 469.) This heightened public interest confirms that McCord was "participating in a public dialogue on matters of interest to the public." *Dishnow v. Sch. Dist. of Rib Lake*, 77 F.3d 194, 197 (7th Cir. 1996). "[N]o more was required to place [her] speech, prima facie, within the protection of the First Amendment." *Id.*

### C. McCord's interest in speaking outweighed South Madison's interest in restricting her speech.

Because McCord's speech to Kinnett was protected, "the court needs to engage in *Pickering* balancing," which is "in the nature of an affirmative defense" on which South Madison bears the burden of persuasion. *Harnishfeger*, 943 F.3d at 1113, 1115; *see Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). To carry this burden, South Madison must show that McCord's speech was "so inimical to the maintenance of a proper educational atmosphere as to be constitutionally permissible grounds for discipline or discharge." *Dishnow*, 77 F.3d at 197. And the "controversial subject[]" of McCord's speech—gender identity— heightens South Madison's burden. *Janus*, 585 U.S. at 913; *see Connick*, 461 U.S. at 152 (requiring "a stronger showing" by a public employer when "employee's speech more substantially involved matters of public concern"). There are no genuine disputes of fact material to *Pickering* balancing. As a matter of law, McCord's interests prevail.

19

## 1. McCord's speech, in which she had a strong interest, did not disrupt South Madison's provision of public services.

As a matter of law, McCord's interest "as a citizen in commenting on the matter" outweighs South Madison's interest "in promoting effective and efficient public service." *Gustafson v. Jones*, 290 F.3d 895, 909 (7th Cir. 2002). And as a matter of fact, McCord's speech did not interfere with South Madison's interests at all. South Madison's "Findings of Fact" don't allege any interference with its provision of education—or any other public service, for that matter. (App. 878–84.) "The absence of any evidence that" South Madison itself "considered [McCord's] speech potentially disruptive is particularly telling." *Gustafson*, 290 F.3d at 911.

The undisputed evidence shows there wasn't any interference. Hall testified that the effect of Kinnett's article was "[n]ot so much in the classroom disruption." (App. 237–38.) He could recall "a whole lot of questions about things that were in" the article (*id.*), including "lots of e-mails" (App. 241–42). But when pressed for specifics, he could only recall reports from Taylor "that people were criticizing them." (App. 238.) And Taylor could only recall the article causing "student concerns, parent concerns, and tension within the [counseling] office." (App. 367–68.) But no other effects came to mind. (*Id.*) Other witnesses recalled "a lot of buzz" about Kinnett's article but little else. (App. 465–66; *see* App. 522–23.)

Far from proving interference, those undisputed facts reinforce McCord's own interests. The pronounced community response to Kinnett's article shows that McCord "was participating in a public dialogue on matters of interest to the public." *Dishnow*, 77 F.3d at 197. Once she discovered Kinnett intended to publish a copy of her email about parental notification—whether or not she answered his questions— McCord felt like she had to explain South Madison's practices and her concerns to the community. (App. 615–16.) Otherwise, based on that email, "it looked like [she] was deceiving parents by following the process [she] was told to do." (App. 634–35.)

20

McCord's speech to Kinnett on a matter of public concern implicated mutually reinforcing interests—the public's interest in learning about South Madison's practices and McCord's interest in explaining her role in and disagreement with them. And "[t]he stronger the employee's interest in speaking, the more substantial a showing the state must make to justify its restriction of that speech." *Gustafson*, 290 F.3d at 909. South Madison can't make that substantial showing.

### 2. McCord neither knew her speech was false nor made it in reckless disregard of the truth.

Rather than show how *McCord's* speech interfered with its provision of services, South Madison has argued that five statements made by *Kinnett* were false. (App. 879–82.) That misstates the standard under South Madison's own policy, which prohibits an employee from "making public expression which s/he knows to be false or are made without regard for truth or accuracy." (App. 792.) South Madison's failure to get its own free-speech policy right is the first of many problems.

