UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KATHY MCCORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-00866-RLY-CSW |
| | ) | |
| SOUTH MADISON COMMUNITY | ) | |
| SCHOOL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON MOTIONS FOR SUMMARY JUDGMENT**

In December 2022, Plaintiff Kathy McCord, a school counselor, spoke to a journalist about the way that her school handled gender-related accommodations for students. After the journalist published an article citing McCord as a source, Defendant South Madison Community School Corporation ("South Madison") began investigating McCord's involvement in the article. Eventually, after a hearing, the School Board unanimously voted to cancel McCord's contract, concluding that she violated School Board policies by lying to administrators and making statements to the journalist without regard for truth or accuracy. McCord now sues South Madison under 42 U.S.C. § 1983 for violations of the First Amendment and under Indiana's Religious Freedom Restoration Act ("RFRA").

McCord moves for partial summary judgment as to her First Amendment retaliation claim. South Madison moves for summary judgment on all of McCord's

1

claims.  For the reasons explained below, the court **DENIES** McCord's motion and

**GRANTS in part** and **DENIES in part** South Madison's motion.[1]

## I.     Background

### A.     Background

South Madison is a public school district in Pendleton, Indiana, governed by a

Board of School Trustees ("School Board").  (Filing No. 1, Verified Compl. ¶¶ 2–5).

Pendleton Heights High School ("Pendleton Heights") is part of South Madison.  (*Id.*

¶¶ 3, 24).

At all times relevant to this case, Pendleton Heights had three school counselors:

McCord; Ashley Zukowski; and Michael Taylor, who was the Chair of the Counseling

Department.  (Filing Nos. 50-3, 58-17 & 64-1, Taylor Dep. at 36, 46).  As a counselor,

McCord helped students with academic and personal problems, including college and

career preparation, emotional or family issues, and class scheduling.  (Filing Nos. 50-6,

64-1 & 67-1, McCord Dep. at 20–25; Taylor Dep. at 23).  She also worked with teachers

and helped them "problem solve throughout the day."  (McCord Dep. at 20–21).

Communicating with parents about their children is also an "important" part of a

counselor's job.  (Taylor Dep. at 52–53).

---

[1] McCord also requested oral argument on the motions.  The parties have had ample opportunity
to present their arguments in their briefs.  McCord's motion (Filing No. 65) is therefore
**DENIED**.  *See* S.D. Ind. L.R. 7-5(d) ("The court may . . . deny a request for oral argument . . . in
its sole discretion."); S.D. Ind. L.R. 56-1(j) (noting the court generally "decide[s] summary
judgment motions without oral argument").

## B.    Prior Gender-Related Accommodations Procedure

Before the 2021-2022 school year, if a student in South Madison requested a gender-related name or pronoun change, their counselor was required to inform their parents.  (McCord Dep. at 37–38; Filing Nos. 50-2 & 58-4, Hall Dep. at 29; Filing No. 50-5, Rose Dep. at 30; Filing No. 58-8, Hearing Tr. at 45).  If the parents consented to the change, the counselor then notified the student's teachers of the change.  (McCord Dep. at 38).  If the parents did not consent, the counselor did not notify teachers, and the student was not referred to by their requested name or pronouns in school.  (*Id.*).  This process also applied to other gender-related accommodation requests, such as a student requesting to use gender-neutral bathrooms or a female football player asking to change in a different area.  (Hall Dep. at 29; Filing No. 50-1, South Madison Resp. to Interrogs. at ECF p. 9).

## C.    New Directive and Use of Gender Support Plans

At the beginning of the 2021-2022 school year, South Madison experienced an increase in students requesting to change their name or pronouns for gender-related reasons, especially at Pendleton Heights.  (Hall Dep. at 28, 40; *see* Filing No. 50-7, Hall Email at ECF p. 110 ("During the first days of this school year, we have had students in almost all of our schools who have requested accommodations related to their preferred gender.")).  Additionally, around that time, a student emailed Pendleton Heights Principal Connie Rickert, accusing the school of violating students' rights by requiring parental consent for gender-related name change requests.  (Filing No. 58-6, Rickert Email).

3

In August and September 2021, South Madison provided the School Board, administrators, and school counselors training from South Madison's legal counsel on discrimination and how to handle gender-related accommodation requests. (South Madison Resp. to Interrogs. at ECF p. 9; Filing No. 50-6 & 58-7, 30(b)(6) Dep. at 24–28; Hearing Tr. at 42). After this training, administrators became concerned that South Madison was treating transgender and cisgender[2] students differently in violation of Title IX by requiring parental consent for transgender students to change their name or pronouns in school. (30(b)(6) Dep. at 25; Hall Dep. at 39).

Because of this concern, Superintendent Mark Hall issued a new directive ("Directive") in September 2021: If a student asked to informally change their name or pronouns at school, the change was granted without parental involvement, regardless of whether the student was transgender or cisgender. (30(b)(6) Dep. at 23–25; Hall Dep. at 39–40; Filing Nos. 50-4 & 58-9, Kruer Dep. at 89). But if a student requested any other gender-related accommodation—such as using a different locker room or bathroom or officially changing their name or pronouns on school records, on their diploma, or in the yearbook—parental notification and consent were required. (South Madison Resp. to Interrogs. at ECF p. 11; 30(b)(6) Dep. at 31).

---

[2] The court uses "transgender" to refer to students whose gender identity differs from their sex at birth and "cisgender" to refer to students whose gender identity corresponds with their sex at birth. *See Transgender*, Merriam-Webster's Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/transgender (last visited July 30, 2025); *Cisgender*, Merriam-Webster's Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/cisgender (last visited July 30, 2025).

Around this time, Pendleton Heights and South Madison's middle school began using a form, called a Gender Support Plan, to implement this Directive and to track and collect data about students' gender-related accommodation requests. (South Madison Resp. to Interrogs. at ECF p. 10; Hall Dep. at 52; Taylor Dep. at 131; Kruer Dep. at 52, 89; Hearing Tr. at 41). Assistant Superintendent and Title IX Coordinator Andrew Kruer developed South Madison's Gender Support Plan form with the school counselors using another school district's form. (Taylor Dep. at 110, 128–30, 253–54; Kruer Dep. at 54–55, 57, 59; Filing Nos. 50-1 & 58-16, Zukowski Dep. at 61, 65–66, 68; Hearing Tr. at 41).

The form asked counselors to record the student's preferred and legal names, gender, and sex at birth. (Filing No. 50-7, Gender Support Plan at ECF pp. 134, 140, 143). It also asked counselors to indicate whether the student's parents are aware of the student's request or "supportive of their child's gender status." (*Id.*). It also asked questions about, among other things, what gender-related accommodations the student requested, who (e.g., teachers, staff, administrators, and/or peers) will be made aware of the student's gender identity, how the student's privacy can be protected, the student's transition and medical "history," any "mental health issues" the student had "related to their transition," who "will be the student's 'go to adult' at school" for support, the student's extracurricular activities, and any safety concerns. (*Id.* at ECF pp. 135–37, 140–41, 143–45).