#### i. *South Madison cites only statements by the journalist—not McCord.*

To begin with, South Madison does not explain why statements made *by Kinnett* can justify firing McCord. While each statement purports to rely on information she provided, none of the statements directly quotes McCord. (*See* App. 781–85 (Dec. 5 article); App. 797–98 (Dec. 19 article).) Not only that, in both articles Kinnett cites McCord and multiple other sources: a teacher who resigned in protest of South Madison's parental-notification practices; "another counselor who wished to remain anonymous"; and "other counselors." (App. 781–84; *see* App. 798.) Statements by Kinnett based on multiple sources can't prove McCord told him anything untrue.

In any case, and although she told Kinnett the truth, McCord "is not required to prove the truth of [her] speech in order to secure the protections of the First Amendment." *Kodish*, 604 F.3d at 504. Rather, South Madison must prove that she

21

either "knew [her speech] was false or made it in reckless disregard of the truth." *Id.* Yet the School Board's "Findings of Fact" provide no evidence of McCord's state of mind when she spoke to Kinnett. There, South Madison argued each of *Kinnett*'s five enumerated statements was either "not true" or "partially untrue." (App. 879–81.) But it did not make any findings about specific statements *McCord* made—let alone any findings about statements McCord made that she knew were false or made in reckless disregard of the truth. *Kodish*, 604 F.3d at 504.

South Madison's conclusory assertion "that McCord made statements to Kinnett that were at a minimum made without regard for truth or accuracy" makes no difference under *Pickering*. (App. 884.) It not only fails to mention the required mental state—recklessness—but it cites no supporting facts. South Madison "cannot avoid liability for First Amendment retaliation simply by asserting that [McCord's] otherwise protected speech was false or was made recklessly." *Swetlik v. Crawford*, 738 F.3d 818, 827 (7th Cir. 2013). South Madison, as a matter of law, can't show that her speech lost its "special protection." *Janus*, 585 U.S. at 914 (cleaned up).

  *ii. The journalist's statements were true.*

Kinnett's statements were neither directly attributable to McCord nor complete and accurate reflections of what she told him. Setting that aside, a close look at the statements South Madison relied on proves that even his statements were true.

  *(a) First Statement.*—Take the first statement. In it, Kinnett says: "Over the last two years, dozens of 'Gender Support Plans' with guidelines not to contact parents have been sent to teachers across the South Madison school district headquartered in Pendleton, counselor Kathy McCord confirmed." (App. 781.) According to South Madison, this statement is "not true" because "[t]he majority of gender support plans in the Corporation are developed with parent participation." (App. 879.) But that doesn't contradict Kinnett's statement. It is undisputed that

South Madison sometimes changed students' names or pronouns without parental participation. (*E.g.*, App. 179, 399–400.) In the fall of 2021, for example, parents were not contacted in 30% of student name changes. (App. 786.) And South Madison never contacted parents "asking for permission" but "just letting them know this is what's going to be done." (App. 172.)

More pertinent to the *Pickering* analysis, the undisputed evidence shows Kinnett extrapolated this statement from information McCord believed to be true. In the interview, "he asked her how many Gender Support Plans she thought South Madison had in place." (Verified Compl. ¶ 235.) And based on her own experience, "she estimated that, just at Pendleton Heights High School, each school counselor had 12–15 students with such Plans." (*Id.* ¶ 236.)

South Madison also argued this first statement is not true because "[t]he plan documents are not provided to teachers." (App. 880.) But teachers were involved in implementing the plans and received instructions from the counselors about students' gender-related requests. (App. 159–62, 349, 363.) Teachers were expected to comply with those instructions, including instructions about contacting a student's parents. (App. 363–64, 585.) Whether teachers received a copy of the Gender Support Plan document itself misses the point. It is indisputably true that they received "guidelines not to contact parents." (App. 879.)