In the fall of 2021, Hall presented the Gender Support Plan form to the School Board in an executive session. (Filing Nos. 50-5 & 58-18, Sandefur Dep. at 61–62). The School Board did not have any objections to the Gender Support Plan being

implemented.  (*Id.*).  South Madison did not publicize the Gender Support Plan form, circulate it to parents, or post it online.  (30(b)(6) Dep. at 29, 31–32; Hall Dep. at 53).

Essentially, during the 2021-2022 school year at Pendleton Heights, a student's gender-related name or pronoun change request was handled as follows: First, the student was referred to their counselor.  (South Madison Resp. to Interrogs. at ECF p. 10; Taylor Dep. at 132; Kruer Dep. at 68).  Then, the counselor had an initial meeting with the student.  (South Madison Resp. to Interrogs. at ECF p. 10; Taylor Dep. at 62; Zukowski Dep. at 42–43).  At that meeting, the counselor determined whether the student's parents were aware and supportive of the student's request.  (Zukowski Dep. at 42–43; Hearing Tr. at 97).  The counselor then held a second meeting with the student to complete a Gender Support Plan.  (South Madison Resp. to Interrogs. at ECF p. 10; Zukowski Dep. at 43).  The student, their counselor, and Kruer attended this meeting.  (*See* Zukowski Dep. at 43; South Madison Resp. to Interrogs. at ECF p. 10).  The student's parents could attend the meeting but were not required to do so.  (*See, e.g.*, Taylor Dep. at 62–63).  If parents did not attend, Kruer informed the student that, if a parent contacted anyone at the school about their name or pronouns, the school "would answer honestly" and inform them of their child's request.  (South Madison Resp. to Interrogs. at ECF p. 10).

After a Gender Support Plan was completed, the counselor told the student's teachers about their requested name or pronouns and whether their parents were aware and supportive of the request.  (Kruer Dep. at 117; 30(b)(6) Dep. at 44–46).  The counselor would not share the completed Gender Support Plan with teachers.  (Hall Dep. at 56).  Once a counselor informed a teacher of a student's name or pronoun change, the

6

teacher was expected to comply with the change and not contact the student's parents about it. (*Id.* at 45; Taylor Dep. at 158; Rose Dep. at 34, 64). When communicating with parents, teachers referred to the student "[h]owever the student[s] asked them to." (30(b)(6) Dep. at 41; *see* Filing No. 58-15, Kruer Aff. ¶ 7 (explaining teachers were informed if a student's parents were unaware of their "gender status" so that teachers "could use discretion when speaking with the student's parents in accordance with the student's wishes")). That said, if a student's parents contacted a teacher about their name or pronouns, the teacher would tell the parents about any name or pronoun change, even if the student asked the teacher not to. (30(b)(6) Dep. at 41).

Furthermore, if, at any time, a student's parents contacted anyone at the school about their child's name or pronoun change, staff would inform parents of the change. (South Madison Resp. to Interrogs. at ECF p. 11; Zukowski Dep. at 83, 92; *see* Hearing Tr. at 45 (Kruer testifying that staff members were never told to "hide information" from parents who did or would not approve of their child's name change)). Likewise, if a parent requested to see their child's Gender Support Plan, the school would provide it to them. (Hall Dep. at 56–57).

In practice, some of the Gender Support Plan meetings occurred with parents present, and others did not. (Filing No. 50-7, Training Doc. at ECF p. 130). "[M]ost of the time," parents were present but "[n]ot always." (Hall Dep. at 167).

During the fall 2022 semester, largely the same process was used. (South Madison Resp. to Interrogs. at ECF p. 11). There were two changes: first, Kruer did not attend the

Gender Support Plan meetings, and second, counselors informed teachers of student's name and pronoun changes by email, rather than in person.  (*Id.*).

### D.    McCord's Objections to the Directive

McCord is a Christian and believes that "parents need to be 100 percent involved in their kids['] lives."  (Hearing Tr. at 152; McCord Dep. at 48).  As a counselor, McCord had no problem referring to transgender students by their requested names and pronouns and assisting them with gender-related accommodations—so long as the students' parents were aware and supportive.  (McCord Dep. at 27–28, 39, 120).

On a few occasions, McCord told Taylor and Kruer that she believed it was wrong that parents were not involved in students' name or pronoun change requests and that she felt like she was lying to parents.  (*Id.* at 46–48; Verified Compl. ¶¶ 73, 76; Taylor Dep. at 70).  According to McCord, she referenced her Christian faith in these conversations. (*See* McCord Dep. at 47, 49, 155).  According to Taylor, who attended the same Christian church as McCord, McCord never referenced her faith as a reason why she objected to the Directive.  (Taylor Dep. at 14, 252; *see id.* at 156 (testifying he and McCord never discussed religion at work); McCord Dep. at 48).  Additionally, Kruer did not recall talking to McCord about any religious objections to the Directive.  (Kruer Dep. at 108).

### E.    *The Daily Signal* Article

On November 30, 2022, Tony Kinnett, a journalist from the news website *The Daily Signal*, left McCord a voicemail, asking to speak with her.  (Hearing Tr. at 127). The next day, McCord learned that one of her work emails was circulating in the community and that parents were "upset about it."  (McCord Dep. at 50).  In that email,

she said that a student had requested a name and pronoun change, that the student's parents "were not supportive," and that teachers should "use discretion if they called home." (*Id.* at 51; Filing No. 50-7, McCord Email Aug. 16, 2022, at ECF p. 100). McCord did not know who had circulated the email or why. (McCord Dep. at 51). She returned Kinnett's call because she assumed he wanted to discuss the email and because she wanted "to get to the bottom of what was going on." (*Id.*).

On the evening of December 1, 2022, Kinnett interviewed McCord at her house. (*Id.* at 52; Verified Compl. ¶¶ 116–17). Kinnett brought a blank copy of the Gender Support Plan form to the interview. (McCord Dep. at 53). During the interview, McCord opened the Gender Support Plan form on her computer. (Verified Compl. ¶ 125). After the interview, she downloaded an electronic copy of the Gender Support Plan and emailed it to Kinnett. (*Id.* ¶ 276; McCord Dep. at 57). She also emailed Kinnett a screenshot showing that Kruer had lasted edited the form on Google Docs. (Filing No. 58-13, McCord Email Dec. 1, 2022; Verified Compl. ¶ 276; McCord Dep. at 57).

Later, Kinnett sent McCord a draft of his article. (*See* McCord Dep. at 61; Filing No. 58-14, McCord & Kinnett Emails at 4–5; Filing No. 58-24, Draft Article). McCord responded that there were "a few things" in the draft that she thought "need[ed] clarified" or to "maybe [be] stated differently." (McCord & Kinnett Emails at 3). She proposed some corrections to the draft. (*Id.* at 3–4).

At some point, McCord told Taylor that she had spoken with Kinnett. (Taylor Dep. at 165). Taylor reported this to Hall. (Hall Dep. at 146).