***(b) Second Statement.***—South Madison's argument for the falsity of Kinnett's second statement also misses the point. According to Kinnett, "McCord said she and other counselors have access to such plans, but teachers, parents, and the public do not." (App. 782.) South Madison calls this statement "partially untrue." (App. 880.) In context, Kinnett's statement did not refer to "specific student plans." (*Id.*; *see* App. 782.) And South Madison's statement that "[t]eachers can be provided the form" contradicts its earlier statement—on the same page—that "[t]he plan documents are not provided to teachers." (App. 880.)

23

As for parents' and the public's access to Gender Support Plans, before this lawsuit, South Madison never publicly discussed the plans or Hall's directive not to notify parents. (Answer ¶¶ 86–87; App. 163–64, 217, 576, 578–79.) And when "parents were not aware and not supportive" of the plan to change a student's name or pronouns, the student would meet with a counselor and Kruer (the assistant superintendent over the high school), "but the parents wouldn't be involved." (App. 175.) So it makes no difference if South Madison would have provided a student's Gender Support Plan to the student's parents if "the parent pointblank ask[ed]." (App. 323–24.) As Superintendent Hall admitted, before Kinnett's first article, parents wouldn't "know whether or not to contact the school to" ask whether "'their student is requesting to be called by a different name,'" because there wasn't "anything that would notify them to do that." (App. 248–49.)

Parents and the public did not have access to a Gender Support Plan, because they "wouldn't have known that it existed." (App. 217.)

***(c) Third Statement.***—The testimony also shows why South Madison is wrong to call Kinnett's third statement "not true." (App. 880.) In it, he said: "McCord and another counselor who wished to remain anonymous confirmed that Andrew Kruer, the assistant superintendent in charge of the counseling department, told counseling staff that this gender support policy was 'board-approved.'" (App. 782.)

The deposition testimony doesn't support South Madison's statement that "Kruer is not in charge of the counseling department." (App. 880.) As "the assistant superintendent over the high school," Kruer "oversees the high school" and "anything that occurs at the high school." (App. 390–91; *see* Answer ¶¶ 69–70.) That necessarily includes the high school's "counseling department." (App. 880; *see* App. 518–19.) And as the Title IX coordinator, Kruer "was primarily responsible for overseeing implementation of the Gender Support Plan," in particular. (Answer ¶ 297; *see* App. 145–47, 152, 187, 341, 389–90, 428–29, 505.) Especially because

24

Kinnett's article related to Gender Support Plans, he correctly said Kruer was "in charge of the counseling department." (App. 880.)

The deposition testimony also contradicts South Madison's quibble that the Gender Support Plan was "not approved by the board." (*Id.*) Around the time South Madison started using Gender Support Plans, Superintendent Hall presented a copy of the Gender Support Plan to the School Board, and the Board did not object to its implementation. (App. 538–39, 587.) This allowed Hall to proceed with implementing the Gender Support Plan. (App. 538–39.) Consistent with Kinnett's statement, the School Board approved implementing Gender Support Plans.

**(d) Fourth Statement.**—The fourth Kinnett statement South Madison cites is the last from his December 5 article. (App. 880.) In it, Kinnett says that Indiana law "doesn't give counselors the authority to diagnose or treat gender dysphoria. McCord and other counselors told The Daily Signal the current South Madison policy requires counselors to do so." (App. 783.) The undisputed evidence is that Kinnett must have based this statement on asking McCord "several variations on the question, 'Are you qualified to diagnose gender dysphoria?' which she denied." (Verified Compl. ¶ 265.) That answer is neither knowingly false nor reckless.

More to the point, South Madison did require counselors "to diagnose or treat gender dysphoria." (App. 783.) By requiring counselors to change students' names and pronouns for gender-related reasons, South Madison required them to engage in so-called "social transition." (App. 22–23, 73–74.) And this is recognized as a "powerful intervention" for gender dysphoria, that "almost inevitably leads to the administration of puberty blockers, which in turn almost inevitably leads to the administration of cross-sex hormones." (App. 75.) This unrebutted scientific evidence supports the truth of Kinnett's statement.