9

On December 5, 2022, Kinnett published his article ("Article"), "'What Else Are They Willing to Lie About?': Indiana School Compels Staff to Hide 'Gender Support Plans' from Parents," on *The Daily Signal*'s website.  (Filing No. 50-7, Article at ECF pp. 104–08).  In the Article, Kinnett cited McCord as a source several times.  (*Id.* at ECF pp. 104–06).  He also relied on other sources, including an anonymous school counselor and a former Pendleton Heights teacher.  (*Id.* at ECF pp. 104–05).  Although Kinnett did not adopt all of McCord's proposed corrections in the final version of the Article, McCord felt the Article was accurate and true, though she "would have worded [some things] differently" and felt some parts needed "more explanation."  (McCord Dep. at 64, 82–83, 99).

South Madison received "significant, negative criticism from the community" as a result of the Article.  (Verified Compl. ¶ 166; *see, e.g.*, Hall Dep. at 105–06, 111; Taylor Dep. at 163).

### F.     Investigation of McCord

Hall believed there were statements in the Article that were inconsistent with his "understanding of what was going on in" South Madison.  (Hall Dep. at 137, 143).  Specifically, he was concerned about the following statements:

- "Over the last two years, dozens of 'Gender Support Plans' with guidelines not to contact parents have been sent to teachers across the South Madison school district . . . , counselor Kathy McCord confirmed."  (Article at ECF p. 104).

- "McCord said she and other counselors have access to such plans but teachers, parents, and the public do not—which she strongly disagrees with."  (*Id.* at ECF p. 105).

- "McCord told The Daily Signal that this Gender Support Plan . . . has been the policy of the South Madison school district since fall of 2021. . . . Now, the South Madison district requires only that the student say that his or her parents don't or wouldn't approve, and the district is obliged to hide the information from parents. . . . McCord and another counselor who wished to remain anonymous confirmed that Andrew Kruer, the assistant superintendent in charge of the counseling department, told the counseling staff that this gender support policy was 'board-approved.'"  (*Id.*).

- "Indiana law . . . doesn't give counselors the authority to diagnose or treat gender dysphoria.  McCord and other counselors told The Daily Signal the current South Madison policy requires counselors to do so." (*Id.* at ECF p. 106).

Hall began meeting with various individuals to figure out where the information in the Article came from and whether actions were being taken in South Madison that were not supported by Hall or the School Board.  (Hall Dep. at 139).  For example, he met with Taylor to determine whether Kruer was giving the counseling department guidance that was inconsistent with the Directive.  (*Id.* at 148–49).  Taylor reported the Kruer never told anyone at Pendleton Heights to lie to parents or that the Directive was a School Board policy.  (*Id.* at 150).

On December 15, 2022, Hall met with McCord.  (Verified Compl. ¶ 167; Hall Dep. at 144).  Shaun Rose, the assistant principal of Pendleton Heights (who became principal shortly thereafter), and Lana Moore, a representative of South Madison's teacher's union, also attended the meeting.  (Verified Compl. ¶¶ 169–70; Filing Nos. 50-7 & 58-19, Moore Dep. at 11; McCord Dep. at 123).  At the meeting, Hall asked McCord many questions about her conversation with Kinnett and the Article.  (McCord Dep. at 127).  McCord told Hall that parts of the Article "could have been worded differently,"

11

(*id.*), and "didn't accurately convey information from her in every instance," (Moore Dep. at 43). McCord also told Hall that she provided feedback on Kinnett's draft article, but she did not show Hall the corrections that she proposed. (McCord Dep. at 111, 125–26).

During that meeting, Hall asked McCord either how Kinnett got a blank copy of the Gender Support Plan form, (Verified Compl. ¶ 177), or if she gave Kinnett a copy of the form, (McCord Dep. at 126; Hall Dep. at 152). McCord said that she did not know how Kinnett accessed the form and that she did not share it with him. (Hall Dep. at 151–53; McCord Dep. at 126). Hall also asked how Kinnett knew that Kruer was the last person to edit the form, and McCord said she did not know. (Hall Dep. at 152–53).

On December 19, 2022, Kinnett published a second article ("Second Article") about South Madison: "School Board Refuses to Explain Secret Transgender Policy to Parents." (Filing No. 50-7, Second Article at ECF pp. 120–24). He again cited McCord as a source. (*Id.* at ECF pp. 121–22). The Second Article contained the following statements:

- "School counselor Kathy McCord went on the record with The Daily Signal to outline the shady methods the school district employed to keep the so-called Gender Support Plan away from teachers and parents. McCord also described how she was ordered to compel speech from teachers by requiring them to use one set of names and pronouns with students and another with parents." (*Id.* at ECF p. 121).

- "McCord told The Daily Signal that Assistant Superintendent Andrew Kruer . . . had informed all counselors that this procedure of keeping information from parents was a school board-approved policy." (*Id.*).

- "Hall . . . said the district didn't ask or allow counselors or teachers to diagnose or treat gender dysphoria, which conflicts with expectations set forth for counseling staff in the district's Gender Support Plan as well as the information provided by McCord." (*Id.* at ECF p. 122).

12

Around this time, Hall and Kruer asked Ryan Watts, South Madison's Director of Technology, to run an audit report of the Gender Support Plan form in Google Docs. (Hall Dep. at 155–56; Filing Nos. 50-7 & 58-20, Watts Dep. at 8, 25, 47).  He generated an audit report that showed who had viewed, edited, copied, or downloaded the updated 2022 form from Google Docs between July and December 2022.  (Watts Dep. at 25–26; Filing No. 50-7, Audit Report at ECF pp. 209–10).  The report showed that the form had been downloaded once during that time period: McCord downloaded it on the night of her interview with Kinnett.  (Watts Dep. at 29; Audit Report at ECF p. 209).

In early January, Hall and Principal Rose met with McCord again.  (Hall Dep. at 156, 158; Filing No. 18, Answer ¶ 192).  During that meeting, Hall showed McCord the audit report.  (Hall Dep. at 156; Answer ¶ 195; McCord Dep. at 132–33).  McCord acknowledged that she had downloaded the Gender Support Plan form.  (Hearing Tr. at 114).  She again said that she was not sure how Kinnett got the form.  (Hall Dep. at 157).  She said she did not give him a physical copy of it.  (Moore Dep. at 67; *see* Rose Dep. at 113 (stating McCord said "she did not give it to him")).  She also said that she had an electronic copy of the form pulled up on her computer during the interview and speculated that Kinnett may have learned about the form's editing history by looking at her computer.  (Hall Dep. at 157; Hearing Tr. at 114).  After the meeting, though, McCord reviewed her correspondence with Kinnett and remembered that she had emailed him an electronic copy of the form.  (McCord Dep. at 138; *see* Filing No. 50-7, McCord Req. for Meeting at ECF p. 127).

13

On January 20, 2023, McCord received a letter from Rose recommending that the School Board cancel her contract and placing her on administrative leave.  (Answer ¶¶ 205, 371; Filing No. 50-7, Rose Letter at ECF pp. 149–53).  The letter set forth two reasons for Rose's preliminary decision: (1) McCord violated School Board Policy 3310 (Freedom of Speech in Noninstructional Settings)[3] by knowingly or recklessly providing Kinnett false statements, which she allowed to be published online and which resulted in reputational damage to South Madison; and (2) McCord lied to administrators about Kinnett's access to the Gender Support Plan form.  (Rose Letter at ECF p. 149).  Generally, the letter alleged that McCord engaged in insubordination and conduct unbecoming of a teacher and that she willfully failed to follow School Board policy.  (*Id.*).