**(e) Fifth Statement.**—The fifth and final Kinnett statement came from his second article, published December 19, 2022. (App. 881.) In that article, Kinnett

said: "McCord also described how she was ordered to compel speech from teachers by requiring them to use one set of names and pronouns with students and another with parents." (App. 798.) For one thing, it's undisputed McCord didn't give another interview to Kinnett for this article. (Verified Compl. ¶ 145.)

Besides that, in this statement Kinnett correctly describes how counselors implemented Hall's directive not to notify parents. School counselors would meet with a student who had made a gender-related request to change names or pronouns. (App. 142.) If a student asked that the student's parents not be notified, then South Madison did not notify them. (App. 408.) In correspondence with such parents, South Madison would continue using the student's legal name and correct pronouns—even while using a different name or pronouns during the school day. (App. 450.) And when a counselor informed other South Madison employees about a student in a situation like this, the other employees were expected to comply with the counselor's instructions. (*See* App. 159–62, 212–13, 363–64, 502, 514, 545, 582.)

According to South Madison, the word "compel" inaccurately describes the counselors' obligation. (App. 881.) But even if South Madison quibbles with Kinnett's word choice, his core claim is true.

*     *     *

The undisputed facts establish that, when McCord spoke to Kinnett for his article about Gender Support Plans and Hall's directive not to notify parents, she spoke as a private citizen on a matter of public concern. Because South Madison has never even alleged that her speech interfered with its provision of public services, and because it cannot show that McCord knew her speech was false or was reckless in regard to its falsity, the First Amendment protects it.

## II. Undisputed evidence shows South Madison would not have fired McCord but for her protected speech.

Because McCord's speech was protected, the question is whether South Madison punished her "because of" her speech. *Kodish*, 604 F.3d at 500. Courts previously analyzed this question using either the "direct method" of proof or the "indirect method." *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 763–66 (7th Cir. 2016). But now the analysis is reduced to a single question: "Whether a reasonable juror could conclude that [the plaintiff] would have kept his job" absent the protected characteristic or activity, "and everything else had remained the same." *Id.* at 764.

The undisputed, direct evidence that South Madison retaliated against McCord because of her protected speech shows that she has satisfied that question as a matter of law. The Court need not consider whether South Madison's other stated justifications are pretextual. But if the Court decides to consider pretext, then the record here creates genuine issues of material fact. (*See infra* pp. 28–35.)

### A. The direct evidence that South Madison fired McCord because of her speech makes a pretext analysis unnecessary.

South Madison expressly relied on McCord's protected speech to fire her, just as Rose and Hall had recommended it should do. (App. 879–81; *see* App. 805 (Hall's letter); App. 826–30 (Rose's letter).) She can thus show "a direct case of retaliation—one that does not require a burden-shifting analysis." *Kodish*, 604 F.3d at 501. And she need not prove pretext to prevail. *See Uvalle v. Dominick*, No. 09-C-3665, 2011 WL 589620, at *5 (N.D. Ill. Feb. 10, 2011) (*Uvalle I*) (per St. Eve, J.) (noting "direct method of proof … does not require a burden shifting, pretext analysis"). South Madison's statements in its "Findings of Fact" attributing McCord's termination to her protected speech amount to "direct evidence" it retaliated against her. *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005).

Along with that direct evidence, the Court can also consider circumstantial

evidence of causation. *Id.* This includes the circumstantial evidence of "suspicious timing." *Id.* (citation omitted). After Kinnett's December 5 article, Superintendent Hall met with McCord about the article as soon as they could find time on their schedules—December 15. (App. 260–61.) Then, after Christmas, Hall surprised McCord by attending a January 4 meeting and confronting her about Kinnett's access to South Madison's Gender Support Plan. (Verified Compl. ¶¶ 192–97; Answer ¶¶ 192–95.) Soon after—and less than a month after the publication of Kinnett's article—Hall and Rose informed McCord's union representative that they intended to recommend that the School Board terminate her employment. (Answer ¶ 370.) Rose's final recommendation to fire McCord came a short time later, a little more than one month after the publication of Kinnett's article. (*Id.* ¶ 371.)