On January 25, 2023, McCord emailed Hall, requesting a private conference to discuss Rose's letter.[4]  (McCord Req. for Meeting at ECF p. 126).  McCord summarized her response to the allegations made in the letter.  (*Id.*).  She also stated that she had remembered that she emailed Kinnett an electronic copy of the Gender Support Plan form and a screenshot showing that Kruer had last edited it.  (*Id.* at ECF p. 127; McCord Dep. at 141; Hall Dep. at 154).

---

[3] Policy 3310 states that, when a staff member "is not engaged in the performance of professional duties," she should "refrain from making public expressions which [she] knows to be false or are made without regard for truth or accuracy."  (Filing No. 50-7, Policy 3310 at ECF p. 115).

[4] McCord also copied members of the School Board on this email.  (McCord Req. for Meeting at ECF p. 126).  However, the School Board did not consider the information in this email in determining whether to terminate her contract.  (30(b)(6) Dep. at 105–06, 110).

On February 3, 2023, Hall had a brief meeting with McCord and her union representative to discuss Rose's letter and to allow McCord to "appeal" Rose's recommendation. (30(b)(6) Dep. at 81–82; Answer ¶ 279; Moore Dep. at 73; Hearing Tr. at 113). McCord reiterated what she said in the January 25 email. (Hall Dep. at 83). She did not provide any new or additional information. (Hearing Tr. at 113; *see id.* at 117 (Hall testifying that McCord said, "I have nothing else to say but what's provided in the letter")). Hall did not ask many questions. (McCord Dep. at 142). A few days later, Hall sent a note to the School Board stating that he recommended that McCord's contract be canceled. (Filing No. 50-7, Hall Note to Sch. Bd. at ECF p. 128; Answer ¶ 372).

### G.    Hearing and Termination

At McCord's request, a hearing was held by the School Board on March 7, 2023 ("Hearing"). (Answer ¶ 281; Hearing Tr.). At the Hearing, Hall represented South Madison, and the Indiana State Teachers Association represented McCord. (Hearing Tr. at 2, 5). Rose, Kruer, Zukowski, Taylor, Watts, and Hall testified. (*See id.* at 3). McCord also testified. (*Id.*).

Two days after the hearing, on March 9, 2023, the School Board unanimously voted at a public meeting to cancel McCord's contract. (Answer ¶ 306; Filing No. 50-7, Board Findings & Conclusions at ECF p. 208). In support of its decision, the School Board issued its "Findings of Fact, Conclusion of Law, and Order on Contract Cancellation." (Board Findings & Conclusions at ECF pp. 201–08). The School Board found that the following statements attributed to McCord in the Article and Second Article were untrue or partially untrue:

15

- "[D]ozens of 'Gender Support Plans' with guidelines not to contact parents have been sent to teachers across the South Madison school district . . . ." (*Id.* at ECF pp. 202–03).

- "'[T]eachers, parents, and the public do not' have access to the gender support plans." (*Id.* at 203).

- "Andrew Kruer, the assistant superintendent in charge of the counseling department, told the counseling staff that this gender support policy was 'board-approved.'" (*Id.*).

- "'[T]he current South Madison policy requires counselors' to 'diagnose or treat gender dysphoria.'" (*Id.*).

- "[McCord] was order[ed] to compel speech from teachers by requiring them to use one set of names and pronouns with students and other with teachers." (*Id.* at ECF p. 204).

Then, the School Board concluded, by a preponderance of the evidence, that (1) "McCord was untruthful in her conversations with Rose and Hall" about "how Kinnett obtained the gender support plan document and information regarding the editing of the document"; (2) "McCord made statements to Kinnett that were at a minimum made without regard for truth or accuracy"; and (3) "McCord's untruthful statements to Rose and Hall as well as the statements to Kinnett were gross misconduct which constituted insubordination for purposes of Board Policy 3139, as violations of Board Policy 3310 and Board Policy 3210."[5] (*Id.* at ECF pp. 206–07). The Board determined that McCord's

---

[5] The School Board's "Staff Ethics" policy (Policy 3210) requires staff members to be "men and women of integrity" and "to maintain high standards in their working relationships." (Filing No. 50-7, Policy 3210 at ECF p. 200). Its "Staff Discipline" policy (Policy 3139) sets forth South Madison's progressive discipline procedures, as well as exceptions to those procedures, such as when an employee exhibits "[w]illful refusal to follow established rules or standards for the conduct of a professional employee, i.e., insubordination." (Filing No. 50-1, Policy 3139 at ECF p. 147).

conduct provided "good and just cause to cancel her contract." (*Id.* at ECF p. 207). The Board unanimously voted to cancel her contract. (*Id.* at ECF p. 208).

Any other facts necessary to resolve the motions will be addressed in the Discussion below.

### H.    South Madison's Motion to Exclude Expert Witness

In support of her motion for partial summary judgment, McCord submits an expert report from Dr. Stephen Levine. (Filing No. 50-1, Levine Expert Report at ECF pp. 17–134). South Madison moves to exclude Dr. Levine from providing expert testimony, arguing that his testimony is irrelevant and does not meet the standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Because the court does not consider Dr. Levine's expert report in resolving McCord's First Amendment retaliation claim, the court **DENIES** South Madison's motion (Filing No. 51) **as MOOT**.

## II.    Legal Standard

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When reviewing cross-motions for summary judgment, the court "view[s] all facts and inferences in the light most favorable to the nonmoving party on each motion." *Wis. Alumni Rsch. Found. v. Xenon Pharms., Inc.*, 591 F.3d 876, 882 (7th Cir. 2010).

III.    **Discussion**

McCord brings the following claims against South Madison: a § 1983 First

Amendment retaliation claim (Count 1); a § 1983 compelled speech claim (Count 2); a

§ 1983 viewpoint discrimination claim (Count 3); a § 1983 free exercise claim (Count 4);

and a state-law RFRA claim (Count 5).  South Madison moves for summary judgment on

McCord's claims.  McCord moves for partial summary judgment as to her First

Amendment retaliation claim and, in her response to South Madison's motion, argues that

she is also entitled to summary judgment on her other claims.

A.    **First Amendment Retaliation**

First, McCord brings a First Amendment retaliation claim against South Madison,

asserting that she was fired in retaliation for expressing her views on the Directive to a

journalist.  Both parties move for summary judgment on this claim.

For a First Amendment retaliation claim, a public employee must show that

(1) "she engaged in constitutionally protected speech," (2) "she suffered a deprivation

likely to deter protected speech," and (3) "her protected speech was a motivating factor in

the deprivation and ultimately, if the public employer cannot show it would have inflicted

the deprivation anyway, its but-for cause." *Harnishfeger v. United States*, 943 F.3d 1105,

1112–13 (7th Cir. 2019).  South Madison argues McCord's claim fails because she cannot

show her speech was constitutionally protected.  Having carefully considered the record

and the parties' arguments, the court agrees.