Additionally, both Rose and Hall expressly based their termination recommendations on McCord's protected speech. (App. 826–28 (Rose); App. 805 (Hall).) Not only that, former School Board president Sandefur testified about the Board's concern with a "[p]ossible leak of information to the media." (App. 551.) In other words, Sandefur acknowledged that the content of McCord's speech to Kinnett motivated the investigation—and ultimately termination—of her. (App. 551–52.)

The timeline resembles *Uvalle I.* There, the "direct method" evidence that an employer retaliated based on the plaintiff's election activity consisted mainly of "the suspicious timing of his termination." 2011 WL 589620, at *5–6. The termination process began shortly after his election activity and ended in his firing a month later. *Id.* Similarly, Hall investigated McCord right after Kinnett published his article. In both cases, the process took time to come to fruition. But the causal connection with the election in *Uvalle I* or the article here cannot be disputed. Given the clear causation here, the record shows "that but for [McCord's] protected speech [South Madison] would not have taken the same action." *Kodish*, 604 F.3d at 501.

**B. Genuine disputes of material fact preclude summary judgment on whether South Madison fired McCord for pretextual reasons.**

Under the pretext analysis, McCord must first show her "speech was at least a 'motivating factor' in [South Madison's] decision to take adverse action against [her]." *Peele v. Burch*, 722 F.3d 956, 960 (7th Cir. 2013). McCord has shown that (*see supra* pp. 27–28) and established her prima facie case. South Madison may contend "that it would have taken the same action in the absence of the protected speech." *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 670 (7th Cir. 2009). But if it does, McCord "may still reach trial by producing sufficient evidence to allow a reasonable fact finder to determine that [the] reasons were merely a pretext for firing [her], at least in part, for exercising her First Amendment rights." *Id.*

To start, all South Madison's reasons for firing McCord point to her protected speech, which itself supports an inference of pretext. *See Huff v. Buttigieg*, 42 F.4th 638, 646–47 (7th Cir. 2022) ("Courts are to consider direct and circumstantial evidence together, not separately."). Additionally, because South Madison "enforce[d] [its] polic[ies] in an objectively unreasonable way," a "jury may infer pretext."[1] *Id.* at 648. A variety of "objectively unreasonable" circumstances are present: (1) "the rule invoked by the employer was rarely used, ambiguous, and managers interpreted it differently," *id.*; (2) there is an "imbalance of 'the severity of the punishment in relation to the alleged offense,'" *id.* (quoting *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 290 (7th Cir. 1999)); and (3) there is "evidence from which to infer that [the employer] did not sincerely believe that the investigation against [the plaintiff] and his eventual termination were warranted by his unprotected activity," *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 646 (7th Cir. 2013).

---

[1] *Huff* analyzed "the more generous standard" for causation that applies in federal-employment cases under Title VII. *Leonard v. McDonough*, No. 17-C-9259, 2024 WL 965192, at *9 (N.D. Ill. Mar. 6, 2024). But *Huff* relied throughout on employment cases brought against defendants other than the federal government. *See, e.g.*, 42 F.4th at 648. And *Huff* nowhere suggested that a different pretext standard applies in federal-employment cases.

### 1. South Madison's enforcement of rarely used, ambiguous policies provides an inference of pretext.

South Madison has argued that McCord violated two policies: Policy 3210, "Staff Ethics," and Policy 3310, "Freedom of Speech in Noninstructional Settings." (App. 883–84; *see* App. 877 (Policy 3210); App. 792 (Policy 3310).) It has never even investigated—let alone *fired*—another employee for violating either of these policies. (App. 243, 489–90, 566–67, 600–01.) As for Policy 3310, Superintendent Hall never "explained to the staff members how they would go about complying with this policy." (App. 245.) Not even he could explain how they would "understand when their expression conflicts with the corporation's interest." (App. 243.)