A public employee's speech is constitutionally protected if (1) she "made the

speech as a private citizen," (2) her "speech addressed a matter of public concern," and

(3) her "interest in expressing that speech was not outweighed by the state's interests as an employer." *Davis v. City of Chicago*, 889 F.3d 842, 845 (7th Cir. 2018) (quoting *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013)). The first two elements are undisputed. Therefore, the court turns its attention to the third element, referred to as *Pickering* balancing after the Supreme Court's decision in *Pickering v. Board of Education*, 391 U.S. 563 (1968). Under *Pickering*, the court weighs McCord's interests in speaking on matters of public concern against South Madison's interests, as an employer, in promoting the effective and efficient provision of public services. *Id.* at 568. If South Madison's interests weigh heavier in the balance, its decision to terminate McCord "is considered to be justified and does not violate the First Amendment." *Swetlik*, 738 F.3d at 827 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).

South Madison argues that it is entitled to summary judgment on this claim because the School Board reasonably believed, after the Hearing, that certain statements attributed to McCord in the Article and Second Article were false. Under *Pickering*, even when there are fact disputes as to the truth or falsity of an employee's speech, "an employer may defeat a First Amendment retaliation claim if" the decisionmakers "reasonably believed, after an adequate investigation," that the employee's speech was false. *Id.* at 825, 828 (quoting *Wright v. Ill. Dep't of Child. & Fam. Servs.*, 40 F.3d 1492, 1506 (7th Cir. 1994)); *McWilliams v. Frankton-Lapel Cmty. Schs.*, No. 1:20-cv-01419, 2022 WL 17605393, at *6 (S.D. Ind. Dec. 12, 2022).

19

*1.    Speech at Issue*

South Madison points to five statements that it maintains the School Board

reasonably believed, after an adequate investigation, to be false:

- *Statement 1*: "Over the last two years, dozens of 'Gender Support Plans' with guidelines not to contact parents have been sent to teachers across the South Madison school district . . . , counselor Kathy McCord confirmed." (Article at ECF p. 104).

- *Statement 2*: "McCord said she and other counselors have access to such plans, but teachers, parents, and the public do not." (*Id.* at ECF p. 105).

- *Statement 3*: "McCord and another counselor who wished to remain anonymous confirmed that Andrew Kruer, the assistant superintendent in charge of the counseling department, told counseling staff that this gender support policy was 'board-approved.'" (*Id.*).

- *Statement 4*: "Indiana law . . . doesn't give counselors the authority to diagnose or treat gender dysphoria.  McCord and other counselors told The Daily Signal the current South Madison policy requires counselors to do so." (*Id.* at ECF p. 106).

- *Statement 5*: "McCord also described how she was ordered to compel speech from teachers by requiring them to use one set of names and pronouns with students and another with parents." (Second Article at ECF p. 121).

McCord insists that these statements cannot be attributed to her because Kinnett did not

directly quote her and relied on other sources in his articles.  She argues that these are

Kinnett's statements, not hers.

However, the court looks at these statements from the perspective of the

decisionmakers—the School Board.  *See Hicks v. Ill. Dep't of Corr.*, 109 F.4th 895, 903

(7th Cir. 2024) ("'[C]ourts look to the facts as the employer reasonably found them to be,'

not as viewed by the employee, a court, or a jury."  (quoting *Waters v. Churchill*, 511 U.S.

20

661, 677 (1994) (plurality opinion))).  The School Board was aware that Kinnett clearly

attributed each of these statements to McCord in his articles.  Additionally, when McCord

was asked at the Hearing if Kinnett's Article accurately represented her conversation with

him, she testified that Kinnett "took some liberty" with parts of the Article but that she

"would say generally it did" represent their conversation accurately, even if she thought

"there w[ere] a few things that weren't accurate."  (Hearing Tr. at 148).  She also later

testified that the statements in Kinnett's articles that South Madison was concerned about

accurately captured what she said to him.  (*Id.* at 156 (Q: ". . . But don't you also feel like

that if you would've come out after the story ran and said this isn't entirely accurate to

what I told him, that would've squashed a lot of this?"  A: "It might have, some of it.  But,

again, the things that they are saying are not accurate are not.")).  During the Hearing, she

did not disclaim ownership of any of the specific statements attributed to her in the

articles.  Therefore, viewing these statements through the eyes of South Madison, the

court concludes that it was reasonable for South Madison to attribute the five statements

to McCord.

### 2.    *Adequate Investigation*

Now, the court turns to the question of whether South Madison conducted an

"adequate investigation."  *Swetlik*, 738 F.3d at 828.  What constitutes an adequate

investigation depends on the facts and circumstances of each case.  *McWilliams,* 2022

WL 17605393, at *7 (citing *Waters*, 511 U.S. at 671, 678, 680).  Generally, an employer's

investigation is adequate if "their conclusion was the product of the care that a reasonable

manager would use before making an employment decision."  *Wright*, 40 F.3d at 1506.

"Only procedures outside the range of what a reasonable manager would use may be condemned as" inadequate. *Waters*, 511 U.S. at 678.

McCord argues that the School Board's investigation into her speech was not reasonable because it did not resemble the investigation in *Swetlik*, where the city hired an outside investigator that conducted more than eighty interviews over the course of a year before recommending that the plaintiff be terminated. 738 F.3d at 822–23. However, *Swetlik* did not set any mandatory procedures for an adequate investigation. *See id.* at 828–29. What constitutes an adequate investigation depends on the circumstances of each case, *McWilliams,* 2022 WL 17605393, at *7, *9, and more than one course of action "will necessarily be reasonable" in any given situation, *Waters*, 511 U.S. at 678.

Here, Hall and Rose met with McCord and others several times in December and January to investigate McCord's statements in the Article and Second Article. Rose then provided McCord a written explanation of why he recommended that her contract be cancelled. Hall met with McCord to discuss Rose's recommendation before he in turn recommended to the School Board that McCord be terminated. Finally, the School Board conducted a three-hour hearing to determine whether McCord should be terminated. (*See* Filing No. 62, Hearing Recording; Hearing Tr.). At the Hearing, the Board heard from several witnesses. McCord was represented at the Hearing, and she was able to cross-examine South Madison's witnesses and was given the opportunity to testify and present evidence. (*See generally* Hearing Tr.). No reasonable factfinder could conclude that this investigation fell "outside the range of what a reasonable manager" would do. *Waters*,

511 U.S. at 678. Therefore, the court concludes that South Madison conducted an adequate investigation.

### 3. *Reasonable Belief*

Next, the court turns to the question of whether it was reasonable for the School Board to believe that McCord's speech was false. In making this determination, the court considers the information that the School Board knew at the time of the termination decision to determine whether its belief that McCord's statements contained false information "was supported by a sufficient factual basis." *McWilliams*, 2022 WL 17605393, at *7; *Hicks*, 109 F.4th at 903. The record shows that the School Board was aware of sufficient facts after the Hearing to support their conclusion that the five statements contained false information.