Along with disciplining McCord under previously unused policies, South Madison also employed a previously unused procedure. It normally punishes policy violations under the "progressive discipline" principles established in Policy 3139, "Staff Discipline." (App. 824–25; *see* App. 490–93.) But South Madison bypassed progressive discipline and fired McCord without imposing any lesser punishment. To justify that, it labeled her alleged policy violations "insubordination," invoking an exception to South Madison's use of progressive discipline. (App. 883.) Again, there is no evidence South Madison has ever invoked this or any other progressive-discipline exception as it did with McCord. (App. 492–93.)

An employer's decision to use exceptions to a progressive-discipline policy can itself support an inference of pretext. *See Machinchick v. PB Power, Inc.*, 398 F.3d 345, 354 & n.29 (5th Cir. 2005), *unrelated holding abrogated by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009); *Haddad v. Wal-Mart Stores, Inc.*, 914 N.E.2d 59, 101 & n.17 (Mass. 2009) (holding under state law that reasonable jury could view termination "for a single policy infraction" as pretext, even though progressive-discipline policy "permit[ted] immediate termination" for "gross misconduct").

30

More fundamentally, the Seventh Circuit has held on similar facts that firing an employee based on a "rarely used label" that witnesses could not define "raise[d] a significant question about the truthfulness of [the employer's] proffered reason for the discharge." *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 890 (7th Cir. 2001). That principle applies here. South Madison's own superintendent could not explain important details of Policy 3310, nor had he tried to explain compliance with this policy to South Madison's employees. (App. 243, 245.) And there is no evidence that South Madison has enforced either Policy 3210 or Policy 3310 against any employee other than McCord. (App. 243, 489–90, 492–93, 566–67, 600–01.) Enforcement of these policies is "an almost unprecedented occurrence." *Gordon*, 246 F.3d at 890.

"Mobilizing a rarely enforced rule against an employee is evidence of pretext, even without comparators." *Huff*, 42 F.4th at 649. Because "the rule[s] invoked by" South Madison were "rarely used" and "ambiguous," McCord has "proffered enough evidence of pretext to avoid summary judgment." *Id.* at 648.

### 2. South Madison's disproportionate discipline provides an inference of pretext.

Not only did South Madison invoke rarely used, ambiguous policies to justify disciplining McCord. It invoked them to end her nearly 25-year career with South Madison without even a warning—and without a hint of concern about her job performance. And it fired McCord based on a claim that she lied about providing a non-confidential document to a journalist who had already obtained a copy of that same document from another source. "[T]he imbalance of 'the severity of the punishment in relation to the alleged offense'" further strengthens the inference that South Madison's stated reasons for firing McCord are pretextual. *Huff*, 42 F.4th at 648 (quoting *Stalter*, 195 F.3d at 290); *see Yahnke*, 823 F.3d at 1072 (summary judgment inappropriate on pretext where it was "clear that, even if [plaintiff] had violated department rules, lesser forms of discipline were available");

31

*see also Wilcox v. Lyons*, 970 F.3d 452, 457 (4th Cir. 2020) (reasoning that a "disproportionate response to a minor workplace infraction suggests pretext"); *Karatzas v. Herricks Union Free Sch. Dist.*, No. 15-CV-2888, 2017 WL 3084409, at *23 (E.D.N.Y. July 18, 2017) (denying summary judgment to school based on "disproportionately harsh punishment [plaintiff] received").

McCord had worked at the school since the 1998–1999 school year. (Answer ¶ 24.) During her tenure, she received consistently positive performance reviews. (*Id.* ¶¶ 27, 31.) And the School Board's "Findings of Fact" do not mention any job-performance-related concerns. Just the opposite, it notes that "McCord has received effective or highly effective reviews throughout her tenure." (App. 879.)

South Madison justified firing her by alleging "McCord was untruthful in her conversations with Rose and Hall on December 15 and January 3 regarding how Kinnett obtained the gender support plan document and information regarding the editing of the document." (App. 883–84.) But South Madison nowhere alleges that the information McCord provided Kinnett was confidential or protected in any way. In fact, South Madison has admitted that she "had not been instructed 'not to share a blank Gender Support Plan with anyone.'" (Answer ¶ 81; *see* App. 270, 352, 444.) And multiple witnesses confirmed that sharing a blank Gender Support Plan with a community member did not violate any South Madison policy. (App. 352, 444–45, 507–08, 551–53.) So no employee would expect to be fired for sharing it. (App. 508.)