> a. *Statement 1: "Over the last two years, dozens of 'Gender Support Plans' with guidelines not to contact parents have been sent to teachers across the South Madison School District . . . , Kathy McCord confirmed."*

With respect to Statement 1, at the Hearing, several witnesses (Rose, Kruer, Taylor, and Zukowski) testified that Gender Support Plans were never sent to teachers. (Hearing Tr. at 15, 43, 69, 79). More specifically, Taylor and Zukowski explained that, after a counselor met with a student to complete a Gender Support Plan, the counselor would only share the student's requested name or pronouns with their teachers, not their Gender Support Plan. (*Id.* at 69, 80, 85). Based on this testimony, it was reasonable for the School Board to find that Statement 1 was false in part because Gender Support Plan "documents [were] not provided to teachers," and teachers were only "informed if a

23

student ha[d] requested a change in name and/or pronouns." (Board Findings & Conclusions at ECF p. 203).

   b.    *Statement 2: "McCord said she and another counselor have access to such plans but teachers, parents, and the public do not, which she strongly disagrees with."*

Turning to Statement 2, several witnesses (Zukowski, Rose, and Taylor) testified at the Hearing that parents could access Gender Support Plans if they asked about them. (Hearing Tr. at 16, 69, 80). Similarly, Kruer testified that he told counselors to "tell the truth" about a student's gender-related accommodations "if a parent contacted them regarding" those accommodations. (*Id.* at 46). This was sufficient for the School Board to reasonably conclude that Statement 2 was "partially untrue" because "[p]arents can access the plans." (Board Findings & Conclusions at ECF p. 203). Of course, McCord expressed her concern at the Hearing that "when parents don't know the plan exists, they don't know to ask about it." (Hearing Tr. at 133, 151–52). But that observation does not affect the reasonableness of the School Board's conclusion that parents can access the forms.

   c.    *Statement 3: "McCord and another counselor who wished to remain anonymous confirmed that Andrew Kruer, the assistant superintendent in charge of the counseling department, told the counseling staff that this gender support policy was 'board-approved.'"*

With respect to Statement 3, Kruer testified that he never told counselors that "the school board had an approved gender support policy." (Hearing Tr. at 50). Likewise, Taylor and Zukowski testified that Kruer never told them that there was a board-approved policy. (*Id.* at 70, 80). At the Hearing, McCord seemed to agree with the other

counselors, testifying that she did not "know if [Kruer] said in those words that [the Directive] is a board-approved policy" or if "it was ever said" that the Directive was "a board-approved policy." (*Id.* at 143). Rather, she testified that "it was conveyed to [counselors] several times" that they had to comply with the Directive because "legal says we have to" and that it was "interpreted to [counselors] as" an approved policy. (*Id.*). From this testimony, it was reasonable for the School Board to find that Statement 3 was false in part because Kruer "did not say the policy was board-approved, as it is not a policy and as such is not approved by the board." (Board Findings & Conclusions at ECF p. 203). The reasonableness of this conclusion is only enhanced by the fact that the School Board itself is the best source of information about what policies or directives are not School Board-approved.

> d.     Statement 4: "Indiana law . . . doesn't give counselors the
>        authority to diagnose or treat gender dysphoria. McCord and
>        other counselors told The Daily Signal the current South
>        Madison policy requires counselors to do so."

Regarding Statement 4, Taylor and Zukowski explained at the Hearing how name and pronoun change requests were handled during the fall 2022 semester: A counselor would first meet with the requesting student, then complete a Gender Support Plan with the student, and then inform the student's teachers about their requested name or pronouns. (Hearing Tr. at 69, 74–75, 80, 85). Kruer testified that the Gender Support Plan form does not mention gender dysphoria and that he never told counselors that they "need[ed] to diagnose and treat gender dysphoria." (*Id.* at 51). Further, because Hall showed the School Board the Gender Support Plan form when it was first implemented,

they would have known that form did not require counselors to make any particular diagnosis in order to complete the form or assist students with their accommodation requests.  For their part, Taylor and Zukowski testified that they were not expected to diagnose or treat gender dysphoria as school counselors.  (*Id.* at 70, 81–82).  McCord disagreed.  She testified at the Hearing that, after doing research in the weeks leading up to the Hearing, she believed that counselors were treating transgender students by participating in the Directive.  (*Id.* at 152 ("I've had seven weeks to do a little research on this[;] socialization is the first step of treatment for transgender kids. . . . We are allowing that to happen in our school . . . . That's a treatment in my book.")).

Given the School Board's familiarity with the Gender Support Plan form and the witness testimony at the Hearing about how the Directive functioned in practice, it was reasonable for the School Board to find that that Statement 4 was false because the "district does not have a policy requiring counselors to diagnose or treat gender dysphoria."  (Board Findings & Conclusions at ECF p. 203).  Although McCord's testimony at the Hearing and her arguments at summary judgment suggest that she personally believes that she was treating gender dysphoria by participating in the Directive, her "subjective beliefs about the veracity of" Statement 4 "don't matter" in the court's analysis.[6]  *McWilliams*, 2022 WL 17605393, at *9 (citing *Swetlik*, 738 F.3d at

---

[6] In arguing that the School Board's finding was unreasonable, McCord cites to Dr. Levine's expert report, which states that changing a student's name or pronouns for gender-related reasons "strongly disposes the child and family to desire and receive puberty blockers, cross-sex hormones and surgical interventions."  (Levine Expert Report at ECF pp. 27–28).  The court does not consider this report because it was not before the School Board at the time of the termination decision.

828).  In any event, her testimony about *treating* gender dysphoria certainly does not affect the reasonableness of the School Board's conclusion about counselors not *diagnosing* gender dysphoria.

> e.   *Statement 5: "McCord also described how she was ordered to compel speech from teachers by requiring them to use one set of names and pronouns with students and another with parents."*

Finally, the court considers Statement 5.  At the Hearing, Kruer and Zukowski both shared their opinions that counselors were never ordered to compel the speech of teachers.  (Hearing Tr. at 52, 71).  Taylor testified that he had been ordered, at some point, to compel teachers' speech.  (*Id.* at 83 (Q: "[H]ave you ever been compelled or been ordered to compel the speech of other teachers?"  A: "Yeah."  Q: "Do you have the authority to compel the speech of other teachers in your role as guidance counselor?"  A: "Not all the time.").  Generally though, Taylor and Zukowski's testimony showed that all a counselor was required to do after meeting with a student was inform the student's teachers about their requested name and pronouns.  With this understanding of the Directive, it was reasonable for the School Board to find that Statement 5 was false in part because "[n]o counselor was told to compel the speech of teachers."  (Board Findings & Conclusions at ECF p. 204).

Having determined that the School Board was aware of sufficient facts to support its findings that the five statements contained false information, the court concludes that the School Board "reasonably believed, after an adequate investigation," that McCord's speech was false.  *Swetlik*, 738 F.3d at 828.

Ordinarily, when engaging in *Pickering* balancing, the court weighs several factors. *See Harnishfeger*, 943 F.3d at 1115 (listing seven factors). However, the court need not do so here. An employee fails *Pickering* balancing if her employer "takes action against [her] for speech that the employer, based on an adequate investigation, reasonably believes to be false." *Swetlik*, 738 F.3d at 825; *see also Wright*, 40 F.3d at 1506 (noting this can "be the decisive factor in the *Pickering* balance"). Therefore, McCord's First Amendment retaliation claim fails. South Madison is entitled to summary judgment on this claim, and McCord is not.