On top of the fact that McCord did not lie to Rose and Hall (*see infra* pp. 34–35), "the punishment of termination was grossly excessive in light of the alleged infraction." *Stalter*, 195 F.3d at 290. It used an unprecedented procedure to fire her based on never-enforced policies because of a dispute about when she told Hall that she had shared an accurate, non-confidential document with a journalist.

The facts here resemble *Nichol v. City of Springfield*, No. 6:14-CV-01983-AA, 2017 WL 6028465 (D. Or. Dec. 3, 2017). There, a police department fired an officer

for alleged "dishonesty" during an investigation of a report she made of misconduct by other officers. *Id.* at *5. But she "maintained that the alleged examples of dishonesty were mere misunderstandings and asserted she actually was being fired in retaliation for reporting workplace misconduct." *Id.* Based on "powerful evidence of pretext," *id.* at *8, the court largely denied the defendants' summary-judgment motion, *see id.* at *1, 14. "Of particular note is the fact that plaintiff was terminated for two relatively minor incidents of dishonesty without progressive discipline, despite having a spotless personnel record." *Id.* at *14.

As in *Nichol*, South Madison fired McCord for alleged dishonesty with her superiors. (App. 883–84.) And as in *Nichol*, McCord has consistently "maintained that the alleged examples of dishonesty were mere misunderstandings." 2017 WL 6028465, at *5. For example, McCord testified that during her December 15 meeting with Hall and Rose, she understood Hall to be asking whether she gave Kinnett a copy of the Gender Support Plan during the interview. (App. 666–68.) And Hall acknowledged that he "[d]idn't specify" whether he wanted to know how Kinnett had obtained the hard copy of the Gender Support Plan he brought to McCord's house. (App. 268.)

As in *Nichol*, South Madison's decision to fire McCord based on a misunderstanding between her and Hall is "arguably disproportionate." 2017 WL 6028465, at *14. That evidence could lead a reasonable jury to find that South Madison's reliance on McCord's alleged dishonesty is pretextual.

**3. South Madison's investigation was suspicious in time and scope, further strengthening the inference of pretext.**

As discussed above, South Madison's entire investigation into McCord and its final rationale for firing her were based on her protected speech, which supports its own inference of pretext. *See supra* pp. 27–28. What's more, South Madison's choice to change its rationale mid-investigation—its "shifting factual accounts and

explanations"—further strengthens that inference. *Donley v. Stryker Sales Corp.*, 906 F.3d 635, 638 (7th Cir. 2018). "Here, a reasonable jury would have ample evidence from which to infer that [South Madison] did not sincerely believe that the investigation against [McCord] and [her] eventual termination were warranted by [her] unprotected activity." *Hobgood*, 731 F.3d at 646. Two of the School Board's "findings of fact" illustrate this point.

First, South Madison could not have reasonably found that "[a]t no time has McCord refuted any of the statements" made by Kinnett "or refute[d] any of the information in the preliminary determination letter." (App. 880, 882.) Notes made by both Hall and Rose about their meetings with McCord show that she repeatedly refuted those statements. (*See* App. 795–96 (Hall's notes); App. 809–10 (Rose's notes).) And McCord refuted Rose's allegations in an email she sent directly to the Board. (App. 803–04.) But Hall "instructed them all not to read it." (App. 603.) Hall also said he did not "ever apprise the board of any of Ms. McCord's efforts to refute any of the statements" used to justify her termination. (App. 605.)

Second, the conclusion that McCord lied about Kinnett's access to the Gender Support Plan hinged on the unreasonable finding that "[o]nly McCord and Kruer had access to see who made revisions to the document." (App. 881.) The only evidence to support that finding was an "audit report" for one version of the plan. (App. 886–87; *see* App. 739–40, 742–43.) But South Madison's technology director admitted that the audit report did not contain the entire document history. (App. 738–39.) And neither the School Board, nor Hall, nor anyone else asked him to investigate the entire history. (App. 742–43.)