### B.    *Monell* Liability

South Madison seeks summary judgment on McCord's remaining federal claims—her compelled speech, viewpoint discrimination, and free exercise claims—on the basis that she has failed to establish that South Madison is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

To succeed on her *Monell* claims, McCord must show that South Madison "adopted a policy or custom that resulted in the deprivation of [her] constitutional rights." *Bennett v. Roberts*, 295 F.3d 687, 699 (7th Cir. 2002). To do so, McCord must show that the alleged constitutional violation "was caused by (1) an express government policy; (2) a widespread and persistent practice that amounted to a custom approaching the force of law; or (3) an official with final policymaking authority." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021). South Madison argues that McCord has failed to show that her compelled speech, viewpoint discrimination, and free exercise

claims resulted from a South Madison policy, widespread practice or custom, or person with final policymaking authority.

There is sufficient evidence in the record for a reasonable factfinder to conclude that the Directive was at least a widespread practice or custom. McCord points to evidence that the Directive was implemented on a district-wide basis. (*See, e.g.*, Training Doc. at ECF pp. 129–31 (South Madison's response to Office of Civil Rights investigation suggesting the Directive was a district-wide practice); South Madison Resp. to Interrogs. at ECF p. 10 (stating "the district started using a Gender Support Plan document" in September 2021); Hall Dep. at 52–53 (indicating Pendleton Heights and middle school used Gender Support Plan forms)). This is sufficient to demonstrate that there is a South Madison "policy at issue rather than a random event or even a short series of random events." *Bridges v. Dart*, 950 F.3d 476, 479 (7th Cir. 2020). Accordingly, South Madison is not entitled to summary judgment on McCord's compelled speech, viewpoint discrimination, and free exercise claims on this basis.

### C.    Compelled Speech

McCord brings a compelled speech claim against South Madison, asserting that, by requiring her to inform other staff members about students' gender-related name and pronoun changes without notifying parents, South Madison compelled McCord to speak in support of lying to parents, which is a message she disagreed with. South Madison moves for summary judgment on this claim. In response, McCord argues that she instead is entitled to summary judgment.

29

The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Therefore, the government cannot compel an individual "to mouth support for views" with which they disagree. *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018). School employees, including counselors, do not "shed their constitutional rights to freedom of speech . . . at the schoolhouse gates." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969); *see Janus*, 585 U.S. at 908. That said, a school, like any public employer, "may insist that [an] employee deliver any lawful message" so long as "the speech in question is part of [the] employee's official duties." *Kilborn v. Amiridis*, 131 F.4th 550, 562 (7th Cir. 2025) (quoting *Janus*, 585 U.S. at 908).

South Madison argues that, through the Directive, it only asked McCord to deliver a lawful message pursuant to her official duties. McCord disagrees, arguing that she did not speak pursuant to her official duties and that South Madison's message was unlawful. The court agrees with South Madison.

### 1.    *Official Duties*

First, the court considers whether McCord spoke pursuant to her official duties as a school counselor. To make this determination, the court makes "a practical inquiry into what duties" she was "expected to perform," without limiting itself to her "formal job description." *Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008). Here, the record reflects that McCord's duties as a school counselor included helping students with personal and academic issues, as well as communicating with teachers and parents about

their students.  Reporting students' name and pronoun changes to teachers pursuant to the Directive therefore falls squarely within McCord's official duties.

McCord resists this conclusion by arguing that the Directive's requirement that she share this information with teachers without notifying parents cannot possibly fall within her official duties because she ordinarily was not required to hide information from or lie to parents.  The court disagrees.  A school counselor's duty to communicate with parents necessarily includes decisions about what *not* to share with parents.  *See, e.g.*, *Polk v. Montgomery Cnty. Pub. Schs.*, No. DLB-24-1487, 2025 WL 240996, at *12 (D. Md. Jan. 17, 2025) (reasoning teacher's speech pursuant to policy restricting telling "parents about their child's gender identity without the student's consent" fell within her official duties because "communicating with parents . . . is 'part and parcel' of a teacher's responsibilities" (quoting *Coomes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1264 (9th Cir. 2016))); *Willey v. Sweetwater Cnty. Sch. Dist. #1 Bd. of Trs.*, No. 23-CV-0069-SWS, 2023 WL 9597101, at *8 (D. Wyo. Dec. 18, 2023) (concluding teacher keeping students' name and pronoun changes private was speech pursuant to official duties because "communicating with parents . . . is part of a teacher's official duties").

### 2. *Lawful Message*

Next, the court turns to the question of whether South Madison sought to compel McCord to deliver an unlawful message.

McCord argues that the message South Madison insisted that she deliver was unlawful.  Specifically, she argues that the Directive required her to lie to parents about their children and that this deception violated parents' constitutional rights to direct the

31

care and upbringing of their children.  To make this argument, McCord relies on *Mirabelli v. Olson*, where the court concluded the teacher-plaintiffs adequately alleged a free speech claim, reasoning that the policy at issue violated parents' constitutional right "to be accurately informed by public school teachers about their student's gender incongruity" or other health matters.  761 F. Supp. 3d 1317, 1330–32 (S.D. Cal. 2025).  However, in that case, the policy at issue barred teachers entirely from telling parents about a student's "gender incongruity" without the student's permission, and this allegedly resulted in teachers directly lying to parents who asked about their child's gender identity.  *Id.* at 1322–23, 1325, 1330.  Here, although the Directive did not require parental notification to "grant" a student's name or pronoun change request, it did require school staff, including McCord and other counselors, to tell parents about their children's requests if they asked.

Ultimately, all the Directive required McCord to do was meet with her students who made gender-related name or pronoun change requests and to inform those students' teachers of their requested name or pronouns and whether their parents were supportive of the request.  McCord was merely required to report accurate, truthful information from her meetings with students to teachers.  Although she did not initially contact parents, she was required to tell parents about their child's name or pronouns if they asked.  Nothing about the Directive required McCord to directly lie to parents or to endorse an unlawful message.

Even viewing the facts in the light most favorable to McCord, the record shows that South Madison required McCord to deliver a lawful message pursuant to her official

duties.  Therefore, South Madison is entitled to summary judgment on McCord's compelled speech claim.

### D.    Viewpoint Discrimination

Next, McCord asserts that South Madison threatened to punish her and eventually terminated her because of her viewpoint that students should not be socially transitioned without parental notice or consent.  McCord frames this claim as a viewpoint discrimination claim, arguing that South Madison's targeting of her viewpoint is presumptively unconstitutional.  *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) (stating viewpoint discrimination "is presumed to be unconstitutional").  South Madison moves for summary judgment on this claim, arguing that, because McCord's speech occurred in the course and scope of her employment, the court should apply *Garcetti* and the First Amendment retaliation framework to this claim. In response, McCord briefly argues she is entitled to summary judgment on this claim instead.  The court agrees with South Madison.

Viewpoint discrimination occurs when the government discriminates among viewpoints or regulates speech based on "the specific motivating ideology or the opinion or perspective of the speaker." *Id.* at 829.  Thus, viewpoint discrimination claims typically involve a law or regulation that restricts or limits speech. *See, e.g.*, *Brown v. Kemp*, 86 F.4th 745, 756, 778 (7th Cir. 2023) (involving state law criminalizing photographing, filming, or confronting hunters).  Here, McCord does not allege that she was restricted from expressing her views about a topic.  Instead, she alleges that she was punished by her employer for her viewpoint, which "is a retaliation theory of liability, not

a theory implicating content or viewpoint discrimination." *Manchester v. Town of Ludlow*, No. 23-30117-MGM, 2025 WL 1208717, at *5 (D. Mass. Apr. 25, 2025).