South Madison chose to artificially limit the "scope of [its] investigation," which "support[s] an inference that the investigation was not prompted by" South Madison's belief that McCord had violated its policies. *Hobgood*, 731 F.3d at 646. Coupled with the "suspicious" timing of "[t]he initiation" of that investigation, both

34

facts "support an inference" that McCord's investigation and ultimate termination were "instead prompted by [South Madison's] desire to construct a case for [her] termination after [it] discovered that" she had spoken to Kinnett. *Id.*

In some cases, an unusual investigation, "when combined with the fact that the investigation into" the plaintiff "occurred immediately after" protected activity has sufficed to show pretext. *see Johnson v. Chrysler Grp., LLC*, No. 1:12-CV-1582-WTL-DML, 2014 WL 3509984, at *6 (S.D. Ind. July 15, 2014). Here, because South Madison expressly relied on McCord's protected speech to justify firing her, "a reasonable jury could … conclude[]" that South Madison's investigation was "an attempt to make" McCord "look worse, giving it more reason to terminate [her]." *Id.* at *6. McCord "has produced adequate evidence to cast doubt on the sincerity of [South Madison's] proffered rationale for [her] termination." *Noeth v. Autozone Stores, Inc.*, No. 3:05-CV-149-RLY-WGH, 2007 WL 1396428, at *10 (S.D. Ind. May 3, 2007).

## CONCLUSION

For these reasons, McCord requests partial summary judgment in her favor on the merits of her free-speech retaliation claim and a jury trial to determine the scope of her damages and to resolve the genuine disputes of material fact which prevent summary judgment on her other four claims.

Dated: November 21, 2024.                    Respectfully submitted,

                                             /s/ *Vincent M. Wagner*
JOSHUA D. HERSHBERGER                         NOEL W. STERETT
Indiana Bar No. 29679-39                      Illinois Bar No. 6292008
HERSHBERGER LAW OFFICE                        VINCENT M. WAGNER
P.O. Box 233                                  Virginia Bar No. 98663
Hanover, Indiana 47243                        GLYNIS R. GILIO
(812) 228-8783                                D.C. Bar No. 1780627
josh@hlo.legal                                LAURENCE J. WILKINSON
                                              NY Bar No. 6148704
KATHERINE L. ANDERSON                         ALLIANCE DEFENDING FREEDOM
Arizona Bar No. 33104                         44180 Riverside Parkway
ALLIANCE DEFENDING FREEDOM                    Lansdowne, Virginia 20001
15100 N. 90th Street                          (571) 707 4655
Scottsdale, Arizona 85260                     nsterett@ADFlegal.org
(480) 444-0020                                vwagner@ADFlegal.org
kanderson@ADFlegal.org                        ggilio@ADFlegal.org
                                              lwilkinson@ADFlegal.org
DAVID A. CORTMAN
Georgia Bar No. 188810
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road N.E.,
   Suite D1100
Lawrenceville, Georgia 30043
(770) 339-0774
dcortman@ADFlegal.org


                        *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2024, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following counsel of record:

BRENT R. BORG
CHURCH CHURCH HITTLE & ANTRIM
10765 Lantern Road, Suite 201
Fishers, Indiana 46038
(317) 773-2190
bborg@cchalaw.com

ALEXANDER P. PINEGAR
LYNSEY F. DAVID
CASSIE N. HEEKE
CHURCH CHURCH HITTLE & ANTRIM
Two North Ninth Street
Noblesville, Indiana 46060
(317) 773-2190
apinegar@cchalaw.com
ldavid@cchalaw.com
cheeke@cchalaw.com

/s/ *Vincent M. Wagner*
Vincent M. Wagner
Virginia Bar No. 98663
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655
vwagner@ADFlegal.org

*Attorney for Plaintiff*

37