Supreme Court precedent makes clear that "constitutional review of government employment decisions must rest on different principles than review of speech restraints imposed by the government as sovereign." *Waters*, 511 U.S. at 672–74; *see Pickering*, 391 U.S. at 568; *Garcetti*, 547 U.S. at 418–19. Therefore, the First Amendment retaliation framework set forth in *Garcetti* and *Pickering* is the appropriate standard to apply to McCord's "viewpoint discrimination" claim involving allegedly speech-based employment decisions. *See Garcetti*, 547 U.S. at 419; *Pickering*, 391 U.S. at 568; *see also, e.g.*, *Kluge v. Brownsburg Cmty. Sch. Corp.*, 432 F. Supp. 3d 823, 839 (S.D. Ind. 2020 (applying *Garcetti* to viewpoint discrimination claim); *Damiano v. Grants Pass Sch. Dist. No. 7*, 140 F.4th 1117, 1149 (9th Cir. 2025) (noting plaintiff's First Amendment retaliation and viewpoint discrimination claims were both "subject to the *Pickering* analysis"); *Cochran v. City of Atlanta*, 289 F. Supp. 3d 1276, 1292–94 (N.D. Ga. 2017) (applying *Pickering* to plaintiff's viewpoint discrimination claim asserting public employer suspended and fired him because it disagreed with a book he published).

Accordingly, for McCord's claim to be successful, she must show that she spoke (1) as a private citizen (2) about a matter of public concern. *Garcetti*, 547 U.S. at 419. South Madison argues that McCord's claim fails because (1) she spoke pursuant to her official duties as a school counselor and (2) her speech did not address a matter of public concern because it only involved assisting students with accommodation requests. McCord devotes only two paragraphs to her viewpoint discrimination claim and does not

respond to South Madison's arguments regarding *Garcetti*'s application to this claim. McCord's failure to respond to South Madison and to develop her arguments constitutes waiver. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 462 (7th Cir. 2010); *Puffer v. Allstate Ins.*, 675 F.3d 709, 718 (7th Cir. 2012). In any event, the court already concluded above that McCord's speech was made pursuant to her official duties. Therefore, South Madison is also entitled to summary judgment on McCord's viewpoint discrimination claim.

### E.    Free Exercise of Religion and RFRA

Finally, McCord brings claims under the Free Exercise Clause of the First Amendment and Indiana's RFRA, asserting that South Madison burdened her right to exercise her Christian beliefs about not lying to parents. South Madison moves for summary judgment on these claims. In response, McCord argues she instead is entitled to summary judgment. Having reviewed the record, the court concludes there are material disputes of fact that preclude summary judgment for either party on these claims.

The First Amendment's Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amend. I. A plaintiff may prove a free exercise claim "in various ways, including by showing that a government entity has burdened h[er] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (quoting *Emp. Div., Dep't of Hum. Res. of Ore. v. Smith*, 494 U.S. 872, 877 (1990)). If she makes such a showing, the court "will find a First Amendment violation"

35

unless the government satisfies strict scrutiny by "demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Id.*

Similarly, RFRA provides that "a governmental entity may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability," unless it "demonstrates that application of the burden to the person: (1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that" interest. Ind. Code § 34-13-9-8(a)–(b). Thus, for a RFRA claim, a plaintiff must first show that "the disputed governmental action substantially burden[ed]" her "sincerely held religious belief." *Blattert v. Indiana*, 190 N.E.3d 417, 421 (Ind. Ct. App. 2022) (citing *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 705 (2014)). Then, the burden shifts to the government to establish that application of the challenged law to the plaintiff satisfies a compelling government interest and that the substantial burden is the least restrictive means of furthering that interest. *Id.*

McCord contends that the undisputed facts reveal that South Madison substantially burdened her free exercise of religion. She insists that it is undisputed that she believed that participation in the Directive required her to lie in violation of her Christian beliefs. At times, McCord has been clear that she believed that the Directive required lying. (*See, e.g.*, McCord Dep. at 159; Verified Compl. ¶¶ 324–25; Taylor Dep. at 70, 155). However, she also testified at the Hearing that the Directive "never said" that she and other school staff "were to lie to parents." (Hearing Tr. at 150; *see also id.* at 133 ("I just don't feel that this was the right thing to be keeping this from parents. And I know it's semantics, we're not lying to parents . . . .")). The court cannot resolve this inconsistency at

summary judgment. *See, e.g.*, *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014) (noting the court cannot, at summary judgment, "weigh evidence, make credibility determinations, [or] resolve fact disputes"); *Allen v. Chi. Transit Auth.*, 317 F.3d 696, 699–700 (7th Cir. 2003) (noting that, when a witness contradicts herself on material matters, her "credibility becomes an issue for the jury," not for the court at summary judgment).

Additionally, McCord contends that the Directive was unlawful and unconstitutional as applied to her. The parties appear to agree that McCord must show that she requested and was denied a religious accommodation or exemption under the Directive for a successful claim. *See Troogstad v. City of Chicago*, 576 F. Supp. 3d 578, 588 (N.D. Ill. 2021) (rejecting plaintiffs' as-applied free exercise claim because they had not "alleged that they ha[d] applied for an exemption from" the challenged policy, "let alone ha[d] been denied one"), *aff'd*, *Lukaszczyk v. Cook County*, 47 F.4th 587 (7th Cir. 2022). McCord insists that it is undisputed that she requested an accommodation, while South Madison insists it is undisputed that she did *not*. Neither party is correct. While there is evidence showing McCord shared her religious objections to the Directive with Taylor and Kruer, (*e.g.*, McCord Dep. at 45–49, 155–56), both Taylor and Kruer testified that they did not discuss religious objections to the Directive with McCord, (*e.g.*, Taylor Dep. at 156, 252; Kruer Dep. at 108, 188).

These are material factual disputes that preclude summary judgment for either party. Therefore, neither McCord nor South Madison is entitled to summary judgment on McCord's free exercise and RFRA claims.

IV.     **Conclusion**

Plaintiff's Motion for Partial Summary Judgment (Filing No. 49) is **DENIED**.

Plaintiff's Motion for Oral Argument (Filing No. 65) is **DENIED**.  Defendant's Motion to

Exclude Plaintiff's Expert Witness (Filing No. 51) is **DENIED as MOOT**.  Defendant's

Cross-Motion for Summary Judgment (Filing No. 58) is **GRANTED in part** and

**DENIED in part**.  Specifically, it is **GRANTED** as to McCord's First Amendment

retaliation claim (Count 1), compelled speech claim (Count 2), and viewpoint

discrimination claim (Count 3), but it is **DENIED** as to her free exercise claim (Count 4)

and state-law RFRA claim (Count 5).  McCord's free exercise and RFRA claims remain

in this action.

**IT IS SO ORDERED** this 15th day of August 2025.


RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record